ED 12

DOCKETED
MAR 2 5 2003

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

CLERK
U.S. DISTRICT COURT

| | | |
|---|---|---|
| RIDGE CHRYSLER JEEP, L.L.C., d/b/a MARQUETTE CHRYSLER JEEP AND SALES, INC., d/b/a DODGE OF MIDLOTHIAN, | ) ) ) ) ) | Case No. 03C00760 |
| Plaintiffs, | ) ) | U.S. District Judge Nordberg |
| v. | ) ) | United States. Magistrate Judge Sidney I. Schenkier |
| DAIMLERCHRYSLER SERVICES NORTH AMERICA LLC | ) ) ) | |
| Defendant. | ) ) | |

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAR 2 4 2003

FILED

## NOTICE OF FILING

TO:    Counsel of Record on Attached Service List

PLEASE TAKE NOTICE that on Monday, March 24, 2003, we filed with the Clerk of

the United States District Court for the Northern District of Illinois Eastern Division, the

attached Defendant DaimlerChrysler Services North America LLC's Answer to Plaintiffs'

Complaint, copies of which are hereby served upon you.

THOMPSON COBURN LLP

William R. Bay
Francis X. Buckley, Jr.
One U.S. Bank Plaza
St. Louis, Missouri 63101
314-552-6000
FAX 314-552-7010

OF COUNSEL:
THOMPSON COBURN LLP

12

GREENE AND LETTS
Martin P. Greene
Eileen M. Letts
111 West Washington Street, Suite 1650
Chicago, Illinois 60602
312-346-1100
FAX 312-346-4571

Attorneys for Defendant
DaimlerChrysler Services North America LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was mailed, United States postage prepaid, on March 24, 2003 to the following counsel of record for Plaintiffs:

Edward R. Vrdolyak
Nicholas Geanopoulos
EDWARD R. VRDOLYAK, LTD.
741 North Dearborn Street
Chicago, IL 60610

Steven W. Berman
Steven C. Mitchell
Christopher A. O'Hara
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

William Hooks
HOOKS LAW OFFICES, PC
29 S. LaSalle, Suite 333
Chicago, IL 60603

Eugene Pinchman
R. EUGENE PINCHAM, PC
9316 S. Michigan Ave.
Chicago, IL 60619



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RIDGE CHRYSLER JEEP, LLC, d/b/a )
MARQUETTE CHRYSLER JEEP, et al., )
)
Plaintiffs, )
)
v. )
)
DAIMLERCHRYSLER SERVICES )
NORTH AMERICA LLC, )
) Civil Action No. 03 C 00760
Defendant/Counterclaim Plaintiff, )
) Judge John A. Nordberg
v. )
) Magistrate Sidney I. Schenkier
RIDGE CHRYSLER PLYMOUTH, LLC, d/b/a )
MARQUETTE CHRYSLER JEEP, )
)
SALES, INC., d/b/a DODGE OF MIDLOTHIAN, ) **DEFENDANT DEMANDS**
) **TRIAL BY JURY**
GERALD W. GORMAN, )
)
and )
)
ELIZABETH A. GORMAN, )
)
Counterclaim Defendants. )

## DEFENDANT DAIMLERCHRYSLER SERVICES NORTH AMERICA LLC'S ANSWER TO PLAINTIFFS' COMPLAINT

For its answer to Plaintiffs' complaint, Defendant DaimlerChrysler Services North

America LLC, d/b/a Chrysler Financial (herein "Chrysler Financial"), states as follows:

### I.  NATURE OF THE ACTION

1.      In this case, two independently owned Chrysler automobile dealerships bring suit
against Chrysler over a disturbing record of breached contracts, broken promises, forced
"agreements" brokered through threats, intimidation and coercion, and a shocking corporate

policy of blatant racial discrimination and redlining.[1]  ([1]The victims of the redlining practice
have brought a separate lawsuit to redress the wrongs they have suffered.)

      **Answer:**      Chrysler Financial denies each and every allegation of Paragraph 1.

      2.      Both dealerships are owned by the same individual.  Both have signed "Financing
Agreements" with Chrysler, whereby Chrysler agrees to buy sales contracts from the dealerships,
which evidence the sale of new and certain used vehicles from the dealerships to its consumer
customers.  When Chrysler agrees to buy a sales contract, it provides financing for the dealership
customer's vehicle purchase.

      **Answer:**      Chrysler Financial admits that Plaintiffs entered into agreements with

Chrysler Financial that give Chrysler Financial the option to accept or decline to take an

assignment of retail installment contracts that Plaintiffs propose to enter into with their

customers and thereafter sell to Chrysler Financial.  Chrysler Financial refers to those

agreements for an accurate statement of their contents and, therefore, denies Plaintiffs'

characterizations concerning them.  Chrysler Financial admits that it has purchased and taken an

assignment of certain retail installment contracts from Plaintiffs.  Chrysler Financial denies each

and every allegation in Paragraph 2 not expressly admitted herein.

      3.      In theory, Chrysler will buy sales contracts and provide financing for those
customers it deems to be credit worthy.  Chrysler determines credit worthiness using a formula in
its computer program, which is known as "ACE."

      **Answer:**      Chrysler Financial admits that dealers enter into agreements with Chrysler

Financial that give Chrysler Financial the option to accept or decline to take an assignment of

retail installment contracts that the dealers propose to enter into with their customers and

thereafter sell to Chrysler Financial.  Chrysler Financial refers to those agreements for an

accurate statement of their contents and, therefore, denies Plaintiffs' characterizations concerning

them.  Chrysler Financial admits that it has purchased and taken an assignment of certain retail

installment contracts from dealers.  Chrysler Financial admits that it processes retail credit

2074845

applications that it receives from dealers through a computer software application called the

Automated Credit Evaluation ("ACE") System. Chrysler Financial admits that the ACE System

calculates scores and grades for retail credit applications based on the information entered into

the ACE System by dealers, credit history information obtained by the ACE System from

third-party credit bureaus, and "FICO" credit scores obtained by the ACE System from a

third-party credit scoring company. Chrysler Financial admits that it decides whether to

purchase and take assignments of retail installment contracts proposed by dealers based upon the

creditworthiness of the transaction being proposed by the dealer, as determined by the scores and

grades calculated by the ACE System and the creditworthiness of the dealer's customer, relative

to the specific context of the business transaction. Chrysler Financial denies each and every

allegation in Paragraph 3 not expressly admitted herein.

4.    The dealerships, however, were recently told by Chrysler that Chrysler would not
buy contracts and provide financing for non-suburban, African-American customers, regardless
of their creditworthiness.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 4.

5.    Moreover, the dealerships were also informed that they would be held responsible
for financial losses allegedly suffered in connection with a series of sales made by one of the
dealerships to predominantly African-American customers. Chrysler claimed that one of its own
African-American employees fraudulently manipulated its ACE program in order to get these
specific customers qualified for Chrysler financing. Without even attempting to prove any
wrongdoing on the part of the dealerships, and while acknowledging that its own employee was
responsible for the alleged fraud, Chrysler forced the dealerships by threats, coercion and
intimidation to agree to accept "full recourse" for these "nigger deals," [2] ([2]Throughout this
complaint plaintiffs use language that is painful to use the shocking to the conscience.
However, those words are an accurate depiction of what was said by Chrysler executives and
their repetition is necessary in order to fully describe the facts underlying this action.) and to
suffer the brunt of financial losses associated therewith. Chrysler promised to assist in specific
ways in mitigating the losses that the dealerships would incur through this coerced agreement.
Chrysler, however, quickly and repeatedly failed to deliver on its promise to help mitigate the
losses.

**Answer:**        Chrysler Financial admits that it has informed Marquette that, pursuant to

the terms of Marquette's agreements with Chrysler Financial, Marquette is fully liable for the

unpaid balances due on a number of retail installment contracts that Marquette fraudulently

induced Chrysler Financial to buy from it (the so-called "fraud deals") to the extent that the

contracts are not collectable from the borrowers. Chrysler Financial is unaware of the race of the

customers to those retail installment contracts and therefore denies Plaintiffs' allegations

regarding same. Chrysler Financial denies each and every allegation in Paragraph 5 not

expressly admitted herein.

6.        Instead, Chrysler has simply and repeatedly demanded full payment from the
dealerships to cover Chrysler's losses associated with the "nigger deals." When the dealerships
eventually balked at continuing to make large payments to Chrysler under this coerced
agreement and attempted to explain the unfairness of the situation to Chrysler, Chrysler
threatened to stop buying any contracts from one of the two dealerships, which happens to have a
predominantly African-American customer base. Chrysler has made good on this threat.

**Answer:**        See answer to Paragraph 5. Chrysler Financial denies each and every

allegation in Paragraph 6 not expressly admitted herein.

7.        Chrysler has taken further action against the plaintiff dealerships in forcing
reductions in inventory floor plans and failing to support those floor plans, forcing a costly
advancement of its lien holder position, severely restricting the ability to order new cars from the
factory and threatening and taking specific action to force one of the dealerships out of business.
All of these actions were done in a coercive and retaliatory attempt to force payment on the
"nigger deals," and/or to obtain a "full release" from the dealerships, which would insure that
Chrysler's racist attitudes and discriminatory lending practices remain under wraps.

**Answer:**        Chrysler Financial admits that in December 2002, it placed Midlothian on

"finance prior approval," which generally means that Midlothian's floor plan lines of credit were

modified to require prior approval by Chrysler Financial in advance of extending credit for

specific vehicle purchases. Chrysler Financial placed Midlothian on "finance prior approval"

because Midlothian has breached its lending agreements with Chrysler Financial. Chrysler

Financial denies each and every allegation in Paragraph 7 not expressly admitted herein.

8.      As a result of the conduct explained above and more fully explained below, the dealerships have suffered financially and now bring this action to recover their associated financial losses. Plaintiffs assert that Chrysler's willful and reckless conduct constitutes breach of contract, tortious interference with prospective business or economic advantage and violates the Automobile Dealer's Day in Court Act ("ADDCA"), 15 U.S.C. § 1221, *et seq.*, as well as the Illinois Motor Vehicle Franchise Act ("IMVFA"), 815 I.L.C.S. 710(4)(d)(4).

        **Answer:**      Chrysler Financial denies each and every allegation in Paragraph 8.

9.      Plaintiffs seek monetary damages and injunctive relief, treble damages under the Illinois Motor Vehicle Franchise Act, 815 I.L.C.S. 710(4)(d)(4), additional punitive damages, attorneys' fees and costs.

        **Answer:**      Chrysler Financial admits that Plaintiffs seek relief, but deny they are

entitled to any such relief. Chrysler Financial denies each and every allegation in Paragraph 9.

## II.      JURISDICTION

10.      Plaintiff's allege an amount in controversy in excess of Seventy Five Thousand Dollars ($75,000.00), exclusive of interests and costs.

        **Answer:**      Chrysler Financial admits that the amount in controversy exceeds $75,000,

exclusive of interest and costs. Chrysler Financial denies each and every allegation in

Paragraph 10 not expressly admitted herein.

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds the Seventy Five Thousand Dollars ($75,000.00) for each plaintiff and because there is complete diversity of citizenship between each plaintiff and defendant. Venue is properly laid in this Court as defendant has offices and conducts business in this district.

        **Answer:**      Plaintiffs' complaint fails to adequately plead the basis for the Court's

jurisdiction. Nevertheless, Chrysler Financial admits that the Court has subject matter

jurisdiction over this action pursuant to: (a) 28 U.S.C. § 1331 (federal question) because Count

III of the complaint alleges a violation of the Automobile Dealer's Day in Court Act, 15 U.S.C.

2074845                                    - 5 -

§ 1221 *et seq.* (the "Dealer Act" or the "ADDCA"); and (b) 28 U.S.C. § 1332(a)(1) (diversity jurisdiction) because Plaintiffs are deemed to be citizens of the State of Illinois, Chrysler Financial is deemed to be a citizen of the States of Delaware and Michigan, and the amount in controversy, exclusive of interest and costs, exceeds $75,000. Marquette is a limited liability company. Gerald Gorman and Elizabeth Gorman are the members of Marquette and are citizens of the State of Illinois. Marquette, therefore, is deemed to be a citizen of the State of Illinois. Midlothian is a corporation organized under the laws of the State of Illinois having its principal place of business in the State of Illinois. Midlothian, therefore, is deemed to be a citizen of the State of Illinois. Chrysler Financial is a Michigan limited liability company. Its sole member is DaimlerChrysler Corporation, which is a corporation organized under the laws of the State of Delaware having its principal place of business in the State of Michigan. Chrysler Financial, therefore, is deemed to be a citizen of the States of Delaware and Michigan. Chrysler Financial admits that venue is proper in this judicial district. Chrysler Financial denies each and every allegation in Paragraph 11 not expressly admitted herein.

### III.    PARTIES

12.     Plaintiff Ridge Chrysler Jeep, L.L.C., formerly d/b/a, Marquette Chrysler Jeep ("Marquette dealership"), was a Chrysler automobile dealership in Chicago, Illinois.

<u>Answer:</u>     Chrysler Financial denies that there is any entity known as "Ridge Chrysler Jeep, L.L.C." The correct legal name of Marquette is "Ridge Chrysler Plymouth, LLC." Chrysler Financial admits that Marquette was formerly an automobile dealer located in Chicago, Illinois, and had a franchise agreement with DaimlerChrysler Motors Company. Chrysler Financial denies each and every allegation in Paragraph 12 not expressly admitted herein.

2074845

- 6 -

13.    Plaintiff Sales, Inc., d/b/a, Dodge of Midlothian ("Midlothian dealership") is a Chrysler automobile dealership in Midlothian, Illinois.

**Answer:**    Chrysler Financial admits that Midlothian is currently an automobile dealer located in Midlothian, Illinois, and has a franchise agreement with DaimlerChrysler Motors Company.  Chrysler Financial denies each and every allegation in Paragraph 13 not expressly admitted herein.

14.    Defendant DaimlerChrysler Services North America, L.L.C., d/b/a Chrysler Financial Company, L.L.C. ("Chrysler") has its principal place of business in Farmington Hills, Michigan, just outside of Detroit, and at all relevant times was and is a corporation organized under the laws of the state of Delaware and is engaged in the business of providing brand specific financing for automotive dealer inventories and retail customers.  Said defendant is qualified to do business in the State of Illinois.

**Answer:**    Chrysler Financial admits that its principal place of business is in Farmington Hills, Michigan.  Chrysler Financial admits that its business is: (a) to provide wholesale inventory financing to automobile dealers; and (b) to indirectly provide retail financing by purchasing retail installment contracts from dealers.  Chrysler Financial admits that it is qualified to do business in the State of Illinois.  Chrysler Financial denies each and every allegation in Paragraph 14 not expressly admitted herein.

## IV.    FACTS UPON WHICH CLAIMS FOR RELIEF ARE BASED

15.    In February 1999, Gerald Gorman purchased the Marquette Chrysler Jeep dealership ("Marquette dealership") at 6515 South Western Avenue in Chicago, Illinois.  The customer base for the Marquette dealership is roughly ninety percent (90%) African-American. Mr. Gorman has been affiliated with Chrysler as a Dodge dealership owner since June of 1990.

**Answer:**    Chrysler Financial admits that Mr. Gorman and John Barnard acquired the Marquette dealership in February 1999 and that Mr. Gorman acquired an ownership interest in Suburban Dodge of Berwyn (Illinois) in 1990.  Chrysler Financial lacks any knowledge of the race of Marquette's customers and therefore specifically denies any allegations concerning the

2074845                                             - 7 -

same. Chrysler Financial is without knowledge or information sufficient to form a belief as to

the truth of the remaining allegations in Paragraph 15 not expressly admitted herein and therefore

Chrysler Financial denies each and every allegation in Paragraph 15 not expressly admitted

herein.

16. In September 2000, Mr. Gorman purchased the Dodge of Midlothian dealership ("Midlothian dealership") at 14500 South Cicero Avenue in Midlothian, Illinois, just outside of Chicago. The customer base for the Midlothian dealership is roughly thirty percent (30%) African-American.

**Answer:** Chrysler Financial admits that Mr. Gorman acquired the Midlothian

dealership in September 2000. Chrysler Financial lacks any knowledge of the race of

Midlothian's customers and therefore specifically denies any allegations concerning the same.

Chrysler Financial is without knowledge or information sufficient to form a belief as to the truth

of the remaining allegations in Paragraph 16 not expressly admitted herein and therefore

Chrysler Financial denies each and every allegation in Paragraph 16 not expressly admitted

herein.

17. Both dealerships have entered into contracts with Chrysler to inventory and sell new and used vehicles manufactured by DaimlerChrysler.

**Answer:** Chrysler Financial admits that Marquette formerly had and that

Midlothian currently has a dealer franchise agreement with DaimlerChrysler Motors Company to

sell new vehicles manufactured by DaimlerChrysler Corporation. Chrysler Financial is not a

party to those dealer franchise agreements with DaimlerChrysler Motors Company. Chrysler

Financial denies each and every allegation in Paragraph 17 not expressly admitted herein.

18. Both dealerships have signed "Financing Agreements" with Chrysler, whereby Chrysler agrees to buy sales contracts from the dealerships, which evidence the sale of new and certain used vehicles from the dealerships to its consumer customers. When Chrysler agrees to buy these sales contracts, it provides financing for the dealership customer's vehicle purchase.

**Answer:**        Chrysler Financial incorporates its answer to Paragraph 2 as and for its

answer to Paragraph 18. Chrysler Financial denies each and every allegation in Paragraph 18 not

expressly admitted herein.

19.    Specifically, Chrysler agrees to buy the dealerships' sales contracts and to provide
financing for those consumer customers who meet Chrysler's requirements for creditworthiness.
Chrysler and plaintiffs split the proceeds on the vehicle sale in accordance with the specific
terms of the agreement.

**Answer:**        Chrysler Financial incorporates its answer to Paragraph 2 as and for its

answer to Paragraph 19. Chrysler Financial denies each and every allegation in Paragraph 19 not

expressly admitted herein.

20.    Chrysler has a computer program called "ACE," which it uses to assess a
customer's creditworthiness. "ACE" stands for "Automated Credit Evaluation." The ACE
program is designed, in theory, to blindly assess a customer's objective financial condition and
credit history and to "grade" customers accordingly. Customers are graded using a traditional
letter scale of "A" to "F." It is Chrysler's policy and practice to buy dealership contracts and to
provide automobile purchase financing *at premium rates* for customers for whom the ACE
program has assigned grades of "B" or higher.

**Answer:**        Chrysler Financial admits that it processes retail credit applications that it

receives from dealers through a computer software application called the Automated Credit

Evaluation ("ACE") System. Chrysler Financial admits that the ACE System calculates scores

and grades for retail credit applications based on the information entered into the ACE System

by dealers, credit history information obtained by the ACE System from third-party credit

bureaus, and "FICO" credit scores obtained by the ACE System from a third-party credit scoring

company. Chrysler Financial admits that it decides whether to purchase and take assignments of

retail installment contracts proposed by dealers based upon the creditworthiness of the

transaction being proposed by the dealer, as determined by the scores and grades calculated by

the ACE System and the creditworthiness of the dealer's customer, relative to the specific

context of the business transaction. Chrysler Financial denies each and every allegation in

Paragraph 20 not expressly admitted herein.

21.     Those customers who are not approved for financing and whose contracts are not bought by Chrysler typically attempt to receive financing for their automobile purchases through commercial banks and other lending institutions and typically end up paying higher interest rates that are generally available through the manufacturer. Other customers who are not approved for financing by Chrysler end up either not buying a vehicle at all or end up going to different dealerships or manufacturers for their vehicle purchases. This is particularly true for customers seeking to take advantage of special, low-rate, factory-incentive financing offered by Chrysler.

    **Answer:**     Chrysler Financial is without sufficient knowledge to form a belief as to

the truth of the matters alleged in Paragraph 21 and therefore denies each and every allegation in

Paragraph 21.

22.     Because of the nature of the dealership relationship with Chrysler and the agreements governing that relationship, Chrysler dealerships, including those owned by Gerald Gorman, typically make more money on vehicle sales to customers whose contracts are bought by Chrysler and who receive purchase financing from Chrysler rather than sales to customers who receive financing from other sources.

    **Answer:**     Chrysler Financial is without sufficient knowledge to form a belief as to

the truth of the matters alleged in Paragraph 22 and therefore denies each and every allegation in

Paragraph 22.

23.     In selling customer sales contracts to Chrysler, Mr. Gorman's dealerships work with Chrysler management and "buyers" working out of Chrysler's Lisle, Illinois office. Chrysler's Lisle office, just outside of Chicago, is headquarters for Chrysler's "Chicago Zone," which is the Chrysler corporate sales region encompassing the entire state of Illinois and part of Iowa.

    **Answer:**     Chrysler Financial admits that Plaintiffs have transacted business with it at

its office in Lisle, Illinois, which is the location of its "Chicago Zone" regional office. Chrysler

Financial denies each and every allegation in Paragraph 23 not expressly admitted herein.

24.     In roughly mid January 2001, Mr. Gorman received a phone call from Don Spaniak, Chrysler's Dealer Sales Manager for the Chicago Zone and the number-two person in hierarchy at Chrysler's Lisle office. Mr. Spaniak indicated at this time that there was a problem

with certain sales contracts that had been sold to Chrysler by the Marquette dealership and that the Chicago Zone Manager wanted to set up a meeting with Mr. Gorman to discuss it.

**Answer:**     Don Spaniak was the Sales Manager for Chrysler Financial's Chicago

Zone in January 2001. He is no longer employed by Chrysler Financial. Consequently, Chrysler

Financial is without knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 24 not expressly admitted herein and therefore denies each and every

allegation in Paragraph 24 not expressly admitted herein.

25.     A few days later, the Zone Manager, Chrysler's top person in the Chicago Zone, arrived at Mr. Gorman's office accompanied by Mr. Spaniak and by Bob Hickey and Dan Howard, also from Chrysler's Lisle office. This Zone Manager had been with Chrysler for thirty-five years. Also present at this meeting was Shawn Temple, the Chief Financial Officer for the dealerships.

**Answer:**     Chrysler Financial admits that some of its employees met with

Mr. Gorman in January 2001. Chrysler Financial denies each and every allegation in

Paragraph 25 not expressly admitted herein.

26.     At this first meeting, the Zone Manager showed Mr. Gorman and Mr. Temple paperwork on roughly *thirty* Marquette dealership sales contracts that had been recently purchased by Chrysler. The Zone Manager claimed that these sales contracts should have never been accepted and purchaser by Chrysler and that they must have been "fraud deals." The thirty sales contracts in question were predominantly contracts with African-American or other minority customers.

**Answer:**     Chrysler Financial incorporates its answer to Paragraph 5 as and for its

answer to Paragraph 26. Chrysler Financial denies each and every allegation in Paragraph 26 not

expressly admitted herein.

27.     The Zone Manager then asked his employee, Dan Howard, an African-American, to leave the room. After Mr. Howard left the room, the Zone Manager stated that it was his opinion that these sales contracts had been accepted and bought by Chrysler because African-American employees of Chrysler and of the dealership were manipulating the computer system in order to get the deals approved.

2074845                                         - 11 -

**Answer:**      Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 27 and therefore denies each and every allegation

in Paragraph 27.

28.    Specifically, the Zone Manager stated:

> "This happened because all these niggers are involved. We found
> out these 'mulignons' [a derogatory racial slur] were getting
> bought and approved by Chrysler when they should be standing on
> the bus. And if it weren't for Rosa Parks those niggers would still
> be standing in the back of the bus. What's more embarrassing is
> that one of our dumbest niggers, Dan Howard, caught this before
> anyone else. Our nigger, Bruce Johnson, was manipulating our
> computer system to get these niggers bought [meaning, to get their
> financing approved]. I've fired our nigger and I want you to fire
> your niggers that were involved."

**Answer:**      Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 28 and therefore denies each and every allegation

in Paragraph 28.

29.    Mr. Gorman joked, "Well, we just had Christmas and maybe you guy thought he
was Saint Nick." The Zone Manager replied, "Come on, Gerry. No one believes that Santa
Clause is a nigger. Mr. Gorman then stated, "it sounds to me like you've got a problem." To
this, Zone Manager stated, "it's your problem." When Mr. Gorman questioned why it was his
problem, the Zone Manager explained:

> It's your problem because your niggers must be part of the scam.
> Do you really believe that these people really think that they
> should have a new car? These people shouldn't be able to get
> financing for a Schwin [bicycle]. Those niggers have never paid
> anyone. I hate computers. In the old days with the written logs I
> would have seen all these niggers getting bought [approved] and it

would have never gotten this far. I still can't believe that no one caught it earlier. My whole office knows that I don't buy nigger paper [meaning, "I don't approve financing for African-American customers"]. I might buy some niggers at a suburban store because at least they're smart enough not to get shot while trying to buy a car in the ghetto."

**Answer:** Erwin A. Sirovy was the Zone Manager at the time of the allegations in this paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 and therefore denies each and every allegation in Paragraph 29.

30. Mr. Gorman and Mr. Temple then suggested that if there had been fraud on the part of one of Chrysler's employees, then this was potentially a crime and that the proper authorities should be contacted. The Zone Manager refused, explaining, "Do you think you could put these niggers in front of a jury full of Cook County niggers and get a conviction? Are you out of your mind?"

**Answer:** Erwin A. Sirovy was the Zone Manager at the time of the allegations in this paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 and therefore denies each and every allegation in Paragraph 30.

31. Mr. Gorman and Mr. Temple then suggested that if there had been employee fraud, Chrysler could file an insurance claim. They explained that if it could be proven that there had been employee fraud, then Chrysler should have coverage under the employee dishonesty provisions in their policy and Chrysler would be protected from any losses. The Zone Manager again refused this suggestion, explaining that the insurer for the loss would be Chrysler Insurance Company and thus, making a claim would only shift the loss from Chrysler Financial to Chrysler Insurance. He further explained that his "boss," Thomas McAlear, was the head of both Chrysler Financial and Chrysler Insurance, therefore, he was formed to handle this "internally."

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in this paragraph. His employment with Chrysler Financial was terminated in May 2001. Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31 and therefore denies each and every allegation in Paragraph 31.

32.     While discussing Chrysler management, the Zone Manager explained his growing distaste for management ever since the merger between Chrysler and the German Daimler Corporation. As he stated, "there are only two things the Germans ever did: make good cars and kill Jews."

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in this paragraph. His employment with Chrysler Financial was terminated in May 2001. Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 and therefore denies each and every allegation in Paragraph 32.

33.     When the Zone Manager again demanded that Mr. Gorman fire his black employees, Mr. Gorman indicated that he had seen no proof that any of his employees had done anything wrong and insisted that he would not fire them. To this, the Zone Manager claimed that "your guys have to be involved and either they are paying for it or they are getting paid by the customers. Now let me talk to your 'moolies.'"

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in this paragraph. His employment with Chrysler Financial was terminated in May 2001. Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 and therefore denies each and every allegation in Paragraph 33.

34.     The term "moolies" and "mulignons" are offensive racial slurs used in the Chicago area as derogatory terms for African-Americans.

**Answer:**     Chrysler Financial is without knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 34 and therefore denies each and every

allegation in Paragraph 34.

35.     At that time, Mr. Gorman brought in the finance manager at the Marquette
dealership, who happens to be an African-American.  The Zone Manager showed the Marquette
finance manager the paperwork on the "fraud deals" in question and asked, "how did you get
these rats financed."  The finance manager replied, "I'm a good finance guy and I sent them in
[through Chrysler's ACE computer program] and they were bought [approved for financing by
Chrysler]."  When the Zone Manager challenged him on this, the finance manager again
explained, "I just send them in [through the ACE program] and if they get bought, then they get
bought and we sell them the car."

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph.  His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 35 and therefore denies each and every allegation

in Paragraph 35.

36.     The finance manager was then excused from the room, at which time the Zone
Manager stated, "who is that moolie kidding?  That f---er is involved.  Let me talk to your other
nigger."

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph.  His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 36 and therefore denies each and every allegation

in Paragraph 36.

37.     Mr. Gorman then bought in the sales manager for the Marquette dealership, who
is also African-American.  The Zone Manager showed the sales manager the paperwork on the
"fraud deals" in question and asked, "How did you sell all these new cars?  Who do you know or
do that other managers can't do to sell cars to these rats and to get them financed?"  The sales
manager answered that he did not appreciate the tone of the question and explained that, "it's
simple.  We sent the deals in [thru the ACE program] and they got bought."

2074845                                    - 15 -

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in this paragraph. His employment with Chrysler Financial was terminated in May 2001. Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 and therefore denies each and every allegation in Paragraph 37.

38.     The Zone Manager then asked the sales manager if he knew Bruce Johnson, the fired, black Chrysler employee who the Zone Manager had earlier accused of manipulating the computer program in order to provide financing to black customers who should not have otherwise qualified. The sales manager answered that he knew the name and knew that Mr. Johnson worked for Chrysler in their Lisle financial office. The Zone Manager asked the sales manager if he knew Bruce Johnson personally, whether they ever "hung out together" or frequented the same bar. The sales manager answered that he had never met Bruce Johnson and that he did not know him personally. At this, the Zone Manager stated, "Well, I see there is no use in talking to you," and excused the sales manager.

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in this paragraph. His employment with Chrysler Financial was terminated in May 2001. Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and therefore denies each and every allegation in Paragraph 38.

39.     The sales manager then began to leave the room and was only just outside the door when the Zone Manager exclaimed with yet another racial slur, "that shine is lying." After further discussion, the Zone Manager then suggested that the meeting be reconvened at the Chrysler Lisle office in a few days.

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in this paragraph. His employment with Chrysler Financial was terminated in May 2001. Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and therefore denies each and every allegation in Paragraph 39.

2074845                                    - 16 -

40.     In February 2001, Mr. Gorman and Mr. Temple met with the Zone Manager in his office at Chrysler's Lisle, Illinois offices, headquarters for Chrysler's "Chicago Zone." The Zone Manager began by handing over a list of all the Marquette dealership sales that the Zone Manager claimed were "frauds." The list of "fraud deals" had grown from roughly thirty to around fifty-eight. All of these sales were originally sold by the Marquette dealership on a "without recourse or payment obligation" basis. This means that in the event of a default on the part of the buying customer, Chrysler would carry the outstanding liability on the vehicle. At the end of the list was a demand calling for Mr. Gorman to agree to provide "full recourse" on the roughly fifty-eight sales and to pay off Chrysler's end of the financing. This would, in effect, change the terms of the sales contract, and would make the Marquette dealership liable to Chrysler for the remaining balanced owed on the vehicles.

**Answer:**     Chrysler Financial admits that in January or February 2001, its employees

presented Mr. Gorman with a list of 54 "fraud deals" perpetrated by Marquette as described in

the answer to Paragraph 5. Chrysler Financial admits that Marquette had originally assigned the

retail installment contracts for these "fraud deals" to it on a non-recourse basis, which means that

Marquette would not be liable for any unpaid amounts in the event that the borrowers defaulted

on the contracts. Under the terms of the assignments and Marquette's Vehicle Financing

Agreement with Chrysler Financial, the "fraud deals" became full recourse liabilities of

Marquette and Mr. Gorman (due to his personal guaranty of Marquette's indebtedness to

Chrysler Financial) because Marquette had submitted false information to Chrysler Financial in

connection with the "fraud deals." Chrysler Financial denies each and every allegation in

Paragraph 40 not expressly admitted herein.

41.     Mr. Gorman stated that he could not sign for full recourse on all these contracts, as it would be unfair and prohibitively expensive. To this, the Zone Manager stated, "well, you've got your niggers to thanks for that." Mr. Gorman reminded the Zone Manager that it was the Zone Manager's employee who was fired and whom the Zone Manager had originally accused of manipulating the computer system, and that nothing had been proven regarding Mr. Gorman's employees. The Zone Manager stated, "That's why I'll help you."

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 41 and therefore denies each and every allegation

in Paragraph 41.

42. Mr. Gorman again suggested at this time that he simply make an insurance claim on his policy with Chrysler Insurance for employee dishonesty to cover any losses associated with the "fraud deals." The Zone Manager again indicated that he did not think an insurance claim would solve the problem but said he would check on that possibility right away. He then left the room and returned about ten minutes later with Jim O'Brien, a Chrysler Insurance representative, whose office was also located in Chrysler's Lisle, Illinois office. As Mr. O'Brien explained, "I don't think you'd be covered under your policy because it was one of Chrysler's own employees on the inside who manipulated the computer to get these deals approved."

**Answer:** Chrysler Financial is without knowledge or information sufficient to form

a belief as to what Jim O'Brien allegedly said and therefore denies all such allegations in

Paragraph 42. Erwin A. Sirovy was the Zone Manager at the time of the allegations in this

paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the remaining allegations in Paragraph 42 and therefore denies each and every

allegation in Paragraph 42.

43. Mr. Gorman then suggested filing a claim on Chrysler's policy for employee dishonesty, but Mr. O'Brien stated that would not help because Chrysler would be essentially "self insured" for this loss. As the Zone Manger then explained, "What, do you think we have insurance for nigger fraud? The bottom line is you just can't trust these guys and that's why I don't buy nigger paper."

**Answer:** Chrysler Financial is without knowledge or information sufficient to form

a belief as to what Jim O'Brien allegedly said and therefore denies all such allegations in

Paragraph 43. Erwin A. Sirovy was the Zone Manager at the time of the allegations in this

paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the remaining allegations in Paragraph 43 and therefore denies each and every

allegation in Paragraph 43.

44.    The Zone Manager then explained how the full recourse agreement would work
and how he would "help." According to this agreement, Chrysler would provide notice to
Mr. Gorman if and when the customers from the Marquette dealership "fraud deals' became
either thirty, sixty, ninety and/or one hundred and twenty days late with their payments. This
was to allow Mr. Gorman and his staff to help with the collection of payments. If the customer
became more than one hundred and twenty days late with a payment, Chrysler was to repossess
the cars and turn them back over to Mr. Gorman's Midlothian dealership to become part of that
dealership's floor plan for invoice. When the cars were then re-sold by the Midlothian
dealership, Chrysler was to be paid off with the proceeds, but Midlothian would remain liable to
Chrysler for the full contract price of the car. If the vehicle was never found and repossessed,
then Midlothian was also to remain liable to Chrysler for the full contract price of the car.

**Answer:**    Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 44 and therefore denies each and every allegation

in Paragraph 44.

45.    Finally, the Zone Manager made it clear that Mr. Gorman had absolutely no
choice in agreeing to this deal: Either Mr. Gorman was to accept it, or Chrysler would cease
doing business with both of Mr. Gorman's dealerships and Chrysler would also put a financial
hold on the Midlothian dealership and would take away the entire inventory floor plan for the
store within forty-eight hours.

**Answer:**    Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 45 and therefore denies each and every allegation

in Paragraph 45.

46.    Recognizing that this would require the impossible task of procuring a $12
million to $15 million loan and replacing his entire inventory of vehicles in less than two days,
Mr. Gorman had no choice but to accept the agreement. He accepted it under duress.

2074845                                    - 19 -

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 46.

47.    The Zone Manager promised to support Mr. Gorman with the buying of sales contracts and the financing of customers at the Midlothian store (where the percentage of black customers was much lower that at the Marquette store), but stated; "now you can see why I don't buy [financing for] mulignons."

**Answer:**    Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 47 and therefore denies each and every allegation

in Paragraph 47.

48.    During the course of this meeting, The Zone Manager called in Don Spaniak and Dan Howard in order to explain the full recourse agreement to them. Both gentlemen suggested that Mr. Gorman should go back and actually initial and sign Chrysler's copy of all fifty-eight sales contracts to indicate that the sales were on a full recourse basis as opposed to the originally designated "without recourse or payment obligation" basis.[3] ([3]On the back of Chrysler's form Retail Installment Contract, there is an assignment provision that is signed by the dealer to indicate on what type of basis the particular sale is made. The dealer has five choices ranging from "without recourse" to "full payment obligation." The placement of the dealer's signature indicates the basis for the sale.) The Zone manager cut them off and stated, "Why bother? If we don't handle this deal correctly internally, Mr. Gorman will have us all in court and we'll be f---ed."

**Answer:**    Chrysler Financial admits that the back page of its form retail installment

contract contains an assignment provision and lists five potential bases on which an assignment

is made. Chrysler Financial denies each and every allegation in Paragraph 48 not expressly

admitted herein.

49.    Within several days of this agreement, Chrysler began dropping off repossessed vehicles from the Marquette dealership "fraud deals." The number of these "fraud deals" eventually grew to include roughly seventy vehicle sales. Contrary to the agreement he signed with the Zone Manager, Mr. Gorman was never provided notice that any of his customers were late in making their payments and he was never provided with the opportunity to help collect on those payments.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 49.

50.    Indeed, Mr. Gorman came to learn that many of these vehicles were repossessed from customers who either never missed a payment or were only marginally late with a payment.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 50.

51.    Additionally, Mr. Gorman later came to learn that none of his customers were ever given written notice that their cars had been repossessed and that they had the option of redeeming their vehicles by coming current with their payments. Mr. Gorman never received any copies of such notices. This action by Chrysler is not only illegal and a violation of The Illinois Motor Vehicle Retail Installment Sales Act, 625 I.L.C.S. 5/3-114(f-5)(1), but also is a violation of the terms of the Vehicle Financing Agreement between Chrysler and Mr. Gorman's dealerships, which requires notice to be sent to the customers and copies of the notice to be sent to Mr. Gorman.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 51.

52.    In total, out of the roughly seventy "fraud deals" identified by the Zone Manager, approximately sixty of those vehicles were eventually repossessed by Chrysler.

**Answer:**    Chrysler Financial admits that it eventually repossessed a number of the

vehicles involved in the Marquette "fraud deals" described in the answer to Paragraph 5.

Chrysler Financials denies each and every allegation in Paragraph 52 not expressly admitted

herein.

53.    As a result of the repossessions and lack of proper notice, Mr. Gorman and Mr. Temple began receiving visits from angry customers, some of whom actually threatened their lives. Mr. Temple actually had a visit from one repossessed customer who pulled a gun out and pointed it at Mr. Temple's head, demanding that his car be returned. The business reputation at Marquette suffered immensely amongst the predominantly African-American customers as the angry customers told stories about the repossessions and the news spread. Vandalism increased dramatically at the dealership and the dealership was forced to spend significant money to improve security on their lots and in their store.

**Answer:**    Chrysler Financial is without knowledge of information sufficient to form

a belief as to the truth of the allegations of Paragraph 53 and therefore denies each and every

allegation in Paragraph 53.

2074845                                    - 21 -

54.     In early March 2001, Mr. Gorman and Mr. Temple went to see the Zone Manager at the Lisle, Illinois Chrysler headquarters to complain that Chrysler was not holding up its end of the full recourse agreement.

**Answer:**     Chrysler Financial denies each and every allegation in Paragraph 54.

55.     Also at this meeting, Mr. Gorman complained to the Zone Manager that he was not supporting Gorman with financing for customers at the Midlothian dealership as the Zone Manager had promised at their prior meeting. The Zone Manager stated, "well, I told you I was not going to buy rats or 'moolies' anywhere." Mr. Gorman then suggested that perhaps there needed to be better communication between the dealerships and the Chrysler Zone headquarters at Lisle. It was then agreed to schedule another meeting to include others at Chrysler, as well as the sale and finance managers at Midlothian, in order to facilitate better communication.

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 55 and therefore denies each and every allegation

in Paragraph 55.

56.     About 10 days later, in mid-March 2001, this meeting was held in a conference room at Chrysler's Chicago Zone headquarters in Lisle, Illinois. Present at the meeting were the Zone Manager, Don Spaniak, Bob Hickey and another employee with Chrysler, and Gerald Gorman, Shawn Temple, Joe St. Germaine, Mr. Gorman's general manager at his two dealerships, and Mike Keys and Mike Miller, Mr. Gorman's other managers at his two dealerships.

**Answer:**     Chrysler Financial is without knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 56 and therefore denies each and every

allegation in Paragraph 56.

57.     The Zone Manager began the meeting by stating, "let's start this meeting by saying that we don't buy s--t f---ing paper. S--t is s--t. I don't want it and Detroit doesn't want it." The Zone Manager was asked what "s--t paper" was and he explained, "those f---ing seventy dog ass s--t deals from Marquette, for a good start."

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 57 and therefore denies each and every allegation

in Paragraph 57.

58.     Mr. St. Germaine then asked the Zone Manager why Chrysler was willing to buy sales contracts and to provide financing to minorities from a nearby and competing Chrysler suburban dealership, when those suburban customers' credit was no better than the customers at the "south side" Marquette dealership. To this, the Zone Manager replied, "well, you've got to give the nigger a little credit for shopping in the suburbs where the washrooms are cleaner and he has a better chance of getting off the lot with his new ride without getting killed."

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 58 and therefore denies each and every allegation

in Paragraph 58.

59.     Mr. St. Germaine also pointed out that Chrysler has a better record of financing minority customers at Elmhurst Dodge, another suburban dealership. Again, the Zone Manager replied, "a higher class suburban 'shine' is better than those dog ass f---ing south side ghetto pieces of s--t. If we were lucky enough to find a shine with a job who could prove it then maybe we would take a look at him. But don't think I'll buy a f---ing dog ass at Marquette just because Midlothian sells me good paper from good customers. To be honest with you, I'd prefer that you not send me one f---ing customer from the ghetto. I got f---ed at Harvey Chrysler Plymouth a minority-owner Chicago area Chrysler dealership] and I'm not going to take the heat from Detroit for getting f---ed again. We just put seventy cars on the streets as gifts to those pieces of s--t and they're f---ing us already."

**Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph. His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 59 and therefore denies each and every allegation

in Paragraph 59.

60.    The Zone Manger stated at this meeting that he would not even buy contracts for African-Americans from another Chrysler dealership on the "south side" of Chicago, which was owned by one of the Zone Manager's "best friends," because this dealership was also located in "the ghetto."

**Answer:**    Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph.  His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 60 and therefore denies each and every allegation

in Paragraph 60.

61    Also during this meeting, the Zone Manager elaborated on his desire to avoid "taking heat from Detroit" over losing money on financing for African-Americans.  In this regard, he again explained his growing distaste for Chrysler management ever since the merger between Chrysler and the German Daimler Corporation.  As he again stated, "there are only two things the Germans ever did: make good cars and kill Jews."

**Answer:**    Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph.  His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 61 and therefore denies each and every allegation

in Paragraph 61.

62.    At this point, and at several others during the course of this meeting, Mr. Spaniak attempted to interrupt the Zone Manager and to change the course of the conversation.  Each time, the Zone manager would cut him off, explaining, for example, "Don gets really nervous when I talk this way, but I don't care who hears me.  Everyone knows how I feel about them, including Detroit.  And that's why my delinquencies [losses] are lower than everyone else's and why I run the most profitable Zone in the country - because I don't buy nigger paper."

**Answer:**    Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph.  His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 62 and therefore denies each and every allegation

in Paragraph 62.

62.     63.     In this regard, The Zone Manager also commented on the fact that beginning
around December 2000, Chrysler had been making buyout offers to many employees in an effort
to downsize and reduce costs.  He mentioned that he had previously been offered such a buyout
but that Chrysler was so happy with the job he was doing on the Chicago Zone that they talked
him out of taking the buyout and convinced him to say on for one more year to help "groom" his
successor, despite his racist attitudes and practices.  Indeed, the Zone Manager bragged that he
ran the most profitable Zone in the country precisely *because* of his racist attitudes and practices.
As he explained, "These f---ing Germans build these cars for you to sell but we have to finance
them and the f---ing niggers don't pay.  Everyone knows they don't pay and we've got the
statistics to prove it."

    **Answer:**     Erwin A. Sirovy was the Zone Manager at the time of the allegations in

this paragraph.  His employment with Chrysler Financial was terminated in May 2001.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 63 and therefore denies each and every allegation

in Paragraph 63.

    64.     In April 2001, the Zone Manager was suddenly fired by Chrysler after thirty-five
years with the company.  On information and belief, the Zone manager was fired over an
allegedly fraudulent letter of credit that was written by a Chicago-area Chrysler dealership for
the purchase of a Florida Chrysler dealership.  Chrysler claimed that the Zone Manager had
knowledge of the fraudulent letter of credit but failed to act on it.  Unfortunately for
Mr. Gorman's dealerships and for their customers, his replacement as Chrysler's Chicago Zone
Manager was not better.

    **Answer:**     Chrysler Financial admits that the employment of Erwin A. Sirovy, then

the Zone Manager for the Chicago Zone, was terminated in May 2001.  Chrysler Financial

denies each and every allegation in Paragraph 64 not expressly admitted herein.

    65.     The replacement as Chrysler's new Chicago Zone manager was Ben Boggs, who
came to the Chicago Zone from Chrysler's Zone headquarters in Charlotte, North Carolina.

**Answer:** Chrysler Financial admits that Ben Boggs replaced Erwin A. Sirovy as the

Zone Manager for the Chicago Zone. Chrysler Financial denies each and every allegation in

Paragraph 65 not expressly admitted herein.

66. From the time that the former Zone Manager was fired in April 2001 until
August 2001, no one from Chrysler ever contacted Mr. Gorman or his dealerships about any
aspect of the full recourse agreement. No notice was provided that customers were late with
payments and no notice was provided regarding vehicles being repossessed. As a result,
Mr. Gorman was left with the impression that all remaining customers form the fraud deals were
making their payments and that no one was in default. Apparently, this was not the case, but no
one from Chrysler was providing any notice of this to Mr. Gorman, as had been promised.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 66.

67. In August 2001, Chrysler began sending letters to Mr. Gorman listing "accounts
Chrysler Financial has deemed uncollectible." As the letters would indicate, "Please be assured
that every effort has been made to collect or locate these accounts prior to this letter." But this
was not true. Under the terms of the coerced full recourse agreement, Chrysler was to provide
notice to Mr. Gorman when accounts became past due in order to allow Mr. Gorman and his
staff the opportunity to help collect or, indeed, to make payments on the late accounts.
Mr. Gorman never received such notice. On August 31, 2002, Chrysler sent another demand
letter listing a total of twenty-seven accounts on which Chrysler was demanding payment. The
total sum demanded was $741,100.78, and the letter threatened litigation if the sum was not paid
within 10 days.

**Answer:** Chrysler Financial admits that it sent demand letters to Mr. Gorman and

Marquette in August 2001 listing "fraud deal" accounts that Chrysler Financial had deemed

uncollectible and stating: "Please be assured that every effort has been made to collect or locate

these accounts prior to this letter." Chrysler Financial admits that it sent a demand letter to

Mr. Gorman and Marquette on August 31, 2001 listing "fraud deal" accounts on which amounts

were due from Marquette and Mr. Gorman to Chrysler Financial, demanding the amount of

$741,100.78, and advising that Chrysler Financial might pursue litigation if the amount

demanded was not paid within 10 days. Chrysler Financial denies each and every allegation in

Paragraph 67 not expressly admitted herein.

68.     Soon thereafter, approximately five months after taking over for the former Zone Manager, Mr. Boggs called Mr. Gorman to arrange for a meeting at the Lisle headquarters. Present at this meeting, which took place on or about September 17, 2001, were Mr. Boggs, Mr. Gorman, Mr. Temple and Tim Devine, who had recently taken over for Don Spaniak as Chrysler's Dealer Sales Manager for the Chicago Zone and the number two person in hierarchy at Chrysler's Lisle office.

**Answer:**     Chrysler Financial admits that a meeting took place between Mr. Gorman,

Mr. Temple, Mr. Boggs, and other Chrysler Financial employees at Chrysler Financial's Lisle

office on September 17, 2001. Chrysler Financial admits that Tim Devine was employed by

Chrysler Financial. Chrysler Financial denies each and every allegation in Paragraph 68 not

expressly admitted herein.

69.     The September 17, 2001 meeting lasted nearly three hours. Mr. Boggs began the meeting by asking about the full recourse agreement on the "fraud deals," to which Mr. Gorman had agreed with the previous Zone Manager. Mr. Gorman explained that the deal had already cost him around $700,000 and that the tab was still climbing. Mr. Gorman explained that he could not continue with the present arrangement. Mr. Gorman also complained about the racist attitudes of the former Zone Manager and explained as an example how the Manager had previously stated on two separate occasions that "there are only two things the Germans do well make good cars and kill Jews." To this, Mr. Boggs simply replied, "Well, history proves that. Everyone knows that."

**Answer:**     Chrysler Financial admits that a meeting took place between Mr. Gorman,

Mr. Temple, Mr. Boggs, and other Chrysler Financial employees at Chrysler Financial's Lisle

office on September 17, 2001. Chrysler Financial denies each and every allegation in

Paragraph 69 not expressly admitted herein.

70.     Mr. Boggs stated that he would cut a new deal with Mr. Gorman for the cars "still on the street." Mr. Boggs explained that new deal was necessary because the old agreement with the former Zone Manager should not have been made and was probably handled "illegally."

**Answer:**     Chrysler Financial denies each and every allegation in Paragraph 70.

71.     This new deal would again include Chrysler providing notice to Mr. Gorman if the customers from the Marquette dealership "fraud deals" became thirty, sixty, ninety and/or one hundred and twenty days late with their payments. This was again to allow Mr. Gorman and his staff to help with the collection of payments. If the customer became excessively late with

their payments, Chrysler was to again repossess the cars. This time, however, any repossessed cars would go to auction and Chrysler would provide notice to Mr. Gorman of the auction, so that he could bid on the car. If Mr. Gorman bought the cars outright at auction, he could the add them to his floor plan at Midlothian and use any subsequent sales proceeds to pay down his "debt" to Chrysler, which would be split on a "fifty/fifty" basis per car with Chrysler. If the cars were not found, then Mr. Gorman was to owe Chrysler half of the full contract amount for the vehicles and Chrysler would provide titles to the missing vehicles to the Marquette dealership in order to allow Mr. Gorman to make insurance claims on those vehicles. Additionally, by providing Marquette with titles to any missing vehicles, Boggs would insure that Marquette would own those vehicles outright in the event that they were later found, which would also help to mitigate Marquette's losses. Consistent with the promise to provide Marquette with titles to any missing vehicles, the proposed agreement would also allow Marquette to retain the "deficiency rights" to these vehicles.

**Answer:**     Chrysler Financial admits that at the September 17, 2001 meeting, it and Marquette agreed to split evenly all losses incurred as to all remaining "fraud deal" accounts for which the vehicles had not yet been repossessed. The terms of that agreement are in writing and that writing is the best evidence of the contents of that agreement. Chrysler Financial refers to that writing for an accurate statement of its contents and denies Plaintiffs' characterizations concerning it. Chrysler Financial denies each and every allegation in Paragraph 71 not expressly admitted herein.

72.     Mr. Gorman explained that this new deal didn't help him with all the money he lost on the first deal with the former Zone Manager. He also repeated that it was unfair for Chrysler to punish him when it was Chrysler's employees who allegedly committed fraud and who was fired. To this, Mr. Boggs simply replied, "well Gerry, I guess you'll have to find some better niggers to sell cars to."

**Answer:**     Chrysler Financial denies each and every allegation in Paragraph 72.

73.     Mr. Gorman then explained that because of the racist attitudes at Chrysler, it didn't matter to whom he tried to sell his cars - if they were African-American, Chrysler was not going to provide financing. He explained that the former Zone Manager had refused to provide financing to African-Americans and had once told him "everyone knows that niggers don't pay." To this Mr. Boggs answered, "Well Gerry that's true. You see, Chrysler Corp. [the manufacturer] doesn't mind selling cars to these niggers. But we just don't want to finance them. And where I come from, we have a different name for them: We call them 'coons.' One problem ya'll have up here is that you don't have your niggers under control. Down South where I come from, we keep our niggers under control."

**Answer:**     Chrysler Financial denies each and every allegation in Paragraph 73.

74.     Again, Mr. Gorman was given no choice but to agree to the new arrangement with Mr. Boggs and again, he accepted the terms under duress: Mr. Boggs made it clear at this meeting that if Mr. Gorman did not go along with the new arrangement then Chrysler would stop dong business with Mr. Gorman and would pull its support for the floor plan at the Midlothian dealership, just as the previous Zone Manager had threatened to do.

**Answer:**     Chrysler Financial denies each and every allegation in Paragraph 74.

75.     When Mr. Gorman suggested that the prior agreement with the former Zone Manager was unfair and was handled improperly, Mr. Boggs agreed and acknowledged that the original deal should not have been made and that the whole matter should have been turned over to the proper authorities in the first place. Mr. Gorman explained that he had suggested precisely that but the former Zone Manger had replied, "Do you think you could put these niggers in front of a jury full of Cook County niggers and get a conviction? Are you out of your mind?" To this, Boggs stated, "well I've only been living around here for four or five months, but from what I see on TV and read in the papers, he is probably right about Cook County and that's one reason that I don't live there."

**Answer:**     Chrysler Financial denies each and every allegation in Paragraph 75.

76.     Mr. Boggs remarked that the former Zone Manager "cut a lot of side deals that were wrong and illegal." Boggs also indicated , however, that he believed that it was "too late" to turn the matter over to the authorities now and that the only way to move forward was to cut a new deal. When Mr. Gorman asked how he could be sure that the new deal would be handled properly, Mr. Boggs simply told him, "you'll have to trust us." In parting, Mr. Boggs offered Mr. Gorman some advice and suggested that Mr. Gorman think about selling his Marquette dealership in order to concentrate his efforts on the Midlothian dealership, "where you have a much better customer base of good, paying folks."

**Answer:**     Chrysler Financial denies each and every allegation in Paragraph 76.

77.     Again, Chrysler failed to live up to its end of the agreement. Mr. Gorman was never notified when a customer was late with payments, was never informed when a repossessed vehicle was at auction and was never given titles to lost cars for insurance claims. The only notice that Chrysler provided was an indication on Mr. Gorman's reserve statement of his share of the losses. And even on his reserve statements, Chrysler did not account for these losses as "recourse" liabilities, nor did they account for the losses as being related to vehicle repossessions. Instead, in an "Enron-style" accounting technique, Chrysler improperly accounted for these losses as "prepaid accounts."

**Answer:**     Chrysler Financial denies each and every allegation in Paragraph 77.

78.    Indeed, Mr. Gorman has recently come to learn that Chrysler has placed many of these "fraud" accounts into collections, despite the fact that the deficiency rights to these vehicles were to remain with Mr. Gorman and Marquette. Thus, it appears as though Chrysler has been handing over a variety of different collection agencies deficiency rights that it does not possess. Even worse, on information and belief, these collection agencies appear to be attempting to collect the entire amount of the outstanding balance on these accounts from Mr. Gorman's former customers despite the fact that these accounts have been paid, in whole or in part, by Mr. Gorman and Marquette through the coerced agreements on the "fraud deals." Mr. Gorman has not received any of the proceeds from these collection efforts, nor has he received any type of accounting on these efforts.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 78.

79.    Also during this September 2001 meeting with Ben Boggs and Tim Devine, Mr. Boggs raised the issue of Chrysler's lien holder status for the Midlothian dealership floor plan and questioned why Chrysler was in a subordinated position to LaSalle Bank, another Midlothian lender, which had loaned money to Mr. Gorman for his original purchase of the Midlothian dealership. Mr. Gorman explained that the former Chicago Zone Manager was specifically made aware of Chrysler's subordinated position as specifically approved the arrangement that placed LaSalle Bank into the "first position." Mr. Boggs stated that this was now unacceptable to Chrysler and insisted that Chrysler be placed into the first position as the primary lien holder for Midlothian.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 79.

80.    Specifically, Mr. Boggs indicated that the primary reason why Chrysler needed to be in the first position at Midlothian was because he expected Mr. Gorman's losses associated with the coerced full recourse agreement on the "fraud deals" at Marquette to be in the range of $2 million to $3 million. Due to these expected loses, which would have to be covered in large part by positive cash flow from the more profitable Midlothian store, Mr. Boggs insisted that Chrysler be placed in the first position at Midlothian.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 80.

81.    Again, as he had done previously in this meeting, Boggs threatened to stop doing business with Midlothian and to pull Chrysler's support for the Midlothian floor plan unless Mr. Gorman acquiesced to Bogg's demands.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 81.

82.    Mr. Gorman protested the demand, explaining that he was going to incur significant costs and fees in replacing LaSalle Bank with a different lending institution, which would be willing to take a subordinated lien holder position to Chrysler. In response, Boggs promised to help absorb any costs and fees incurred in switching Chrysler to the first position. Specifically, Mr. Boggs promised to help in this regard by increasing Chrysler's purchase of

sales contracts from Midlothian, providing dealer coupons, increasing the Midlothian's "dealer benefit dividend" and providing lower interest rates for the floor plan.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 82.

83.    Mr. Boggs also emphatically agreed that Midlothian could have a "sliding" subordinated note with Chrysler. As Boggs promised, "there are a lot of ways that I can get you money."

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 83.

84.    Having absolutely no choice in the matter, Mr. Gorman replaced LaSalle Bank with Falcon Financial, a lending institution that was willing to take a subordinate position to Chrysler. In order to facilitate this change, Midlothian incurred substantial and significant fees and additional costs in bringing in the new lender at a two-percentage point higher interest rate (and over a longer term to replace LaSalle bank. Despite Boggs' promises to help absorb these fees and costs, Chrysler again failed to deliver, and Midlothian never received any of the help that was promised.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 84.

85.    During the following months, Mr. Boggs and his associates continually hounded Mr. Gorman to pay up on "his share" of the "fraud deals." In order to keep up with Chrysler's accounting of his "his share" of the losses, which would appear on his monthly reserve statements, Mr. Gorman continued to make large capital infusions into the Marquette dealership. These payments mostly came from positive cash flow at Midlothian store.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 85.

86.    Month after month, Chrysler would demand more money. One time, Mr. Gorman refused, stating, "enough is enough." Mr. Boggs simply threatened in reply "we can't buy anymore of that paper from Marquette" if Mr. Gorman didn't make his payments.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 86.

87.    In addition, and in an effort to force payment on the "fraud deals," Chrysler cut the used car floor plan at the Midlothian store from an inventory of $2.3 million vehicles to an inventory of $1 million.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 87.

88.    Mr. Gorman's original arrangement with Chrysler for the Midlothian dealership allowed a used car floor plan inventory of only $1 million. Over time and through a consistent and repeated pattern and course of dealing between the parties, however, Chrysler had allowed Mr. Gorman to increase the used car inventory at Midlothian up to $2.3 million. By cutting the

- 31 -

used car floor plan back down to $1 million, Chrysler forced Mr. Gorman to immediately liquidate a great deal of his inventory of used cars at Midlothian by quickly dumping his vehicles at great losses at auctions.

      **Answer:**      Chrysler Financial denies each and every allegation in Paragraph 88.

      89.      Additionally, this action by Chrysler reduced Mr. Gorman's ability to even accept trade-ins from customers on the purchase of new vehicles, which resulted in additional lost sales and business at this time. Mr. Gorman was told that Chrysler would not "work with you" to replenish the Midlothian floor plan until Mr. Gorman paid in full on the "fraud deals" from Marquette.

      **Answer:**      Chrysler Financial denies each and every allegation in Paragraph 89.

      90.      By early spring 2001, the amount that Chrysler claimed was "owed" by Mr. Gorman on the "fraud deals" was roughly $180,000. At about this time, Mr. Gorman approached Tim Devine, then the Chrysler Dealer Sales Manager for the Chicago Zone about switching the floor plan at the Marquette dealership from a bank over to Chrysler to take advantage of a lower interest rate offered by Chrysler. Unlike the floor plan at Midlothian, which was entirely financed through Chrysler, a bank had financed the floor plan at Marquette. Mr. Devine stated that it would be no problem to switch the floor plan over to Chrysler and indicated that he would begin working on the paperwork for the switch. Before he could complete the paperwork, however, Mr. Devine was transferred out of the Chicago Zone and the paperwork on the floor plan switch was halted.

      **Answer:**      Chrysler Financial admits that Marquette's floor plan financing was with

Associated Bank and not Chrysler Financial. Chrysler Financial denies each and every

allegation in Paragraph 90 not expressly admitted herein.

      91.      Soon thereafter, John Means, the new Chicago Zone Sales Manager for Chrysler, called Mr. Gorman and stated that if Mr. Gorman paid the cost $180,000 "owed" to Chrysler on the fraud deals, then Chrysler would work on replenishing the Midlothian used car floor plan and would also complete the paperwork for the switch of the Marquette floor plan over to Chrysler. Mr. Gorman indicated that he did not then have that amount of money available to pay Chrysler. After a series of negotiations with Mr. Means and Mr. Boggs, Mr. Gorman was told that if he paid $60,000 of the amount "owed," then Chrysler would "work with you" on the Midlothian floor plan and would complete the switch of the Marquette floor plan.

      **Answer:**      Chrysler Financial admits that John Means is employed by Chrysler

Financial. Chrysler Financial denies each and every allegation in Paragraph 91.

92.    Mr. Gorman then sent an overnight check to Mr. Boggs for $50,000 and signed over to Chrysler his rights to another $10,000 that was being held by Chrysler, in order to satisfy the $60,000 demand. He called Mr. Boggs the very next day to confirm the payment and follow up on the agreement regarding the floor plans. Mr. Boggs confirmed his receipt of the check and indicated that he would "call Detroit" about the floor plans. Within an hour, Mr. Boggs called back and said that "Detroit" was now insisting on full payment of the remaining $120,000 "debt" before they would consider replenishing the Midlothian floor plan or switching the Marquette floor plan. Despite the promises of Boggs and Means, to date, Chrysler has refused to take any action on either floor plan; The Midlothian used car floor plan remains capped at $1 million and, before it went out of business, the lender on the Marquette floor plan remained a bank.

**Answer:**    Chrysler Financial admits that Gorman paid $50,000 and assigned his

rights to $10,000 to Chrysler Financial as partial payment for the indebtedness of plaintiff's to

Chrysler Financial. Chrysler Financial admits that Marquette's floor plan financing was with

Associated Bank and not Chrysler Financial. Chrysler Financial denies each and every

allegation in Paragraph 92 not expressly admitted herein.

93.    In June 2002, Brad Norman, a Chrysler Vice-president from its national headquarters outside of Detroit, Michigan, came to Chicago to meet with Mr. Gorman and Mr. Temple. Accompanying Mr. Norman from Chrysler were Ben Boggs, Matt Van Scyoc, Chrysler's Chicago Zone Dealer Relations Manager, and John Means, the Chicago Zone Sales Manager. The meeting had been called to discuss a series of new loan documents that Chrysler wanted Mr. Gorman to sign, Mr. Gorman's financial statement from the Midlothian dealership and the "fraud deals" from the Marquette dealership.

**Answer:**    Chrysler Financial admits that Brad Norman, Ben Boggs, Matt Van Scyoc,

and John Means met with Gerald Gorman and Shawn Temple on June 12, 2002 and that the new

loan and security documentation and the Marquette "fraud deals" were discussed at the meeting.

Chrysler Financial denies each and every allegation in Paragraph 93 not expressly admitted

herein.

94.    Mr. Norman began the meeting by presenting Mr. Gorman with a new and revised set of loan documents, including a "Master Loan Security Agreement," a Notice of Assignment, a Continuing Guaranty and a Retail Installment Contract and Lease Program Agreement, the terms of which had been greatly altered to the benefit of Chrysler and to the detriment of its dealerships.

**Answer:**        Chrysler Financial denies each and every allegation in Paragraph 94.

95.    These new Chrysler loan documents were recently the subject of a detailed review conducted by the Legal and Regulatory Group for the National Automobile Dealers Association ("NADA"). [4] ([4]NADA, a trade organization founded in 197, represents more than 19,400 new car and truck dealers, both import and domestic, with more than 49,300 separate franchises. NADA provides counsel on legal and regulatory matters, represents dealers on Capitol Hill, develops research data on the automobile industry and operates training and service programs to improve dealership business operations, sales and service practices.) Following this review, NADA reported to Chrysler and its dealer members:

> [t]he Loan Documents are decidedly more favorable to the Lender [Chrysler] and less protective of the rights of the dealer than prior versions . . . The Loan Documents provide no protection or safeguards for a dealer who inadvertently makes a late payment or commits a technical breach of a financial covenant. The Loan Documents do not require the Lender to provide a notice of default nor do they afford a right to cure before the Lender exercises the most severe of creditor remedies: the termination of all further advances under the credit facility, the acceleration of all outstanding obligations, the commencement of suit to recover the obligations and the exercise of various self-help remedies including the placement of a keeper in the dealership and taking possession of all the dealer's assets, including its operating account.

**Answer:**        Chrysler Financial is without knowledge or information sufficient to form

a belief as to the truth of the allegations in paragraph 95 and therefore denies each and every

allegation in Paragraph 95.

96.    NADA concluded that the new loan documents contained numerous provisions, "which require amendment to achieve some degree of commercial fairness for dealers while balancing the competing rights and interests of the Lender and the dealer." [5] ([5]*See,* NADA Legal and Regulatory Group Memorandum, dated May 7, 2002.)

**Answer:**        Chrysler Financial is without knowledge or information sufficient to form

a belief as to the truth of the allegations in paragraph 96 and therefore denies each and every

allegation in Paragraph 96.

97.    Consistent with Chrysler's established modus operandi, it was explained to Mr. Gorman that if he did not accept the revised terms in the new loan documents, despite their

unfair and one-sided nature, Chrysler would pull its financial backing for the floor plan inventory at Midlothian. Mr. Gorman complained that the changed terms were blatantly unfair and asked if Chrysler would be willing to alter any of the terms. Mr. Gorman was told that Chrysler was presenting the same form loan documents to all of its dealerships and that no changes would be allowed for any of Chrysler's dealerships. In other words, each Chrysler dealership would be required to sign the same loan document forms, without exception.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 97.

98. This, however, is untrue. As Mr. Gorman latter came to learn, certain Chrysler dealerships were able to negotiate changes in the terms of the new loan documents with addendums to those documents. Additionally, Mr. Gorman came to learn that there are other Chrysler dealerships, which apparently balked at signing the new loan documents entirely, but for which Chrysler maintains its floor plan support.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 98.

99. Despite Mr. Gorman's efforts to negotiate changes in the terms of the new loan documents, Mr. Norman refused. Having no choice and under the threat of losing Chrysler's financial support for his inventory, Mr. Gorman signed the new loan documents under duress.

**Answer:** Chrysler Financial admits that Mr. Gorman and Midlothian signed a new

"Master Loan and Security Agreement" and related documents on or about June 26, 2002.

Chrysler Financial denies each and every allegation in Paragraph 99 not expressly admitted

herein.

100. The meeting then turned to the issue concerning the "fraud deals" at Marquette. Mr. Gorman began by explaining the history behind his forced agreements to suffer losses connected with the "fraud deals" and the history of Chrysler's unwillingness to buy contracts and provide financing for his overwhelming African-American customer base at the Marquette dealership, regardless of creditworthiness. Mr. Gorman explained that the losses he had suffered and continued to suffer as a result of the forced agreements and discriminatory lending practices of Chrysler were such that he was considering seeking the advice of legal counsel on the matter. After listening to the story, Mr. Norman, the Chrysler Vice-president from Detroit, simply suggested that it would be best to let "the lawyers" handle the issues surrounding the "fraud deals."

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 100.

101. Mr. Norman, however, did offer some advice. As he stated: "What you should do is stop selling new cars and concentrate on selling used cars to draw down your working capital." As Boggs added, "Chrysler Corporation [the manufacturer] is not your partner. We are. They

have no financial interest in you. We do, because we supply your floor plan. They don't care who you sell those cars to, but we do. What happened at Marquette is a perfect example [referring to the "fraud deals"]. You helped them sell all those cars but you got stuck with those sh-t deals."

  **Answer:**  Chrysler Financial denies each and every allegation in Paragraph 101.

  102. Mr. Gorman then brought up the issue concerning Chrysler's lien holder status at Midlothian. He explained that the former Chicago Zone Manager had specifically approved the previous arrangement that had LaSalle Bank in the first lien holder position and Chrysler in a subordinated position with respect to the Midlothian floor plan. He explained that Boggs had insisted that this arrangement was now unacceptable to Chrysler, had demanded that Chrysler replace LaSalle in the first position and had threatened to stop doing business at Midlothian if Mr. Gorman refused. Mr. Gorman further explained to Mr. Norman the substantial losses suffered at Midlothian due to Boggs's insistence that Chrysler be placed in the first lien holder position. Finally, he explained how Boggs had promised to help absorb these losses and how Boggs had failed to deliver on that promise.

  **Answer:**  Chrysler Financial denies each and every allegation in Paragraph 102.

  103. In response to this, Mr. Norman simply related that in his view, Mr. Gorman was not required to accept Boggs's demands and that if Mr. Gorman had been unhappy with the demands, he should have just said "no." He stated that Chrysler would have continued to accept its previously subordinated position with respect to the Midlothian floor plan and essentially indicated that Mr. Gorman had simply made a poor business decision in acquiescing to Boggs's threats and demands and that Mr. Gorman would have to live with the associated losses suffered at Midlothian.

  **Answer:**  Chrysler Financial denies each and every allegation in Paragraph 103

  104. During the course of this meeting, Mr. Boggs's cell phone rang and he left the room to take a call. When he returned after about ten minutes, he looked around the room and asked, "Well, guys, what did we decide to do with Gerry's nigger deals? Ha-ha." At this, everyone else in the meeting, with the exception of Mr. Norman, the Chrysler Vice-president from Detroit, stared at each other in shock at the glib use of such abhorrent language, especially in such a sensitive setting and in the presence of a senior executive from Chrysler. Everyone also appeared surprised that Mr. Norman appeared to be completely unmoved by this comment and did not react to it in any fashion whatsoever. Mr. Norman never acknowledged this remark and ultimately left the meeting without suggesting any change whatsoever with the agreements that had been forced on Mr. Gorman or with Chrysler's discriminatory financing policy aimed at Mr. Gorman's African-American customers.

  **Answer:**  Chrysler Financial denies each and every allegation in Paragraph 104.

2074845

105.    In addition, it appears that Mr. Norman returned to Chrysler headquarters after this meeting and never mentioned anything about the coercive agreements forced on Mr. Gorman or the blatant racial discrimination practiced in the Chicago Zone. A few months later, on September 18, 2002, Mr. Gorman spoke with two senior Chrysler Vice-presidents from its Detroit headquarters, Jerry Beverman and Thomas McAlear, Chrysler's top Vice-president in the United States. Both gentlemen claimed they never heard anything from Mr. Norman about their fellow Vice-president's meeting with Mr. Gorman. Apparently, the policies and practices in place in the Chicago Zone were common knowledge at Chrysler headquarters, and thus, Mr. Norman apparently did not find it necessary to report to the home office on what he had heard at the Chicago meeting, including the history of racial discrimination, profiling and redlining practiced in the Chicago Zone or the blatantly racist and offensive remarks made by Mr. Boggs.

**Answer:**       Chrysler Financial denies each and every allegation in Paragraph 105.

106.    A few weeks later, Mr. McAlear, Chrysler's top Vice-president in the United States, agreed to come to Chicago to meet with Mr. Gorman to discuss the situation. This meeting took place on or about November 1, 2002, at the Hyatt hotel in Chicago's O'Hare airport. Present at the meeting were Mr. McAlear, Mr. Gorman, Shawn Temple and another local Chrysler dealership owner. Mr. McAlear began by simply saying, "Gerry, so we have some current and former Chrysler people who like to throw around the 'N-word'. Where does that leave us? How does that hurt you?"

**Answer:**       Chrysler Financial admits that Mr. McAlear met with Mr. Gorman,

Mr. Temple, and another local dealer of DaimlerChrysler Corporation at the Hyatt hotel at

O'Hare airport on or about November 1, 2002. Chrysler Financial denies each and every

allegation in Paragraph 106 not expressly admitted herein.

107.    By August 2002, the amount that Chrysler claimed was "owed" by Mr. Gorman as "his share" of the "nigger deals" was still roughly $120,000. In August 2002, Mr. Boggs called Mr. Gorman at home to again demand payment. Mr. Gorman conducted this conversation on a speakerphone and in the presence of his wife, Elizabeth Gorman, currently a Cook County Commissioner. Mr. Boggs indicated that if he did not get "the $120,000" or "a draft of your lawyer's complaint," he "had orders to stop buying any paper" or financing any customers from the Marquette dealership, including customers who would have otherwise qualified for Chrysler's factory-incentive 0% financing. Given Mr. Boggs's position as the Chicago Zone manager, those "orders" could have only come from Chrysler's national headquarters outside of Detroit. In response to this, Mr. Gorman asked, "where am I supposed to send my customers?" Mr. Boggs simply replied, "send your customers to Chase Bank."

**Answer:**       Chrysler Financial denies each and every allegation in Paragraph 107.

108.    Chrysler has since followed through on Boggs's threat to Mr. Gorman.  After the August conversation between Mr. Boggs and Mr. Gorman, since September 2002, Chrysler has not bought one single contract or provided financing to one single customer from the Marquette dealership.

**Answer:**    Chrysler Financial admits that it did not purchase and take assignments of any retail installment contracts from Marquette after September 2002.  Chrysler Financial denies each and every allegation in Paragraph 108 not expressly admitted herein.

109.    During this August 2002 conversation, Mr. Gorman again tried to explain to Boggs his frustration with Chrysler over the situation.  He explained how unfair it was to continue to force him and his dealerships to suffer losses connected with the alleged fraud committed by one of Chrysler's own Lisle office employees, when Chrysler refused to even file charges against their own employee who allegedly committed the fraud and when there had never been any indication or evidence that anyone at Mr. Gorman's dealerships was in any way connected with or responsible for the alleged fraud.  He explained how the policies and practices put in place by Chrysler and the agreements that had been forced upon him by Chrysler had cost his dealerships approximately $2 million.  He explained how disenchanted he was with Chrysler over their blatantly discriminatory policy aimed at his African-American customers and how he couldn't believe that Chrysler would treat its dealerships and customers in this unfair and illegal manner.  To this, Mr. Boggs simply replied, "Gerry, you have no one but yourself to blame for owning a store in that sh-t neighborhood.  Why don't you do us all a favor and sell your stores and buy a GM or a Ford ticket and see if they are willing to buy your sh-t paper."

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 109.

110.    Furthermore, during the conversation Mr. Boggs threatened Mr. Gorman with a full bank review and audit of his dealerships if he did not pay to Chrysler the $120,000 he "owed" under the coerced agreements related to the "nigger deals."

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 110.

111.    Boggs subsequently called back and indicated that if Mr. Gorman sent Chrysler his audited year end financial statement for the Midlothian dealership, then "I'll turn you back on at Marquette," meaning, Chrysler will again begin buying sales contracts and financing customers at the Marquette store.  Mr. Gorman sent his statement to Mr. Boggs by overnight mail and again called the very next day to confirm that Chrysler would begin buying his contracts from Marquette.  Boggs confirmed his receipt of the financial statement but refused to renew Chrysler's customer financing at Marquette.  As he explained, "Detroit says that you can be back on as soon as you pay the $120,000 or give us a draft of your lawyer's complaint."

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 111.

112.    Beginning around September 2002, Chrysler simply stopped buying contracts and financing African-American customers from Mr. Gorman's Marquette dealership. Chrysler also further slowed its buying and financing for African-American customers from Mr. Gorman's Midlothian dealership. This was true despite the fact that Chrysler had an ongoing nationwide factory incentive-financing program in place for all U.S. Chrysler dealerships whereby Chrysler was offering to sell cars with no money down and 0% financing. Not one vehicle was sold from the Marquette dealership through this national program after early September 2002.

**Answer:**    Chrysler Financial admit that it did not purchase and take assignments of

any retail installment contracts from Marquette after September 2002. Chrysler Financial denies

each and every allegation in Paragraph 112 not expressly admitted herein.

113.    Chrysler's unwillingness to buy contracts and finance African-American customers at the Marquette dealership was also true despite the fact that many of the African-American customers at the Marquette dealership had a credit history and financial condition that should have assured their automatic approval for financing through Chrysler's ACE computer program. While not as pervasive as at Marquette, Chrysler practiced the same policy of turning down many well-qualified African-American customers from the Midlothian dealership as well.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 113.

114.    Indeed, many of the customers at Marquette and Midlothian who applied for financing through Chrysler and who were turned down ended up financing their purchases through independent banks and other lending institutions, which typically would approve these customers for financing, albeit, typically at higher interest rates than that for which those customers would have been otherwise eligible with Chrysler. Many more of these customers simply walked away from purchases altogether, or looked to other dealerships or manufacturers for their purchases. This is especially true for customers who sought to take advantage of, and who should have been approved for, Chrysler's national factory-incentive financing program, which was still offering 0% financing at this time.

**Answer:**    Chrysler Financial is without knowledge or information sufficient to form

a belief as to the truth of the allegations of Paragraph 114 and therefore denies each and every

allegation in Paragraph 114.

115.    Chrysler's unwillingness to buy contracts and finance any African-American customers at the Marquette dealership (and at the Midlothian dealership as well) regardless of the creditworthiness of those customers is clearly discriminatory in nature. This corporate policy, however, does not only violate the civil rights of the predominately African-American customers, but also caused direct harm to Mr. Gorman and his dealerships, as Chrysler dealerships, such as Mr. Gorman's, typically make more money from vehicle sales that are

financed through Chrysler than from sales that are financed through independent banks and other lending institutions. Additionally, Mr. Gorman and his dealerships lost sales completely with those customers who should have been approved but who were denied financing by Chrysler and who ended up walking away from a purchase entirely.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 115.

116. On information and belief, Chrysler's has imbedded a disabling switch in the software that runs Chrysler's ACE computer program. The switch, which can be activated with an electronic signature card by simply changing a "Y" to an "N," effectively shuts off the ACE computer program for selected Chrysler dealerships.

**Answer:** Chrysler Financial admits that it can prevent a dealer from inputting

information into the ACE System by entering a code into the system. Further answering,

Chrysler Financial states that all retail credit applications are processed through the ACE System.

Chrysler Financial denies each and every allegation in Paragraph 116 not expressly admitted

herein.

117. Specifically, the ACE program is designed to assess credit and employment information from a customer and to assign a letter grade to that customer based on specific criteria, which would normally determine whether or not the customer would qualify for financing through Chrysler and at what interest rate. The ACE program is theoretically intended to provide an unbiased and colorblind assessment of Chrysler customers' creditworthiness. When the imbedded disabling switch has been activated for a designated Chrysler dealership, however, the ACE program automatically scores every finance applicant as "Qualified." This does not mean that the customer is determined to be qualified for a loan. Instead, it means that an individual Chrysler employee must further "qualify" the applicant.

**Answer:** Chrysler Financial incorporates its answer to Paragraph 20 as and for its

answer to Paragraph 117. Chrysler Financial denies each and every allegation in Paragraph 117

not expressly admitted herein.

118. In this way, Chrysler is able to bypass the unbiased and neutral design of the computer program, and to profile or "redline" those loan applications that come from selected Chrysler dealerships, which have a high minority or low-income customer base.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 118.

2074845

- 40 -

119.    Redlining is the process of drawing or outlining a geographic area within which lending will be denied due to the composition or characteristics of the area.[6]  ([6]WARREN L. DENNIS & J. STANLEY POTTINGER, FEDERAL REGULATION OF BANKING: REDLINING AND COMMUNITY REINVESTMENT para. 1.02, at 1-4 (1980).)  The Department of Housing and Urban Development defines redlining to include the following: the requirement of larger down payments, higher closing costs, higher loan interest rates, and the refusal to lend on property over a certain age.[7]  ([7]U.S. DEPT. OF HOUSING AND URBAN DEVELOPMENT, REDLINING AND DISINVESTMENT AS A DISCRIMINATORY PRACTICE IN RESIDENTIAL MORTGAGE LOANS pt. II, at 4 (1977).)  Racial redlining does not rely on predictive factors, but rather makes discriminatory assumptions that minorities, by nature of race, are unable or unwilling to repay loans.  Caucasians, it appears, enjoy a general presumption of creditworthiness, which does not extend to other racial groups.[8]  ([8]THE CONSTITUTIONALITY OF REDLINING: THE POTENTIAL FOR HOLDING BANKS LIABLE AS STATE ACTORS, 2 Wm. & Mary Bill of Rts. J. 527, 530 (1993).)

**Answer:**    Paragraph 119 appears to state only legal conclusions and thus requires no

answer.  Chrysler Financial denies each and every allegation in Paragraph 119.

120.    The process of redlining targets entire neighborhoods deemed high risk, regardless of the creditworthiness of individuals applying for loans.  Because these neighborhoods are almost always comprised of racial minorities, African-Americans, Hispanics, and other minorities with good credit ratings are left without access to low interest financing through Chrysler.  This practice violates creditworthy customers' civil and constitutional rights, such as the rights to due process and equal protection and also violates a number of state and federal statutes, including but not limited to the Civil Rights Act, 15 U.S.C. § 1981, *et seq.* and the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.*

**Answer:**    Paragraph 120 appears to state only legal conclusions and thus requires no

answer.  Chrysler Financial denies each and every allegation in Paragraph 120.

121.    Based on information and belief, plaintiffs maintain that Chrysler had turned on their disabling switch at the Marquette dealership and was unlawfully engaged in the practice of redlining Marquette customers since April 2001.  While not as pervasive as at the Marquette dealership, plaintiffs maintain that the practice of relining Midlothian dealership customers has also taken place since this time.  This practice has damaged plaintiffs, as is more fully explained above and below.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 121.

122.    In late September 2002, Chrysler conducted a "Retail Competitive Analysis," also known as a "Retail Credit Analysis" ("RCA"), on the Midlothian dealership.  Matt Van Scyoc, Chrysler's Dealer Relations Manager, conducted this RCA.  Mr. Van Scyoc had previously

attended the June 2002 meeting between Mr. Gorman, Ben Boggs, and Brad Norman, the Chrysler Vice-president from Detroit headquarters.

**Answer:** Chrysler Financial admits that Matt Van Scyoc, then its employee and a

dealer relations manager, performed a Retail Competitive Analysis ("RCA") on the Midlothian

dealership. Chrysler Financial admits that Mr. Van Scyoc had attended the June 12, 2002

meeting. Chrysler Financial denies each and every allegation in Paragraph 122 not expressly

admitted herein.

123.    The results of this RCA were provided to Mr. Gorman on September 30, 2002. Mr. Van Scyoc's summary indicates that the RCA was conducted to provide "a review of a dealership's retail finance and reserve relationship with its finance sources." One of the express purposes of the RCA is to show dealers how they can make additional profit and improve their "bottom line" by arranging more customer financing through Chrysler.

**Answer:** Chrysler Financial admits that a copy of the RCA was provided to Mr.

Gorman. Chrysler Financial admits that that the RCA was conducted to provide "a review of a

dealership's retail finance and reserve relationship with its finance sources" and one purposes of

the RCA is to show dealers how they can make additional profit and improve their "bottom line"

by arranging more customer financing through Chrysler. Chrysler Financial denies each and

every allegation in Paragraph 123 not expressly admitted herein.

124.    The RCA specifically compared Midlothian's sales financed through Chrysler with those sales financed through banks and other lending institutions for the August and September 2002 time period. The results unequivocally and independently showed that Chrysler was not financing all the sales from Midlothian that it should have been financing and that many well-qualified customers were being sent to banks and other lending institutions after having been turned down by Chrysler.

**Answer:** Chrysler Financial admits that the RCA compared Midlothian's sales

financed through Chrysler Financial and Midlothian's sales financed through other financial

institutions in September 2002. Chrysler Financial denies each and every allegation in

Paragraph 124 not expressly admitted herein.

125.    Thereafter, Mr. Gorman discussed the results of this RCA with Mr. Van Scyoc. Mr. Van Scyoc verbally confirmed that the results of the RCA clearly showed that Chrysler was not financing all the sales that it should have been financing and that many well-qualified customers were being sent to banks and other lending institutions after having been turned down by Chrysler. As Mr. Van Scyoc stated, "I have to apologize to you, Gerry. You have been complaining about Chrysler not supporting you with our buying and you were right. Your customers' Empirica [credit] scores were much higher than I was lead to believe. We definitely missed some of these deals and there is no question that we should have been buying them."

**Answer:**    Matt Van Scyoc is no longer employed by Chrysler Financial.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 125 and therefore denies each and every allegation

in Paragraph 125.

126.    When Mr. Gorman asked why this was happening, Mr. Van Scyoc replied that it was because of "a perception" that there was "bad paper" coming out of the Midlothian dealership. Mr. Gorman then asked why anyone would think there was "bad paper" coming from Midlothian and Mr. Van Scyoc explained that there was "a perception" that many of Midlothian's customers were undesirable credit risks. Mr. Gorman protested that the results of the RCA showed just the opposite - that Chrysler was wrongly rejecting many well-qualified Midlothian customers. Mr. Van Scyoc again stated that the problem was due to this "perception" about the quality of Midlothian's customer base. Mr. Van Scyoc also blamed part of this "perception" on the "fraud deals" at the Marquette dealership.

**Answer:**    Matt Van Scyoc is no longer employed by Chrysler Financial.

Consequently, Chrysler Financial is without knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 126 and therefore denies each and every allegation

in Paragraph 126.

127.    Mr. Gorman clearly understood that Mr. Van Scyoc's repeated references to a "perception" problem concerning Midlothian's customers was a veiled reference to the roughly thirty percent African-American customer base at Midlothian. This understanding was quite obvious given Mr. Van Scyoc's prior attendance at the June 2002 meeting with Boggs and Norman and his obvious knowledge of Chrysler's racist financing practices directed at Mr. Gorman's African-American customers, which knowledge was learned at that meeting, if not earlier.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 127.

128.    Shortly after this meeting took place, Mr. Van Scyoc quit his job with Chrysler. When Mr. Gorman subsequently discussed with Mr. Boggs the results of Mr. Van Scyoc's RCA and his meeting with Mr. Van Scyoc, Mr. Boggs simply stated, "I don't care about whatever Matt Van Scyoc says. He's gone."

**Answer:**        Chrysler Financial admits that Matt Van Scyoc is no longer an employee

of Chrysler Financial. Chrysler Financial denies each and every allegation in Paragraph 128 not

expressly admitted herein.

129.    Chrysler has now carried out Boggs' previous threat of a full bank review and audit. On October 14, 2002, Chrysler served Mr. Gorman with a notice that Chrysler intended to undertake a bank review and audit of Mr. Gorman's Midlothian dealership. This bank review and audit, to which Chrysler euphemistically refers as a "Limited Financial Review," called for the production of the following dealership records:

        a.      Financial Statement as of October 31, 2002;

        b.      Latest Financial Statement prepared by outside accountants;

        c.      Copy of outside accountants' latest year-end adjusting entries and a copy of the journal vouchers used to record such entries on the books;

        d.      Computer prepared Summary General Ledger or Trial Balance as of October 31, 2002;

        e.      Copy of the bank statements and bank reconciliation for all bank accounts as of September 30, 2002 *and* October 31, 2002;

        f.      Bank Cutoff Statement(s) for all bank accounts as of the close of business on November 15, 2002;

        g.      A copy of the latest filed Federal Income Tax Return;

        h.      Complete copies of all supporting schedules and all supporting documentation for all assets and liabilities as of October 31, 2002, including, but not limited to, full detail schedules on Inventory, Contracts in Transit, Vehicle Receivables, Lien payoffs, Floor Plan Liability and Cash in Bank. "These schedules must agree to the Summary General Ledger or Trial Balance;"

     i.       All supporting schedules, reconciliation, documents and
               journal detail relevant to the audit.

    **Answer:**     Chrysler Financial admits that it sent a notice to Mr. Gorman and

Midlothian stating Chrysler Financial's intent to perform a limited financial review of

Midlothian and requesting Midlothian to produce certain records. Chrysler Financial denies each

and every allegation in Paragraph 129 and each and every subpart not expressly admitted herein.

    130.   After receiving this notice, Mr. Gorman called Mr. Boggs and asked why his
dealership was being audited and reviewed. Mr. Boggs simply replied, "Why don't you have
one of your fancy lawyers write a letter to home office in Detroit to get that information."

    **Answer:**     Chrysler Financial denies each and every allegation in Paragraph 130.

    131.   The audit and review were completed on December 12, 2002. There is absolutely
no legitimate business reason why Chrysler should be undertaking such an exhaustive bank
review and audit of the Midlothian dealership at this precise time. Chrysler's own computerized
"floor checks," which it runs every month on its "AIM System," consistently show Midlothian's
accounting to be nearly perfect. On information and belief, there are numerous Chicago-area
Chrysler dealerships which have far worse records than does Midlothian on Chrysler's monthly
floor checks. Yet Midlothian is the only Chicago-area dealership for which Chrysler scheduled
such reviews and audit. Indeed, Mr. Gorman has recently heard from other Chicago-area
Chrysler dealership owners who indicated that they heard about Midlothian's review and
expressed a belief that the Midlothian dealership "must be in trouble with Chrysler." Chrysler
plainly undertook this review and audit as a coercive tactic to force the dealership to pay off the
remaining $120,000 on the "nigger deals" and as an intimidation tactic in response to
Mr. Gorman's efforts to seek legal advice on this matter.

    **Answer:**     Chrysler Financial denies each and every allegation in Paragraph 131.

    132.   Following the audit, Mr. Boggs contacted Mr. Gorman and informed him that he
needed to invest additional capital into Midlothian immediately. Mr. Boggs explained that
Chrysler would be willing to match Mr. Gorman's further investment with an equal-sized loan to
Midlothian. This offer, however, came with an important condition: In order to receive the
matching funds, Mr. Gorman would first need to sign a full release of his right to file suit over
the "nigger deals" at Marquette.

**Answer:** Chrysler Financial admits that Mr. Boggs contacted Mr. Gorman and informed him of a need to invest additional capital into Midlothian immediately. Chrysler Financial denies each and every allegation in Paragraph 132.

133. Indeed, Mr. Boggs has now admitted to Mr. Gorman that Midlothian was the only Chicago area dealership scrutinized with a bank review and audit and that the review and audit were conducted as a direct result of Mr. Gorman's efforts to seek legal counsel and advise. As Mr. Boggs explained, "We'd be willing to help you if you give us a signed release but the higher ups in Detroit don't take too kindly to people who have filed a racial lawsuit." When Mr. Gorman reminded Mr. Boggs that no lawsuit had been filed, Boggs simply replied, "Well, technically not yet . . ." Mr. Gorman refused to sign the release.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 133.

134. Without informing Mr. Gorman, Mr. Boggs also lodged an assignment against Midlothian's factory receivables, resulting in a withholding of roughly $160,000 from the dealership. In addition, all of Midlothian's factory orders were canceled at its incoming vehicles sold to other Chrysler dealerships.

**Answer:** Chrysler Financial admits that it lodged an assignment and then removed it. Chrysler Financial denies each and every allegation in Paragraph 134.

135. On information and belief, despite the losses suffered by Mr. Gorman and his dealerships as a result of the "nigger deals" and all the other issues discussed above, Midlothian is actually in a far superior financial position in terms of positive working capital and financial reporting than are most other Chrysler dealerships in the Chicago area.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 135.

136. Mr. Gorman did put additional capital into the Midlothian dealership, but also challenged the results of the audit and bank review. Chrysler ultimately admitted to having made an $830,000 mistake in its calculation of Midlothian's working capital base. After a week of complaints from Mr. Gorman, Mr. Boggs released the assignment on Midlothian's factory receivables. He continued, however, to severely limit Midlothian's ability to order new vehicles from the factory.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 136.

137. Mr. Gorman was told that the reason for the limitations on Midlothian concerned the alleged overextension of the new car inventory at Midlothian. Under the terms of its original agreement with Chrysler, Midlothian's new car inventory was to be capped at $10 million. Over time and through a consistent and repeated pattern of dealing, however, Chrysler had explicitly

allowed Mr. Gorman to take the new car inventory at Midlothian up to $22 million, just as it had allowed Midlothian's used car inventory to go from $1 million to $2.3 million.

> **Answer:**     Chrysler Financial denies each and every allegation in Paragraph 137.

138.     Now, Chrysler was telling Mr. Gorman that he needed to reduce the new car inventory at Midlothian from $22 million down to $8.5 million, in order to leave a cushion below the old $10 million "limit." According to Chrysler, until he does so, Chrysler will not ship any new vehicles to the dealership unless it falls below an inventory of seventy-five days of supply for all models, or unless the dealership has a sold factory order from a customer.

> **Answer:**     Chrysler Financial denies each and every allegation in Paragraph 138.

139.     Mr. Boggs explained to Mr. Gorman that the seventy-five days of supply threshold applied to all Chrysler dealerships in the Chicago Zone and that the factory ordering restrictions placed on Midlothian would also be applied to other dealerships in the Zone with inventories above that threshold. According to Boggs, Chrysler was going to apply the seventy-five day threshold across the board "because we are going to show you we are not a prejudiced company."

> **Answer:**     Chrysler Financial denies each and every allegation in Paragraph 139.

140.     This, again, is untrue, as there are scores of other dealerships in the Zone which exceed the threshold, yet Midlothian remains the only dealership in the Zone under these restrictions. Additionally, there are many dealerships in the area that do not meet their working capital requirements - indeed, some even have negative working capital equity in their floor plans - yet none of those are under the ordering restrictions imposed on Midlothian.

> **Answer:**     Chrysler Financial denies each and every allegation in Paragraph 140.

141.     Under Chrysler's arrangements with its dealers, dealers are eligible to receive a "cap loan" from Chrysler as long as they do not carry used car floor plans. The amount of additional capital Mr. Gorman put into the Midlothian dealership was sufficient to pay off Midlothian's used car floor plan. Thus, Midlothian should have been eligible to receive a "cap loan" from Chrysler to cover any additional working capital requirements requested by Chrysler.

> **Answer:**     Chrysler Financial denies each and every allegation in Paragraph 141.

142.     When Mr. Gorman brought this to Mr. Boggs' attention and requested the cap loan, Mr. Boggs again indicated that this would be possible only if Mr. Gorman signed a full release. Mr. Gorman asked Mr. Boggs if he would let Midlothian order new cars if Mr. Gorman put all the additional capital into Midlothian that had previously been requested by Boggs - even without the cap loan. Mr. Boggs simply replied, "unless you give me a signed release, I'm going to keep you at seventy-five days of supply."

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 142.

143. After Mr. Gorman again refused to sign a release, Mr. Boggs said, "well Gerry, I guess you're going to have to do what you have to do and we're going to have to do what we have to do. You're going down, Gerry."

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 143.

144. Clearly recognizing that Mr. Boggs was in fact threatening to run Midlothian out of business, Mr. Gorman suggested that he would have to find a way to switch the Midlothian floor plans from Chrysler to a bank. In response, Mr. Boggs stated, "You can't do that Gerry. If you try, the bank would ask why you're switching away from Chrysler and if you tell them about this racial lawsuit of yours, we won't be able to settle with you because we won't be able to have an effective confidentiality agreement."

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 144.

145. Chrysler's actions in preventing Midlothian from ordering new cars from the factory is plainly retaliatory in nature, as it is meant to punish Mr. Gorman for his efforts to protect his legal rights and meant to pressure Mr. Gorman into signing a release that would keep the racial attitudes and discriminatory practices of Chrysler under wraps.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 145.

146. This action by Chrysler also puts Midlothian in an uncompetitive position vis-a-vis other Chrysler dealerships, as Midlothian is not being supplied with Chrysler's new and updated models of cars. Other Chrysler dealerships in the area are now pointing to Midlothian's inability to get new models as a selling point with their customers. Additionally, Chrysler dealers receive certain financial incentives when they order new cars for their floor plans, such as "supplemental floor plan assistance" money and advertising money. Thus, by preventing Midlothian from making any new car orders, Chrysler is also hurting the cash flow at Midlothian.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 146.

147. Additionally, apparently confident in his ability to put Midlothian out of business, Mr. Boggs recently began telling other dealerships in the region that Midlothian is now, or will soon be, out of business. In fact, Mr. Gorman has recently heard that one Chicago area dealership owner has been telling other dealerships that, according to Mr. Boggs, "Chrysler is going to put Gorman out of business" and that Midlothian will have a new owner "within ninety days."

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 147.

148. On January 10, 2003, Mr. Gorman received a phone call from Dave Keebler, Chrysler's new Chicago Zone Dealer Representative. Mr. Keebler took over the position formerly held by Matt Van Scyoc. Mr. Keebler informed Mr. Gorman that, despite the fact that Mr. Gorman had put additional capital into the Midlothian dealership as a result of the bank review and audit, Chrysler was going to require that he put more money into the store. Mr. Gorman protested, explaining that his working capital requirement threshold should have come down to a lower level as compared to the time period considered by the bank review and audit.[9] ([9]Chrysler's working capital requirements for dealerships are based on that dealership's new car sales for the previous twelve-month period. The more new cars sold by a dealership, the higher the working capital requirements for that dealership will be. Despite the fact that the bank review and audit for Midlothian did not take place until December 2002, Chrysler insisted on conducting the review and audit based on the October 2001 to October 2002 time frame. Thus, the review and audit specifically included the enormously successful sales month of October 2001, when customers flocked to dealerships offering 0% factory incentive financing following the terrorist attacks of September 11, 2001. Like many dealerships, Midlothian had one of its best sales months ever in October 2001. Because this month was included in the audit, the results of the working capital calculations were skewed and were almost $400,000 higher than they would be based on a 2002 calendar year sales review.)

**Answer:** Chrysler Financial admits that Midlothian's working capital has been

deficient and that Chrysler Financial has demanded that Midlothian increase its working capital

to meet the requirements of its lending agreements with Chrysler Financial. Chrysler Financial

admits that the amount of working capital required is based on a formula that applies to all

dealers. The formula is the dealer's annualized sales of new vehicles based on its sales of new

vehicles during the previous six months multiplied by a certain dollar amount based on the

dealer's annualized sales. For dealers such as Midlothian with annualized sales of 1,200 or more

new vehicles, the multiplier is $1,400 per vehicle. Chrysler Financial admits that Midlothian's

working capital was deficient in the amount of $2.1 million as of Dec. 20, 2002. Chrysler

Financial denies each and every allegation in Paragraph 148 not expressly admitted herein.

149. Mr. Keebler acknowledged that under Chrysler's own working capital formula, the Midlothian capital requirement should have come down by $300,000 to $400,000 since the time of the audit. As he explained, however, "in your case, because of all the problems, I've been told that Boggs is going to hold you to the higher level and keep you at seventy-five days of supply." Mr. Gorman then stated that, "it looks like you're trying to put me out of business." To this, Mr. Keebler replied, "It looks to me like this thing is just between you and Mr. Boggs."

> **Answer:** Chrysler Financial denies each and every allegation in Paragraph 149.

150. On January 15, 2003, Mr. Keebler called back and told Mr. Gorman that if he explained where he got the additional capital to put into the Midlothian dealership, then Chrysler would let Midlothian order some new cars. Mr. Gorman asked who had told Mr. Keebler this. Mr. Keebler responded that this offer came from "Detroit." Mr. Gorman insisted on getting a name and asked, "Who in Detroit." Mr. Keebler answered, "My boss, Mr. Boggs." Mr. Gorman then insisted that the offer be put in writing. Mr. Keebler agreed and stated that he would follow up the next day with a written agreement.

> **Answer:** Chrysler Financial denies each and every allegation in Paragraph 150.

151. Two days later, on January 17, 2003, Mr. Keebler faxed Mr. Gorman a blank "subordination agreement." Under the terms of this agreement, Mr. Gorman was to reveal the source of his additional capital contributions to Midlothian and agree that any indebtedness incurred in raising this additional capital would be subordinated to any outstanding obligations to Chrysler.

> **Answer:** Chrysler Financial admits that Mr. Keebler faxed a subordination

agreement to Mr. Gorman at his request. Chrysler Financial denies each and every allegation in

Paragraph 151 not expressly admitted herein.

152. Upon receiving this fax, Mr. Gorman called Mr. Keebler and asked what he was supposed to get in return for signing the agreement and where was the promise to provide new cars. Keebler stated that Boggs had told him if Mr. Gorman signed the agreement, Boggs would send it to the "higher ups in Detroit" and they might again decide to let Midlothian order new cars. Mr. Gorman asked, "So there is no guaranty that I'm going to get to order any new cars?" Mr. Keebler confirmed that there was no guaranty. Given the now long history of broken promises and one-way agreements from Chrysler, Mr. Gorman refused to sign the subordination agreement.

> **Answer:** Chrysler Financial denies each and every allegation in Paragraph 152.

153. As a direct result of Chrysler's retaliatory bank review and audit, unfair limitations on new car orders and the rumors being spread by Boggs about Midlothian, Midlothian's reputation in the community has been severely damaged and its business has been threatened. Many other dealerships are refusing to work with Midlothian, its suppliers are insisting on cash on delivery and its ability to obtain further financing has been compromised. Midlothian has been prevented from ordering new cars from the factory since shortly after the bank review and audit were completed on December 12, 2002 and, in fact, Midlothian has not received a new car from the factory since December 26, 2002. And even if the ordering restrictions were lifted immediately, Midlothian would not be able to get new cars from the

factory onto its floor plan for an additional three to four weeks. In short, Chrysler is aggressively acting on Mr. Boggs's threat to put Midlothian out of business. Without immediate relief in the form of a temporary restraining order and preliminary injunction directing Chrysler to lift the unfair and retaliatory factory ordering restrictions imposed on Midlothian, the dealership will continue to suffer additional loss of goodwill and business reputation and anticipates that it would be forced out of business within forty-five to sixty days.

> **Answer:** Chrysler Financial denies each and every allegation in Paragraph 153.

154. As a direct result of the harmful actions taken by Chrysler, described above, and the damages suffered by plaintiffs, outlined below, Mr. Gorman was unable to adequately support both his Midlothian and Marquette dealerships. In an effort to avoid losing both, the Marquette dealership was recently sold to a third party. That sale closed on January 29, 2003.

> **Answer:** Chrysler Financial admits that Mr. Gorman sold the Marquette dealership

to a third party. Chrysler Financial denies each and every allegation in Paragraph 154 not

expressly admitted herein.

155. As a result of the coerced agreements, redlining policy and Chrysler's overall pattern of behavior directed toward Mr. Gorman, his dealerships and his customers, plaintiffs have been injured financially as follows:

> (a) damages related to the forced agreements concerning the "fraud deals," the payments made to Chrysler pursuant to those agreements and the associated reputation damage at Marquette;

> (b) lost revenue due to Chrysler's redlining policy and refusal to provide financing to plaintiffs' customers;

> (c) damages arising from Chrysler's auctions in cutting the used car floor plan at the Midlothian dealership from an inventory of $2.3 million vehicles to an inventory of $1 million;

> (d) damages arising from Chrysler's actions in cutting the new floor plan at the Midlothian dealership from an inventory of $22 million to an inventory of $10 million;

> (e) damages arising from the unfair factory ordering restrictions Chrysler has placed on Midlothian and Midlothian's resulting inability to obtain new Chrysler models and compete with other Chrysler dealerships;

    (f)        damages arising from the loss of reputation at Midlothian suffered as a result of Chrysler's audit and bank review and rumors spread by Mr. Boggs about Midlothian;

    (g)       damages arising from floor plan charges and fees because Chrysler refused to finance Marquette's floor plan account, which caused Marquette to pay a higher interest rate and higher fees with a bank;

    (h)       prepayment penalties to LaSalle bank after Mr. Boggs demanded that Chrysler be placed in the "first position" for Midlothian, at the expense of LaSalle;

    (i)        fees and additional costs because of higher interest rates needed to bring in a new lender to replace LaSalle bank; and

    (j)        the ultimate loss of the Marquette dealership.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 155 and each and every subpart.

156.    Plaintiffs bring their claims under the applicable laws of Illinois, under the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221, *et seq.* and under the Illinois Motor Vehicle Franchise Act, 815 I.L.C.S. 710(4)(d)(4).

**Answer:**    Chrysler Financial admits the existence of the statutes cited, but denies they are applicable to it. Chrysler Financial denies each and every allegation in Paragraph 156 not expressly admitted herein.

## VI.    CLAIMS FOR RELIEF

## COUNT I

## BREACH OF CONTRACT

157.    Plaintiffs reallege all preceding paragraphs as though fully set forth herein.

**Answer:**        Chrysler Financial restates its answers to Paragraphs 1-156 as if fully set

forth herein.

158.    Plaintiffs maintain contracts with Chrysler, including Vehicle Finance
Agreements, whereby Chrysler agreed to provide financing for qualified customers at plaintiffs'
Chrysler dealerships.

**Answer:**        Chrysler Financial incorporates its answer to Paragraph 2 as and for its

answer to Paragraph 158. Chrysler Financial denies all allegations in Paragraph 158 not

expressly admitted herein.

159.    Chrysler's unlawful and discriminatory redlining policy and practice, as described
above, represents a breach of Chrysler's Vehicle Finance Agreements signed with plaintiffs, as
well as a breach of other Chrysler corporate contracts with plaintiffs whereby Chrysler has
agreed to finance plaintiffs' customers meeting a minimum standard of creditworthiness based
on an unbiased review of objective criteria.

**Answer:**        Chrysler Financial denies all allegations in Paragraph 159.

160.    Additionally, Chrysler entered into two contracts with plaintiffs in order to
distribute to plaintiffs a percentage of losses that were suffered by Chrysler as a result of the
Marquette "fraud deals" and a third contract to help absorb losses associated with fees and costs
incurred in placing Chrysler in a first lien holder position for the Midlothian floor plan.

**Answer:**        Chrysler Financial admits that under the terms of the assignments and

Marquette's Vehicle Financing Agreement with Chrysler Financial, the Marquette "fraud deals"

described in the answer to Paragraph 5 became full recourse liabilities of Marquette and

Mr. Gorman (due to his personal guaranty of Marquette's indebtedness to Chrysler Financial)

because Marquette had submitted false information to Chrysler Financial in connection with the

2074845                                          - 53 -

"fraud deals." In February 2001, Marquette signed a document whereby it acknowledged that the "fraud deal" accounts had become full recourse liabilities and that it was fully liable for the unpaid amounts due on the accounts in the event the borrowers defaulted. Chrysler Financial denies all allegations in Paragraph 160 not expressly admitted herein.

161.    Despite the onerous conditions and terms that these contracts placed on plaintiffs, Chrysler breached these contracts by, among other things:

(a)    Failing to provide promised notice to plaintiffs that their customers were becoming late with payments in order to permit plaintiffs to assist with collection efforts;

(b)    Failing to wait until plaintiffs' customers were at least 120 days late with payments before repossessing those customers' vehicles, which failure cause a great loss of reputation among plaintiffs' customer base;

(c)    Failing to provide notice to those customers who had vehicles repossessed that they had the right to redeem those vehicles, as was required by the terms of the Vehicle Finance Agreements, and which failure cause a great loss of reputation among plaintiffs' customer base;

(d)    Failing to provide notice to plaintiffs that repossessed vehicles were being sold at auction;

(e)    Failing to turn over vehicle titles for vehicles that were never found or accounted for, in order to allow plaintiffs to file insurance claims or to secure their interest in the vehicles in the event they were ever found; and

(f)    Failing to help absorb any of the fees and costs incurred in placing Chrysler in a first lien holder position for the Midlothian floor plan.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 161 and each and every subpart.

162.    As a direct and proximate result of these contractual breaches, plaintiffs have suffered damages in an amount to be proven at the time of trial.

2074845                                                    - 54 -

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 162.

## COUNT II

## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS OR ECONOMIC ADVANTAGE

163.   Plaintiffs reallege all preceding paragraphs as though fully set forth herein.

**Answer:** Chrysler Financial restates its answers to Paragraphs 1-162 as if fully set

forth herein.

164.   Plaintiffs had a reasonable expectation of entering into a valid business relationship with those customers who signed contracts to buy vehicles at plaintiffs' dealership and who applied for financing through Chrysler and should have been eligible for such financing based on their credit history and financial condition.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 164.

165.   Plaintiffs' reasonable expectation in such a case was the ability to sell vehicles to customers who would obtain their purchase financing from Chrysler and the plaintiffs' ability to reap all the benefits that would have flowed from such a sale.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 165.

166.   Based on the contracts and business relationship between plaintiffs and defendant, and based on the financing applications received from such customers by defendant, defendant was aware of such a reasonable expectation on the part of plaintiffs.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 166.

167.   Defendant, however, intentionally interfered with plaintiffs' business relations with such customers by intentionally refusing to approve financing, or by approving financing with unreasonable qualifications, such as unreasonably high interest rates or the requirement of unreasonably high down payments, for such customers who should have been eligible for low interest financing through Chrysler.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 167.

168.   Such intentional interference was directed at plaintiffs' minority customers in order to further Chrysler's unlawful policy of discriminatory "redlining."

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 168.

169.   Defendant's intentional interference prevented plaintiffs' legitimate expectancy from ripening into fruition, as these otherwise qualified customers were forced to seek financing for their vehicle purchases from independent banks and other lending institutions or were forced to simply go to different dealerships or manufacturers for their purchases. The latter scenario is particularly true for customers who were seeking to take advantage of special factory-incentive financing that was being advertised by Chrysler and who should have qualified for that financing but for the discriminatory policies of defendants. These customers typically walked off the dealership lots without making a purchase.

   **Answer:**   Chrysler Financial denies each and every allegation in Paragraph 169.

170.   Defendant's intentional interference directly and proximately caused damages to plaintiffs. For those customers who did end up buying a vehicle with financing from an independent bank or other lending institution, the amount of money realized on the sale by plaintiffs was typically less than it would have been had the customers received the financing from Chrysler for which they were qualified. Worse, for those customers who never went through with a purchase through plaintiffs' dealerships because they were denied the Chrysler financing for which they were qualified, plaintiffs lost sales entirely. The precise amount of damages caused by defendant's intentional interference will be proven and established at the time of trial.

   **Answer:**   Chrysler Financial denies each and every allegation in Paragraph 170.

171.   Defendant further intentionally interfered with plaintiff Midlothian's prospective business advantage by forcing the reductions of the new and used car inventories at Midlothian, by placing unfair factory ordering restrictions on the dealership and by spreading rumors about the dealership, as described above, which prevented the dealership from accepting many used cars as trade in for new sales, from competing with other Chrysler dealerships on newer models of vehicles and from generally being free to conduct business as usual. Defendant's intentional interference directly and proximately caused damages to Midlothian, including many lost sales.

   **Answer:**   Chrysler Financial denies each and every allegation in Paragraph 171.

172.   Defendant's intentional interference was willful, wanton, reckless and malicious in that defendant's conduct was carried on with an utter indifference to and/or a conscious disregard for the welfare and rights of plaintiffs and their customers and exemplified a course of conduct and blatant discrimination that warrants the imposition of punitive or exemplary damages.

   **Answer:**   Chrysler Financial denies each and every allegation in Paragraph 172.

## COUNT III

## VIOLATION OF THE AUTOMOBILE DEALERS' DAY IN COURT ACT, 15 U.S.C. § 1221, *ET SEQ.*

173.    Plaintiffs reallege all preceding paragraphs as though fully set forth herein.

**Answer:**    Chrysler Financial restates its answers to Paragraphs 1-172 as if fully set forth herein.

174.    Plaintiffs being this claim under the Automobile Dealers' Day in Court Act ("ADDCA"), 15 U.S.C. § 1221, *et seq.*

**Answer:**    Chrysler Financial admits the existence of the statute cited but denies it is applicable to it.  Chrysler Financial denies each and every allegation in Paragraph 174.

175.    Plaintiffs are "automobile dealers," as that term is defined in the ADDCA, and are acting under "franchise" agreements with defendant, as that term is defined in the statute.

**Answer:**    Chrysler Financial admits that Marquette formerly was and that Midlothian currently is an "automobile dealer" as that term is defined in the Dealer Action. Chrysler Financial denies each and every allegation in Paragraph 175 not expressly admitted herein.

176.    Defendant Chrysler is subject to the ADDCA, as it is an "automobile manufacturer," as that term is defined in the statute.  Specifically, Chrysler is a wholly owned subsidiary of DaimlerChrysler AG, the auto manufacturer, acting as its "captive" finance arm.  In this regard defendant Chrysler acts as an instrumentality and agent of DaimlerChrysler AG.  In all averments in the complaint, defendant Chrysler was and is acting on behalf of and in concert with the manufacturer, DaimlerChrysler AG, in that defendant's dealing with plaintiffs have been for the sole and exclusive purpose of providing financing to facilitate the sale of dc vehicles at the plaintiff dealerships.

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 176.

177.    The ADDCA makes in unlawful for an automobile manufacturer to fail to act in "good faith" in conforming or complying with any terms or provisions of contracts and agreements governing the manufacturer's relationship with its automobile dealers.  15 U.S.C. § 1222.

2074845                                    - 57 -

**Answer:** Chrysler Financial refers to the Dealer Act for an accurate statement of its contents and, therefore, denies Plaintiffs' characterizations concerning the Dealer Act and each and every allegation in Paragraph 177.

178. The ADDCA defines "good faith" to mean, "the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party . . ." 15 U.S.C. § 1221(e).

**Answer:** Chrysler Financial admits that Paragraph 178 contains a partial, incomplete quotation of the definition of "good faith" in 15 U.S.C. § 1221(e). Chrysler Financial denies each and every allegation in Paragraph 178 not expressly admitted herein.

179. Defendant breached its duty of good faith by:

(a) Engaging in an unlawful practice of discriminatory redlining based on race and geographic location, which policy was aimed at the dealership plaintiffs and customers and which policy was contrary to contracts and agreements between the parties whereby Chrysler agreed to provide financing for plaintiffs' customers who met a minimum standard of creditworthiness based on an unbiased review of objective criteria;

(b) Forcing plaintiffs to accept under great duress and through threats, coercion and intimidation, as explained above, unfair and harmful agreements to share in losses related to the Marquette "fraud deals," which losses were not caused by plaintiffs or their employees and which losses should not have been required to be assumed by the plaintiffs under the terms of the dealerships;

(c) Threatening to and then refusing to honor their legitimate contractual obligations to provide financing to those of plaintiffs' customers who were qualified for such financing, until such time that plaintiffs accepted and paid for defendants' unreasonable assessment of plaintiffs' share of the losses allegedly suffered as a result of the "fraud deals," which losses were not caused by plaintiffs or their employees and which losses should not have been required

to be assumed by the plaintiffs under the terms of the
dealerships;

(d)    Threatening to and then conducting a full bank review and
       audit at Midlothian in an effort to punish plaintiffs for
       seeking legal advice and to force payments on defendant's
       unreasonable assessment of plaintiffs' share of the losses
       allegedly suffered as a result of the "fraud deals," which
       losses were not caused by plaintiffs or their employees and
       which losses should not have been required to be assumed
       by the plaintiffs under the terms of the dealerships;

(e)    Intimidating and coercing plaintiff Midlothian dealership
       by cutting the used car floor plan at the Midlothian store
       from an inventory of $2.3 million vehicles to an inventory
       of $1 million;

(f)    Intimidating and coercing plaintiff Midlothian dealership
       by cutting the new car floor plan at the Midlothian store
       from an inventory of $22 million to an inventory of $10
       million;

(g)    Intimidating and coercing plaintiff Midlothian dealership
       by lodging an assignment against the dealership's factory
       receivable and by placing unfair factory ordering
       restrictions on the dealership resulting in Midlothian's
       inability to obtain new Chrysler models and compete with
       other Chrysler dealerships;

(h)    Intimidating and coercing plaintiff Midlothian dealership
       by spreading false rumors about the dealership;

(i)    Intimidating and coercing plaintiff Midlothian dealership to
       incur substantial losses associated with putting Chrysler
       into a first lien holder position for the Midlothian floor
       plan, and threatening to cease doing business with
       Midlothian if it did not accept;

(j)    Forcing plaintiff Midlothian to accept under great duress
       and through threats, coercion and intimidation, as explained
       above, new, unfair and one-sided loan documents, which
       were "decidedly more favorable to the [Chrysler] and less
       protective of the rights of the dealer than prior version;"
       and

    (k)     Threatening to put Midlothian out of business unless it
signed a full release from any pending lawsuits and then
acting on that threat by aggressively trying to force the
dealership out of business when Midlothian refused to sign
a release.

**Answer:**     Chrysler Financial denies each and every allegation in Paragraph 179 and

each and every subpart.

180.    Defendant's breach of their duty of good faith directly and proximately caused
damages to plaintiffs in an amount that will be proven and established at the time of trial. Under
the ADDCA, plaintiffs may recover such damages, including lost profits and the cost of this suit.

**Answer:**     Chrysler Financial denies each and every allegation in Paragraph 180.

## COUNT IV

## VIOLATION OF THE ILLINOIS MOTOR VEHICLE FRANCHISE ACT

181.    Plaintiffs reallege all preceding paragraphs as though fully set forth herein.

**Answer:**     Chrysler Financial restates its answers to Paragraphs 1-180 as if fully set

forth herein.

182.    Plaintiffs bring this claim under the Illinois Motor Vehicle Franchise Act
(IMVFA), 815 I.L.C.S. 710/4(b), and 710/4(d)(1), (3), (4) and (6).

**Answer:**     Chrysler Financial admits the existence of the statute cited but denies it is

applicable to it. Chrysler Financial denies each and every allegation in Paragraph 182.

183.    Plaintiffs are "motor vehicle dealers" and "franchisees" as those terms are defined
under the IMVFA, 815 I.L.C.S. 710/2(h) and (k).

**Answer:**     Chrysler Financial admits that Marquette formerly was and that

Midlothian currently is a "motor vehicle dealer" and a "franchisee" as those terms are defined in

the Illinois Motor Vehicle Franchise Act. Chrysler Financial denies each and every allegation in

Paragraph 183 not expressly admitted herein.

184.    Defendant Chrysler is a factory branch, factory representative, distributor or wholesaler, distributor branch and/or distributor representative, as those terms are defined under the IMVFA, 815 I.L.C.S. 710/2(c)-(g).

**Answer:**    Chrysler Financial denies each and every allegation in Paragraph 184.

185.    The IMVFA makes it unlawful for "any manufacturer, factory branch, factory representative, distributor or wholesaler, distributor branch, distributor representative or motor vehicle dealer to engage in any action with respect to a franchise which is arbitrary, in bad faith or unconscionable and which causes damage to any of the parties or to the public." 815 I.L.C.S. 710/4(b).

**Answer:**    Chrysler Financial admits the existence of the statute cited, but denies that

the statute is applicable to it. Chrysler Financial denies each and every allegation in

Paragraph 185.

186.    The IMVFA also makes it unlawful for "a manufacturer, a distributor, a wholesaler, a distributor branch or division, or officer, agent or other representative thereof . . . to adopt, change, establish or implement a plan or system for the allocation and distribution of new motor vehicles to motor vehicle dealers which is arbitrary or capricious or to modify an existing plan so as to cause the same to be arbitrary or capricious." 815 I.L.C.S. 710/4(d)(1).

**Answer:**    Chrysler Financial admits the existence of the statute cited, but denies that

the statute is applicable to it. Chrysler Financial denies each and every allegation in

Paragraph 186.

187.    The IMVFA also makes it unlawful for "a manufacturer, a distributor, a wholesaler, a distributor branch or division, or officer, agent or other representative thereof . . . to refuse to deliver in reasonable quantities and within a reasonable time after receipt of dealers' order, to any motor vehicle dealer having a franchise or selling agreement for the retail sale of new motor vehicles sold or distributed by such manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division or wholesale branch or division, any such motor vehicles as are covered by such franchise or selling agreement specifically publicly advertised in the State by such manufacturer, distributor, wholesaler, distributor branch or division, factory branch or division, or wholesale branch or division to be available for immediate deliver." 815 I.L.C.S. 710/4(d)(3).

**Answer:**    Chrysler Financial admits the existence of the statute cited, but denies that

the statute is applicable to it.  Chrysler Financial denies each and every allegation in

Paragraph 187.

188.    The IMVFA also makes it unlawful for "a manufacturer, a distributor, a
wholesaler, a distributor branch or division, or officer, agent or other representative thereof . . . to
coerce, or attempt to coerce, any motor vehicle dealer to enter into any agreement with such
manufacturer, . . . agent or other representative thereof, or to do any other act prejudicial to the
dealer by threatening to reduce his allocation of motor vehicles or cancel any franchise or selling
agreement existing between such manufacturer, distributor, wholesaler, distributor branch or
division, or factory branch or division, or wholesale branch or division, and the dealer." 815
I.L.C.S. 710/4(d)(4).

**Answer:**    Chrysler Financial admits the existence of the statute cited, but denies that

the statute is applicable to it.  Chrysler Financial denies each and every allegation in

Paragraph 188.

189.    The IMVFA also makes it unlawful for "a manufacturer, a distributor, a
wholesaler, a distributor branch or division, or officer, agent or other representative thereof . . . to
cancel or terminate the franchise or selling agreement of a motor vehicle dealer without good
cause and without giving notice as hereinafter provided; to fail or refuse to extend the franchise
or selling agreement of a motor vehicle dealer upon its expiration without good cause and
without giving notice as hereinafter provided; or, to offer a renewal, replacement or succeeding
franchise or selling agreement containing terms and provisions the effect of which is to
substantially change or modify the sales and service obligations or capital requirement of the
motor vehicle dealer arbitrarily and without good cause and without giving notice as hereinafter
provided not withstanding any term or provision of a franchise or selling agreement ." 815
I.L.C.S. 710/4(d)(6).

**Answer:**    Chrysler Financial admits the existence of the statute cited, but denies that

the statute is applicable to it.  Chrysler Financial denies each and every allegation in

Paragraph 189.

190.    Defendant violated these provisions of the IMVFA by:

    (a)    Engaging in an unlawful practice of discriminatory
         redlining based on race and geographic location, which
         policy was aimed at the dealership plaintiffs and their
         customers and which policy was contrary to contracts and

agreements between the parties whereby Chrysler agreed to provide financing for plaintiffs' customers who met a minimum standard of creditworthiness based on an unbiased review of objective criteria;

(b) Forcing plaintiffs to accept unfair and harmful agreements to share in losses related to the Marquette "fraud deals," which losses were not caused by plaintiffs or their employees and which losses should not have been required to be assumed by the plaintiffs under the terms of the dealerships' agreements, by way of threats to put a financial hold on the Midlothian dealership and to remove the entire floor plan for the store within forty eight hours;

(c) Reducing the Midlothian dealerships' used car floor plan as a means of coercing plaintiffs into continuing to make payments and share in losses related to the Marquette "fraud deals," which losses were not caused by plaintiffs or their employees and which losses should not have been required to be assumed by the plaintiffs under the terms of the dealerships' agreements;

(d) Intimidating and coercing plaintiff Midlothian dealership by cutting the new car floor plan at the Midlothian store from an inventory of $22 million to an inventory of $10 million;

(e) Forcing plaintiff Midlothian to accept under great duress and through threats, coercion and intimidation, as explained above, new, unfair and one-sided loan documents, which were "decidedly more favorable to the [Chrysler] and less protective of the rights of the dealer than prior version.";

(f) Intimidating and coercing plaintiff Midlothian dealership by lodging an assignment against the dealership's factory receivable and by placing unfair factory ordering restrictions on the dealership resulting in Midlothian's inability to obtain new Chrysler models and compete with other Chrysler dealerships;

(g) Threatening to and then ceasing all buying at the Marquette dealership as a means of coercing plaintiffs into continuing to make payments and share in losses related to the Marquette "fraud deals," which losses were not caused by plaintiffs or their employees and which losses should not

have been required to be assumed by the plaintiffs under the terms of the dealerships' agreements;

(h) Intimidating and coercing plaintiff Midlothian dealership to incur substantial losses associate with putting Chrysler into a first lien holder position for the Midlothian floor plan, and threatening to cease doing business with Midlothian if it did not accept; and

(i) Threatening to put Midlothian out of business unless it signed a full release from any pending lawsuit and then acting on that threat by aggressively trying to force the dealership out of business when Midlothian refused to sign a release.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 190 and

each and every subpart.

191. Defendant's violations of the IMVFA directly and proximately caused damages to plaintiffs in an amount that will be proven and established at the time of trial. Under the IMVFA, plaintiffs may recover such damages, including attorneys' fees and the cost of this suit.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 191.

192. Defendant's violations of the IMVFA were willful and wanton. As such, plaintiffs are entitled to treble damages pursuant to 815 I.L.C.S. 710/13.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 192.

## VII.   PUNITIVE DAMAGES

193. By reason of the conduct alleged above, defendant's acts were willful, wanton, reckless and malicious in that defendant's conduct was carried on with an utter indifference to and/or a conscious disregard for the welfare and rights of plaintiffs and their customers and exemplified a course of conduct and blatant discrimination that warrants the imposition of punitive or exemplary damages.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 193.

194. Defendant's unconscionable conduct thereby warrants and assessment of exemplary and punitive damages against defendant in an amount appropriate to punish defendant and set an example, which will deter similar conduct.

**Answer:** Chrysler Financial denies each and every allegation in Paragraph 194.

## VIII. JURY DEMAND

195.   Plaintiffs demand trial by jury on all issues so triable.

**Answer:**      Chrysler Financial demands trial by jury on all issues so triable.

### DEFENSES

### FIRST DEFENSE

Answering further, and by way of defense, Chrysler Financial states that Plaintiffs' complaint fails to state any claim upon which relief may be granted.

### SECOND DEFENSE

Answering further, and by way of defense, Chrysler Financial states that Plaintiffs' claims are barred by the doctrines of waiver and estoppel.

### THIRD DEFENSE

Answering further, and by way of defense, Chrysler Financial denies that Plaintiffs have suffered any damages. To the extent that any damages exist, Plaintiffs failed to mitigate their damages and any recovery obtained by Plaintiffs must be reduced as a result.

### FOURTH DEFENSE

Answering further, and by way of defense, Chrysler Financial denies that Plaintiffs have suffered any damages. To the extent that any damages exist, Plaintiffs' damages were due to their own conduct, or the conduct of third parties, over which Chrysler Financial had no control.

### FIFTH DEFENSE

Answering further, and by way of defense, Chrysler Financial states that Plaintiffs have acted with unclean hands and are therefore barred from any relief.

2074845

- 65 -

## SIXTH DEFENSE

Answering further, and by way of defense, Chrysler Financial states that Plaintiffs' claims are barred by the doctrine of laches.

## SEVENTH DEFENSE

Answering further, and by way of defense, Chrysler Financial states that it owed no duty, and breached no duty, to Plaintiffs.

## EIGHTH DEFENSE

Answering further, and by way of defense, Chrysler Financial states that Plaintiffs have failed to state a basis upon which this Court may award treble damages.

## NINTH DEFENSE

Answering further, and by way of defense, Chrysler Financial states that Plaintiffs' claims for punitive damages are barred for one or more of the following reasons:

A.      The imposition of punitive damages, as sought by Plaintiffs in this case, would constitute an excessive fine in violation of the Eighth Amendment to the United States Constitution.

B.      An award of punitive damages is barred by the Eighth Amendment to the United States Constitution, because an award of punitive damages would constitute an excessive fine in that under applicable law, a portion of a punitive damage award may be paid to the government, thus constituting a penal fine that is excessive and disproportionate to the conduct at issue in this case.

C.      The recovery of punitive damages by Plaintiffs in this case is barred by the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution,

2074845                                           - 66 -

because the standards and procedures for determining and reviewing such awards under applicable law do not sufficiently ensure a meaningful individualized assessment of the appropriate deterrence and retribution.

D.    The recovery of punitive damages by Plaintiffs in this case is barred by the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution, because there are not realistic standards or limits imposed on the amount of punitive damages which may be awarded, and no required relationship between the actual damages sustained and the amount of punitive damages which may be awarded.

E.    The recovery of punitive damages by Plaintiffs in this case is barred by the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution, because the vague standards employed in punitive damage cases results in extremely disparate results among similar defendants accused of similar conduct.

F.    The recovery of punitive damages by Plaintiffs in this case is barred by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, since the purpose of punitive damages is punishment and deterrence, and there are not adequate procedural safeguards in place to protect Defendants' right against self-incrimination, right to proof beyond a reasonable doubt, and right to freedom from unreasonable searches and seizures in this case.

<u>TENTH DEFENSE</u>

Answering further, and by way of defense, Chrysler Financial states that its actions were justified because Chrysler Financial acted to protect its financial interests arising from its business dealings with Plaintiffs.

## ELEVENTH DEFENSE

Answering further, and by way of defense, Chrysler Financial states that Plaintiffs are barred from any recovery because, as set forth in Chrysler Financial's counterclaims, which are incorporated herein by reference, Plaintiffs are guilty of misrepresentation and have materially breached their agreements with Chrysler Financial.

## TWELFTH DEFENSE

Answering further, and by way of defense, Chrysler Financial states that it had good cause for its actions and took those actions in good faith.

## THIRTEENTH DEFENSE

Answering further, and by way of defense, Chrysler Financial states that the Automobile Dealer's Day in Court Act, 15 U.S.C. § 1221 *et seq.*, and the Illinois Motor Vehicle Franchise Act, 815 ILCS 710/1 *et seq.* (the "IMVFA"), do not apply to Chrysler Financial because: (a) Chrysler Financial is not a party to the dealer franchise agreements between Plaintiffs and DaimlerChrysler Motors Company for vehicles manufactured by DaimlerChrysler Corporation; (b) Chrysler Financial provides vehicle inventory and retail financing; it does not manufacture, sell, or distribute vehicles; and (c) Chrysler Financial does not act for and is not the agent of DaimlerChrysler Motors Company, DaimlerChrysler Corporation, or anyone else that manufactures, sells, or distributes cars.

## FOURTEENTH DEFENSE

Answering further, and by way of defense, Chrysler Financial states that following completion of discovery and investigation in this matter, additional defenses may become available. Chrysler Financial reserves the right to assert additional defenses that may be discovered in the course of these proceedings.

Respectfully submitted,

William R. Bay
Francis X. Buckley, Jr.
One U.S. Bank Plaza
St. Louis, Missouri 63101
314-552-6000
FAX 314-552-7010

OF COUNSEL:
THOMPSON COBURN LLP

GREENE AND LETTS
Martin P. Greene
Eileen M. Letts
111 West Washington Street, Suite 1650
Chicago, Illinois 60602
312-346-1100
FAX 312-346-4571

Attorneys for Defendant
DaimlerChrysler Services North America LLC

2074845                        - 69 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was mailed, United States postage prepaid, on March ⟋4 , 2003 to the following counsel of record for Plaintiffs:

Edward R. Vrdolyak
Nicholas Geanopoulos
EDWARD R. VRDOLYAK, LTD.
741 North Dearborn Street
Chicago, IL 60610

Steven W. Berman
Steven C. Mitchell
Christopher A. O'Hara
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

William Hooks
HOOKS LAW OFFICES, PC
29 S. LaSalle, Suite 333
Chicago, IL 60603

Eugene Pinchman
R. EUGENE PINCHAM, PC
9316 S. Michigan Ave.
Chicago, IL 60619

