DOCKETED
MAR 2 5 2003

FILED
MAR 2 4 2003
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RIDGE CHRYSLER JEEP, L.L.C., d/b/a MARQUETTE CHRYSLER JEEP AND SALES, INC., d/b/a DODGE OF MIDLOTHIAN, | ) ) ) ) ) | Case No. 03C00760 |
| Plaintiffs, | ) ) | U.S. District Judge Nordberg |
| v. | ) ) | United States. Magistrate Judge Sidney I. Schenkier |
| DAIMLERCHRYSLER SERVICES NORTH AMERICA LLC | ) ) ) | |
| Defendant. | ) ) | |

**NOTICE OF FILING**

TO:     Counsel of Record on Attached Service List

    PLEASE TAKE NOTICE that on Monday, March 24, 2003, we filed with the Clerk of

the United States District Court for the Northern District of Illinois Eastern Division, the

attached Defendant's Verified Counterclaim, copies of which are hereby served upon you.

THOMPSON COBURN LLP

W.c.R.B.
_____
William R. Bay
Francis X. Buckley, Jr.
One U.S. Bank Plaza
St. Louis, Missouri 63101
314-552-6000
FAX 314-552-7010

OF COUNSEL:
THOMPSON COBURN LLP

CLERK, U.S. DISTRICT COURT
03 MAR 24 PM 5: 15

2081991

GREENE AND LETTS
Martin P. Greene
Eileen M. Letts
111 West Washington Street, Suite 1650
Chicago, Illinois 60602
312-346-1100
FAX 312-346-4571

Attorneys for Defendant
DaimlerChrysler Services North America LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was mailed, United States postage prepaid, on March 24, 2003 to the following counsel of record for Plaintiffs:

Edward R. Vrdolyak
Nicholas Geanopoulos
EDWARD R. VRDOLYAK, LTD.
741 North Dearborn Street
Chicago, IL 60610

Steven W. Berman
Steven C. Mitchell
Christopher A. O'Hara
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

William Hooks
HOOKS LAW OFFICES, PC
29 S. LaSalle, Suite 333
Chicago, IL 60603

Eugene Pinchman
R. EUGENE PINCHAM, PC
9316 S. Michigan Ave.
Chicago, IL 60619



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RIDGE CHRYSLER JEEP, LLC, d/b/a MARQUETTE CHRYSLER JEEP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAIMLERCHRYSLER SERVICES NORTH AMERICA LLC, | ) | |
| | ) | Civil Action No. 03 C 00760 |
| Defendant/Counterclaim Plaintiff, | ) | |
| | ) | Judge John A. Nordberg |
| v. | ) | |
| | ) | Magistrate Sidney I. Schenkier |
| RIDGE CHRYSLER PLYMOUTH, LLC, d/b/a MARQUETTE CHRYSLER JEEP, | ) | |
| | ) | **DEFENDANT DEMANDS** |
| SALES, INC., d/b/a DODGE OF MIDLOTHIAN, | ) | **TRIAL BY JURY** |
| | ) | |
| GERALD W. GORMAN, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ELIZABETH A. GORMAN, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## VERIFIED COUNTERCLAIM

COMES NOW Defendant/Counterclaim Plaintiff DaimlerChrysler Services North

America LLC, d/b/a Chrysler Financial (herein, "Chrysler Financial"), by and through counsel,

and states the following as its counterclaims against Plaintiff/Counterclaim Defendant Ridge

Chrysler Plymouth, LLC, d/b/a Marquette Chrysler Jeep, Plaintiff/Counterclaim Defendant

Sales, Inc., d/b/a Dodge of Midlothian, Counterclaim Defendant Gerald W. Gorman ("Gerald

2072926

Gorman"), and Counterclaim Defendant Elizabeth A. Gorman (Elizabeth Gorman) (collectively, the "Counterclaim Defendants"):

## PARTIES, JURISDICTION, AND VENUE

1.      Chrysler Financial is a limited liability company organized under the laws of the State of Michigan, authorized to do business in the State of Illinois, and having its principal place of business in the State of Michigan.  Chrysler Financial is the successor by merger to Chrysler Financial Company, LLC, a Michigan limited liability company, which was the successor by merger to Chrysler Financial Corporation, a Michigan corporation, which was the successor by merger to Chrysler Credit Corporation, a Delaware corporation.

2.      Chrysler Financial's sole member is DaimlerChrysler Corporation, a corporation organized under the laws of the State of Delaware having its principal place of business in the State of Michigan.  Chrysler Financial is thus deemed to be a citizen of the States of Delaware and Michigan for purposes of diversity jurisdiction.

3.      Gerald Gorman is an individual with his domicile located in the State of Illinois and in this judicial district.  He is a citizen of the State of Illinois.

4.      Elizabeth Gorman is an individual with her domicile located in the State of Illinois and in this judicial district.  She is a citizen of the State of Illinois.

5.      Upon information and belief, Gerald Gorman and Elizabeth Gorman are husband and wife.

6.      Ridge Chrysler Plymouth, LLC, d/b/a Marquette Chrysler Jeep ("Marquette"), is a limited liability company organized under the laws of the State of Illinois having its principal place of business in Chicago, Illinois, which is located in this judicial district.  (Ridge Chrysler Plymouth, LLC, is misidentified as "Ridge Chrysler Jeep, LLC" in Plaintiffs' complaint.)

2072926                                                   - 2 -

Gerald Gorman and Elizabeth Gorman are the only members of Marquette. Marquette is thus deemed to be a citizen of the State of Illinois.

7.      Marquette is a former dealer of vehicles manufactured by DaimlerChrysler Corporation. It had a dealer franchise agreement with DaimlerChrysler Motors Company LLC.

8.      Sales, Inc., d/b/a Dodge of Midlothian ("Midlothian"), is a corporation organized under the laws of the State of Illinois having its principal place of business in Midlothian, Illinois, which is located in this judicial district. Midlothian is thus deemed to be a citizen of the State of Illinois.

9.      Midlothian is currently a dealer of vehicles manufactured by DaimlerChrysler Corporation. It has a dealer franchise agreement with DaimlerChrysler Motors Company LLC.

10.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because (i) there is complete diversity of citizenship, and (ii) the amount in controversy, exclusive of interest and costs, exceeds $75,000 as against each of the Counterclaim Defendants. Additionally, the Court has supplemental subject matter jurisdiction under 28 U.S.C. § 1367 because the counterclaims asserted herein are so related to claims in the action that are within the Court's original subject matter jurisdiction that the counterclaims form part of the same case or controversy under Article III of the United States Constitution.

11.     Venue in this action is proper pursuant to 28 U.S.C. § 1391 because (i) all of the Counterclaim Defendants reside in Illinois and one or more of the Counterclaim Defendants reside in this judicial district, (ii) one or more of the Counterclaim Defendants is subject to personal jurisdiction in this judicial district, and (iii) a substantial part of the events giving rise to Chrysler Financial's claims occurred in this judicial district.

2072926

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### A.  Loan and Security Agreements between Chrysler Financial and Midlothian

12.  On or about June 26, 2002, Midlothian and Chrysler Financial entered into a Master Loan and Security Agreement (the "Security Agreement").  Under the Security Agreement, Chrysler Financial has financed Midlothian's acquisition and inventory of new and used motor vehicles.  This is known as "floor plan" financing.  A true and accurate copy of the Security Agreement is attached hereto as **Exhibit 1** and incorporated by reference herein.

13.  On or about June 26, 2002, Midlothian and Chrysler Financial entered into a Master Loan and Security Agreement Variable Interest Rate Schedule (Prime Rate) (the "Security Agreement Interest Schedule").  Pursuant to the Security Agreement Interest Schedule, Midlothian and Chrysler Financial agreed to supplement the Security Agreement concerning certain terms relating to the rate of interest charged on loans to Midlothian by Chrysler Financial.  A true and accurate copy of the Security Agreement Interest Schedule is attached hereto as **Exhibit 2** and incorporated by reference herein.

14.  On or about June 26, 2002, Midlothian and Chrysler Financial entered into a Dealer Cash Management Addendum to Master Loan and Security Agreement (the "Cash Management Agreement").  Pursuant to the Cash Management Agreement, Midlothian and Chrysler Financial agreed to supplement the Security Agreement concerning certain terms relating to the repayment by Midlothian on loans to Midlothian by Chrysler Financial.  A true and accurate copy of the Cash Management Agreement is attached hereto as **Exhibit 3** and incorporated by reference herein.

15.  On or about June 26, 2002, Midlothian and Chrysler Financial entered into a DRAC Addendum to Master Loan and Security Agreement (the "DRAC Agreement").  Pursuant

to the DRAC Agreement, Midlothian and Chrysler Financial agreed to supplement the Security

Agreement concerning the ability of Midlothian to request loans from Chrysler Financial for

vehicles that Midlothian leases or rents on a daily rental basis to third parties. A true and

accurate copy of the DRAC Agreement is attached hereto as **Exhibit 4** and incorporated by

reference herein.

      16.     On or about June 26, 2002, Midlothian and Chrysler Financial entered into a

Retail Installment Contract and Lease Program Agreement (the "Retail Program Agreement").

Pursuant to the Retail Program Agreement, Midlothian and Chrysler Financial agreed to certain

terms concerning the purchase by Chrysler Financial from Midlothian of retail installment

contracts or leases with Midlothian's customers for motor vehicles. A true and accurate copy of

the Retail Program Agreement is attached hereto as **Exhibit 5** and incorporated by reference

herein.

      17.     On or about June 26, 2002, Midlothian and Chrysler Financial entered into a

Dealer Rate Buy-Down Addendum to Retail Installment Contract and Lease Program Agreement

(the "Retail Program Agreement Addendum"). Pursuant to the Retail Program Agreement

Addendum, Midlothian and Chrysler Financial agreed to modify and/or supplement certain terms

of the Retail Program Agreement concerning variable interest rates and other charges under retail

contracts. A true and accurate copy of the Retail Program Agreement Addendum is attached

hereto as **Exhibit 6** and incorporated by reference herein.

      18.     On or about June 26, 2002, Midlothian and Chrysler Financial entered into a

Special Retail Finance Plan Agreement (the "Special Retail Agreement"). Pursuant to the

Special Retail Agreement, Midlothian and Chrysler Financial agreed to certain additional and

supplemental terms concerning the purchase by Chrysler Financial from Midlothian of contracts

or leases with Midlothian's customers for motor vehicles. A true and accurate copy of the Special Retail Agreement is attached hereto as **Exhibit 7** and incorporated by reference herein.

19.     On or about June 26, 2002, Midlothian executed in favor of Chrysler Financial a Notice of Assignment (Factory Credits and Other Payments) (the "Factory Credit Assignment"). Pursuant to the terms of the Factory Credit Assignment, Midlothian acknowledged Chrysler Financial's right to collect factory credits or other payments otherwise due to Midlothian. A true and accurate copy of the Factory Credit Assignment is attached hereto as **Exhibit 8** and incorporated by reference herein.

20.     On or about June 26, 2002, Midlothian executed in favor of Chrysler Financial a Notice of Assignment (Deposit Accounts), as acknowledged by First Suburban National Bank (the "Deposit Accounts Assignment"). Pursuant to the terms of the Deposit Accounts Assignment, Midlothian and First Suburban National Bank acknowledged Chrysler Financial's security interest in the deposit accounts of Midlothian located with the First Suburban National Bank. A true and accurate copy of the Deposit Accounts Assignment is attached hereto as **Exhibit 9** and incorporated by reference herein.

21.     On or about June 26, 2002, Midlothian executed in favor of Chrysler Financial a Special Power of Attorney (Wholesale and DRAC) (the "Power of Attorney"). Pursuant to the Power of Attorney, Midlothian irrevocably appointed Chrysler Financial as its attorney-in-fact for purposes of accomplishing certain actions described therein. A true and accurate copy of the Power of Attorney is attached hereto as **Exhibit 10** and incorporated by reference herein.

22.     On or about June 26, 2002, Midlothian executed in favor of Chrysler Financial a Certificate of Authority (the "Certificate of Authority"). Pursuant to the Certificate of Authority, Midlothian certified to Chrysler Financial that certain individuals had authority to undertake

certain actions on behalf of Midlothian as described therein. A true and accurate copy of the Certificate of Authority is attached hereto as **Exhibit 11** and incorporated by reference herein.

23.     On or about December 15, 2000, Midlothian and Gerald Gorman executed in favor of Chrysler Financial a Subordination Agreement (the "Subordination Agreement"). Under the terms of the Subordination Agreement, Midlothian agreed to refrain from paying, and Mr. Gorman agreed to refrain from collecting, any payment on $4.5 million in subordinated debt owed by Midlothian to Mr. Gorman because the debt owed by Midlothian to Mr. Gorman is subordinate in priority to Midlothian's debt to Chrysler Financial. A true and accurate copy of the Subordination Agreement is attached hereto as **Exhibit 12** and incorporated by reference herein.

24.     The Security Agreement, the Security Agreement Interest Schedule, the Cash Management Agreement, the DRAC Agreement, the Retail Program Agreement, the Retail Program Agreement Addendum, the Special Retail Agreement, the Factory Credit Assignment, the Deposit Accounts Assignment, the Power of Attorney, the Certificate of Authority, and the Subordination Agreement are sometimes hereinafter referred to together as the "Midlothian Loan and Security Documents."

25.     Pursuant to the terms of the Security Agreement and other Midlothian Loan and Security Documents, Midlothian granted Chrysler Financial a first-priority security interest in the following present and future property and rights of Midlothian: (i) all Inventory (including both Inventory financed by Chrysler Financial and other Inventory not financed by Chrysler Financial), including without limitation all new and used motor vehicle and parts Inventory, and further including without limitation all Inventory on order but not yet delivered to Midlothian, and all consigned goods; (ii) all Equipment, including without limitation all furniture, fixtures,

2072926                                    - 7 -

machinery, tools, and all attachments and accessions; (iii) all investment property; all accounts, contract rights, tangible chattel paper, electronic chattel paper, instruments, documents, promissory notes, and supporting obligations; (iv) all general intangibles, payment intangibles, franchise rights, books, records, files, computer disks, software, involving or emanating from Midlothian's business or assets; (v) all rights to receive payment, credits, and other compensation (including without limitation all holdbacks, incentive payments, stock rebates, allowances, and additional factory credits) from any manufacturer, distributor, or supplier of Inventory or Equipment, or from any of their subsidiaries or affiliates; (vi) all payments and credits that Chrysler Financial may owe to Midlothian, and all funds of Midlothian that Chrysler Financial may have or retain in its possession, whether in the form of cash collateral, reserve, contingency or escrow accounts, or otherwise; (vii) and all proceeds of the foregoing, including without limitation proceeds of proceeds, goods received in trade, claims and tort recoveries, insurance proceeds, refunds of insurance premiums, proceeds derived from Midlothian's sale of chattel paper, and all cash and other funds held in all deposit accounts in which proceeds may be deposited (collectively, the "Collateral").

26. Specifically, as part of the Collateral, Midlothian granted Chrysler Financial a security interest in those motor vehicles listed on the attached **Exhibit 13**.

27. The security interest of Chrysler Financial in the Collateral is duly perfected, Chrysler Financial having filed a UCC-1 financing statement showing Chrysler Financial as secured party and Midlothian as debtor with the Illinois Secretary of State.

28. True and accurate copies of the documents constituting the financing statements are attached hereto as **Group Exhibit 14** and incorporated by reference herein.

29.     The Security Agreement requires Midlothian to "[p]rovide Lender [Chrysler Financial] with such financial information and statements (including monthly balance sheet and profit and loss statements), audit reports, management letters, lists of assets and liabilities, agings of receivables and payables, budgets, forecasts, projected cash flow statements, and such other reports with respect to Borrower's [Midlothian's] financial condition and business operations at such intervals and in such detail as Lender [Chrysler Financial] may request."

30.     The Security Agreement provides that "[s]o long as this Agreement remains in effect, Borrower [Midlothian] ... shall ... [m]aintain minimum capitalization, minimum net worth, and other financial ratios to such amounts and within such percentages as may be acceptable to Lender [Chrysler Financial]." These working capital and net worth obligations are required to provide Chrysler Financial with further assurance that Midlothian will be able to repay its loans with Chrysler Financial.

31.     A dealer's working capital is measured by its current assets (the sum of cash, accounts receivable, new and used inventory values, plus prepaid expenses) less its current liabilities (the sum of accounts payable to trade creditors and other payables and accrued expenses). Certain current assets—including amounts due to Midlothian from its officers (such as its owner, Gerald Gorman), employees, and affiliates (such as Marquette)—are excluded in calculating a dealer's working capital. Dealers such as Midlothian know how the amount of their working capital is calculated for purposes of their financing relationships with Chrysler Financial.

32.     The amount of working capital required is based on a formula that applies to all dealers. The formula is the dealer's annualized sales of new vehicles based on its sales of new vehicles multiplied by a certain dollar amount based on the dealer's annualized sales. For

dealers such as Midlothian with annualized sales of 1,200 or more new vehicles, the multiplier is $1,400 per vehicle.

33.     The Security Agreement provides for numerous Events of Default, including, but not limited to:

    a.     "Should Borrower [Midlothian] fail to comply with or perform under any term or condition of this Agreement or any Related Document";

    b.     "Should any representation, warranty or statement made to Lender [Chrysler Financial] under this Agreement, or under any Related Document, or in connection with any Loan or Obligation, prove to be false or misleading in any material respect"; and

    c.     "Should there be a material adverse change in Borrower's [Midlothian's] or any Guarantor's financial condition, or should Lender [Chrysler Financial] reasonably believe the prospect of Borrower's [Midlothian's] payment or performance to be impaired."

34.     The Security Agreement provides that upon occurrence of an Event of Default:

Lender may take possession of the Collateral wherever located, even if the Collateral is then in the possession of a third party. Immediately following Lender's demand, Borrower shall deliver, or cause to be delivered, to Lender or its designee all Collateral then in Borrower's possession, or in the possession of any third-party over which Borrower may exercise control. Borrower shall further deliver or cause to be delivered to Lender all books, records, files, computer disks and software in any way relating to the Collateral. If and when requested by Lender, Borrower shall assemble the Collateral and make it available to Lender at a place or at such places as Lender may designate. Lender may enter upon Borrower's property, or the property of a third party where any of the Collateral may then be located, and take possession of and remove the Collateral.

35.     Pursuant to the terms of the Midlothian Loan and Security Documents, Midlothian is responsible for payment of all attorneys' fees, costs, and expenses incurred by

Chrysler Financial to collect the sums due and owing by Midlothian to Chrysler Financial or to secure possession of the Collateral.

### B.      Midlothian's Defaults

36.      Midlothian is in default under the Midlothian Loan and Security Documents because:

a.      Midlothian provided false, misleading, and inaccurate financial statements to Chrysler Financial;

b.      Midlothian has failed to satisfy working capital requirements;

c.      Midlothian paid out over $1 million to Gerald Gorman in violation of the Subordination Agreement;

d.      Midlothian has failed to provide any monthly financial statements to Chrysler Financial for any month since December 2002; and

e.      Midlothian has committed other defaults.

37.      On or about December 2, 2002 through December 5, 2002, Chrysler Financial performed a "Limited Financial Review" ("LFR") of Midlothian to compare Midlothian's October 2002 financial statement submitted to Chrysler Financial and Midlothian's general ledger.  Chrysler Financial conducted a detailed review of cash and vehicle equity accounts, a limited review of the asset, liability, and equity accounts, and a reconciliation of Midlothian's financial statement with Midlothian's general ledger in accordance with Chrysler Financial's LFR program.  All of the documents reviewed were prepared and provided by Midlothian.  The purpose of the LFR was to determine the true overall financial condition of Midlothian.  A true and accurate copy of the audit report for the LFR is attached hereto as **Exhibit 15** and incorporated by reference herein.

2072926

38.     A further investigative tool used by Chrysler Financial, a bank cut off ("BCO"), was performed by Chrysler Financial's auditors with respect to Midlothian's financial condition on December 5, 2002. A BCO is an examination of the amount of cash on hand and new and used vehicle equity. The BCO confirmed the findings of the LFR, which had considered the financial condition of Midlothian as of October 31, 2002 (the date of the most recent Midlothian financial statements available to Chrysler Financial at the time).

39.     The LFR revealed a number of financial irregularities and deceptive reporting practices and that Midlothian's financial records were inaccurate in many respects and significantly misstated its true financial condition.

40.     The LFR revealed that Midlothian had overstated its net worth by $850,015.

41.     The LFR revealed that Midlothian had falsely stated its assets and liabilities, thereby overstating its reported working capital position in the amount of $2,087,646. Among the misstatements of Midlothian's assets and liabilities were the following:

        a.      Midlothian misstated $419,454 due from Gerald Gorman as cash in Midlothian's bank account when, in fact, this amount consisted of unrecorded wire transfers and checks paid to Gerald Gorman. Midlothian's misstatement falsely inflated its reported working capital by $419,454. Because this amount was in fact an amount due from Mr. Gorman, it could not be included in Midlothian's current assets for purposes of calculating Midlothian's working capital.

        b.      Midlothian misstated $125,000 due from Gerald Gorman as "Cash on Deposit," when, in fact, this amount had been paid out to purchase stock in First Suburban Bancorp Corp. owned by Gerald and Elizabeth Gorman. Midlothian's

misstatement falsely inflated its reported working capital by $125,000. Because this amount was in fact an amount due from Mr. Gorman, it could not be included in Midlothian's current assets for purposes of calculating Midlothian's working capital.

c.      Midlothian improperly offset against its accounts payable old accounts receivable in the amount of $480,860 due from Marquette, its affiliated sister company, and thereby understated its current liabilities and overstated its working capital by $480,860. This amount should have been recorded as affiliated accounts receivable, which could not be included in Midlothian's current assets for purposes of calculating Midlothian's working capital.

d.      Midlothian misstated as "Prepaid Expenses" $112,135 in accumulated personal expenses of Gerald Gorman and Shawn Temple (Midlothian's chief financial officer)—including credit card, mortgage, telephone, and other bills— that Midlothian paid. Midlothian's misstatement falsely inflated its reported working capital by $112,135.

e.      Midlothian misstated $697,847 of accounts receivables that it should have classified as doubtful based on its aging report, which showed the receivables to be over 90 days old. In turn, those accounts receivable should have been excluded from Midlothian's current assets for purposes of calculating its working capital.

42.     As a result of the LFR and BCO audits, Chrysler Financial discovered that Midlothian's working capital was only approximately $288,000 as of October 31, 2002. Based

on the standard formula discussed above and Midlothian's annualized sales, as of that date, Midlothian was required to have approximately $2,377,000 in working capital.

43.     Midlothian, without the prior approval or advance knowledge of Chrysler Financial, made one or more payments totaling in excess of $1 million on debt owed to Gerald Gorman in violation of the terms of Sections 2(a) and 5 of the Subordination Agreement. Under the terms of the Subordination Agreement, Midlothian had agreed to refrain from paying, and Gerald Gorman agreed to refrain from collecting, any payment on the subordinated debt owed by Midlothian to Gerald Gorman because the debt owed by Midlothian to Gerald Gorman is subordinate in priority to Midlothian's debt to Chrysler Financial.

44.     Midlothian has failed to provide any monthly financial statements to Chrysler Financial for any month since December 2002 although required to do so under the Security Agreement.

45.     Midlothian has committed other defaults under the Security Agreement and the Midlothian Loan and Security Documents.

46.     As a result of the LFR and BCO audits, on or about December 20, 2002, Chrysler Financial provided notice to Midlothian and its principals, Gerald and Elizabeth Gorman, that Midlothian was in default of its obligations to Chrysler Financial. A true and accurate copy of this letter (the "Notice of Default Letter") is attached hereto as **Exhibit 16** and incorporated by reference herein.

47.     In the Notice of Default Letter, Chrysler Financial:

a.      notified Midlothian that a permanent capital injection in the amount of $2.1 million was needed in order to maintain sufficient capital levels to operate the dealership;

b.    notified Midlothian that it had failed to maintain accurate financial statements as required under the Security Agreement between the parties; and

c.    demanded that Midlothian undertake action within 90 days of the date of the letter to obtain an infusion of capital in the form of a true and otherwise unencumbered capital investment or subordinated loan in the principal amount of $2.1 million and deliver to Chrysler Financial accurate financial statements going forward.

48.    To date, Midlothian has failed to cure its defaults under the Security Agreement and the Midlothian Loan and Security Documents.

49.    On March 21, 2003, Chrysler Financial, acting pursuant to its rights under the Security Agreement and the Midlothian Loan and Security Documents, sent a letter to Midlothian in which Chrysler Financial:

a.    advised Midlothian that Midlothian had failed to cure its defaults;

b.    accelerated all amounts due and owing by Midlothian to Chrysler Financial under the Midlothian Loan and Security Documents;

c.    demanded immediate payment of these amounts; and

d.    demanded that Midlothian surrender the Collateral to Chrysler Financial.

A true and accurate copy of this letter (the "Default Letter") is attached hereto as **Exhibit 17** and incorporated by reference herein.

50.    To date, Midlothian has failed and refused to surrender the Collateral to Chrysler Financial.

51.    As of March 12, 2003, Midlothian owes Chrysler Financial $10,251,945 under the Security Agreement and the Midlothian Loan and Security Documents (the "Midlothian

Indebtedness"). To date, Midlothian has not paid the amount due and owing to Chrysler Financial.

### C.     Marquette's Indebtedness to Chrysler Financial

52.     On or about February 4, 1999, Marquette executed in favor of Chrysler Financial a Vehicle Financing Agreement (the "Vehicle Financing Agreement"), which gave Chrysler Financial the option to accept or decline to take an assignment of retail installment contracts that Marquette proposed to enter into with its customers and thereafter sell to Chrysler Financial. A true and accurate copy of the Vehicle Financing Agreement is attached hereto as **Exhibit 18** and incorporated by reference herein.

53.     The Vehicle Financing Agreement provides:

> If any warranty contained in any such [Retail Installment] Contract shall be breached, in addition to any other liability arising from such breach, we [Marquette] unconditionally guarantee payment of the full amount remaining unpaid under the affected Contract and agree to purchase said Contract on demand for the full amount then unpaid whether or not the Contract shall then be, or not be, in default (such liability being herein called a "Full Recourse Liability") and you [Chrysler Financial] are hereby authorized by make the appropriate corrections on our [Marquette's] endorsement and assignment of such Contract.

54.     Marquette entered into a number of retail installment contracts with its customers for the purchases of vehicles from Marquette and then sold and assigned those contracts to Chrysler Financial.

55.     In assigning each of these retail installment contracts, Marquette made several representations and warranties to Chrysler Financial concerning each contract, including (1) that "the Contract contains an accurate representation of statements made by the Buyer, there is no inaccuracy or misrepresentation in any statement made by or on behalf of the Buyer, including those in the credit application, furnished to Assignee [Chrysler Financial] by Seller [Marquette]";

2072926                              - 16 -

and (2) that "no material fact relating to the vehicle was misrepresented." Each of the Retail Installment Contracts provides that if any of the "representations and warranties prove to be false or incorrect in any respect, and without regard to Seller's [Marquette's] knowledge or lack of knowledge, or Assignee's [Chrysler Financial's] reliance, Seller [Marquette] unconditionally, and with waiver of all defenses, agrees to pay to Assignee [Chrysler Financial] immediately on demand the full unpaid balance of this Contract, in principal, interest, costs, expenses, and attorney's fees."

56.   Marquette's representations and warranties to Chrysler Financial were false and incorrect with respect to at least 54 retail installment contracts executed between October 14, 2000 and December 31, 2000 and assigned by Marquette to Chrysler Financial and with respect to other retail installment contracts assigned by Marquette to Chrysler Financial. These retail installment contracts are collectively referred to herein as the "Fraudulent Retail Installment Contracts."

57.   Marquette supplied false information and/or misrepresented various portions of the retail credit applications leading to the Fraudulent Retail Installment Contracts, including, but not limited to:

      a.      Marquette overstated the invoice/wholesale value of the vehicle;

      b.      the consumers had no vehicle insurance or the insurance was cancelled or could not be verified;

      c.      the down payments reported by Marquette were overstated or nonexistent;

      d.      the consumers worked for one of three fictitious employers – Grace Transportation, M & M Towing, or B & S Construction – which apparently did not exist; and

   e.  other misrepresentations or problems.

58. Marquette's actions caused Chrysler Financial to agree to purchase and take assignments of the Fraudulent Retail Installment Contracts when Chrysler Financial would not otherwise have done so.

59. Because Marquette breached its representations and warranties in each of the Fraudulent Retail Installment Contracts, the contracts are full recourse liabilities of Marquette and Marquette is fully liable for the unpaid balances due on the contracts in the event the borrowers defaulted.

60. On or about February 12, 2001, Marquette signed a document (the "Full Recourse Acknowledgement") whereby it acknowledged that 54 of the Fraudulent Retail Installment Contracts had become full recourse liabilities and that it was fully liable for the unpaid balances due on those contracts in the event the borrowers defaulted. A true and accurate copy of the Full Recourse Acknowledgement is attached hereto as **Exhibit 19** and incorporated by reference herein.

61. As of March 21, 2003, Marquette owes Chrysler Financial $227,270.67 for the Fraudulent Retail Installment Contracts (the "Marquette Indebtedness"). On March 21, 2003, Chrysler Financial sent a letter to Marquette in which Chrysler Financial demanded payment of this amount. A true and accurate copy of this letter is attached hereto as **Exhibit 23** and incorporated by reference herein. To date, Marquette has not paid this amount due and owing to Chrysler Financial.

## D.  The Guaranties

62. On or about June 26, 2002, Gerald Gorman executed and delivered to Chrysler Financial a Continuing Guaranty, whereby Gerald Gorman unconditionally guaranteed the

payment of all obligations of Midlothian to Chrysler Financial (the "Gerald Gorman Midlothian Guaranty"). A true and accurate copy of the Gerald Gorman Midlothian Guaranty is attached hereto as **Exhibit 20** and incorporated by reference herein.

63. On or about September 5, 2000, Gerald Gorman and Elizabeth Gorman jointly executed and delivered to Chrysler Financial a Continuing Guaranty, whereby Gerald Gorman and Elizabeth Gorman jointly and unconditionally guaranteed the payment of all obligations of Midlothian to Chrysler Financial (the "Gerald and Elizabeth Gorman Midlothian Guaranty"). A true and accurate copy of the Gerald and Elizabeth Gorman Midlothian Guaranty is attached hereto as **Exhibit 21** and incorporated by reference herein.

64. On or about February 9, 1999, Gerald Gorman and Elizabeth Gorman jointly executed and delivered to Chrysler Financial a Continuing Guaranty, whereby Gerald Gorman and Elizabeth Gorman jointly and unconditionally guaranteed the payment of all obligations of Marquette to Chrysler Financial (the "Gerald and Elizabeth Gorman Marquette Guaranty"). A true and accurate copy of the Gerald and Elizabeth Gorman Marquette Guaranty is attached hereto as **Exhibit 22** and incorporated by reference herein.

## COUNT I – REPLEVIN
### (Against Midlothian)

65. Chrysler Financial realleges and incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

66. Because of Midlothian's defaults, Chrysler Financial is lawfully entitled to immediate possession of the Collateral pursuant to the terms of the Midlothian Loan and Security Documents.

67.     The Collateral has not been taken for any tax, assessment, or fine levied by virtue of the laws of the State of Illinois against Chrysler Financial or the property of Chrysler Financial, nor seized under any lawful process against the goods or chattels of Chrysler Financial subject to such lawful process, nor held by virtue of any order of replevin against Chrysler Financial.

68.     The value of the Collateral does not exceed $10,500,000.

69.     Midlothian is in wrongful possession of the Collateral.

70.     Chrysler Financial is in danger of losing its interest in the Collateral unless Chrysler Financial obtains immediate possession of same.

71.     The allegations of these counterclaims are verified by Robert J. Theriot, Manager-Wholesale Risk Administration for Chrysler Financial, in compliance with 735 ILCS § 5/19-104, incorporated by reference pursuant to the Federal Rules of Civil Procedure.

72.     Based on the foregoing, an order and judgment of replevin should be entered in favor of Chrysler Financial with respect to the Collateral.

WHEREFORE, Chrysler Financial respectfully requests the Court enter an Order and Judgment of Replevin in favor of Chrysler Financial and against Midlothian, granting the following relief:

a.      Immediate possession of the Collateral described herein;

b.      Damages equal to the value of any items of the Collateral not delivered to Chrysler Financial by Midlothian;

c.      An award of Chrysler Financial's expenses, reasonable attorneys' fees, and other costs of collection incurred in obtaining possession of the Collateral; and

     d.     All other relief to which Chrysler Financial is entitled.

**COUNT II – BREACH OF CONTRACT**
**(Against Midlothian)**

73.     Chrysler Financial realleges and incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

74.     The Midlothian Loan and Security Documents constitute valid and binding contracts, enforceable against Midlothian in accordance with their terms.

75.     Midlothian is in breach of its obligations under the terms of the Midlothian Loan and Security Documents for, among other things, the aforementioned defaults.

76.     Despite demand by Chrysler Financial made upon Midlothian, Midlothian has failed to cure its defaults under the Midlothian Loan and Security Documents.

77.     All conditions precedent to Midlothian's performance in making payment and/or surrendering the Collateral have been satisfied by Chrysler Financial or have been excused.

78.     Midlothian continues in its breach of the Midlothian Loan and Security Documents by failing to pay the entire balance due thereunder.

79.     Chrysler Financial has been damaged by Midlothian's breach of the Midlothian Loan and Security Documents in an amount not less than the Midlothian Indebtedness.

WHEREFORE, Chrysler Financial respectfully requests the Court enter judgment in favor of Chrysler Financial and against Midlothian granting the following relief:

     a.     Damages in the amount of the entire Midlothian Indebtedness, being not less than $10,251,945, plus prejudgment interest;

     b.     An award of Chrysler Financial's expenses, reasonable attorneys' fees, and other costs of collection incurred; and

c.      All other relief to which Chrysler Financial is entitled.

## COUNT III – BREACH OF CONTRACT
### (Against Marquette)

80.      Chrysler Financial realleges and incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

81.      The Vehicle Financing Agreement constitutes a valid and binding contract, enforceable against Marquette in accordance with its terms, and includes the assignment warranties made by Marquette to Chrysler Financial in each Fraudulent Retail Installment Contract.

82.      The Full Recourse Acknowledgement constitutes a valid and binding contract, enforceable against Marquette in accordance with its terms.

83.      Marquette is in breach of its obligations under the terms of the assignment warranties, the Vehicle Financing Agreement, and the Full Recourse Acknowledgement because of its failure to pay the amounts due and owing to Chrysler Financial for the Fraudulent Retail Installment Contracts (the "Marquette Indebtedness") despite demand for payment made by Chrysler Financial upon Marquette.

84.      All conditions precedent to Marquette's performance in making payment have been satisfied by Chrysler Financial or have been excused.

85.      Chrysler Financial has been damaged by Marquette's breach of the assignment warranties, Vehicle Financing Agreement, and Full Recourse Acknowledgement in an amount not less than the Marquette Indebtedness.

WHEREFORE, Chrysler Financial respectfully requests the Court enter judgment in favor of Chrysler Financial and against Marquette granting the following relief:

2072926

a.     Damages in the amount of the entire Marquette Indebtedness, being not

less than $227,270.67, plus prejudgment interest;

b.     An award of Chrysler Financial's expenses, reasonable attorneys' fees,

and other costs of collection incurred; and

c.     All other relief to which Chrysler Financial is entitled.

## COUNT IV – ACTION ON GUARANTY
### (Against Gerald Gorman)

86.     Chrysler Financial realleges and incorporates by reference paragraphs 1 through

64 as if fully set forth herein.

87.     The obligations of Gerald Gorman, as the unconditional guarantor of the

Midlothian Indebtedness pursuant to the Gerald Gorman Midlothian Guaranty and the Gerald

and Elizabeth Gorman Midlothian Guaranty and of the Marquette Indebtedness pursuant to the

Gerald and Elizabeth Gorman Marquette Guaranty are primary and independent in nature and

may be enforced directly against him.

88.     Gerald Gorman is personally liable for the amounts due and owing to Chrysler

Financial from Midlothian and Marquette and is personally liable for attorneys' fees and court

and collection costs incurred by Chrysler Financial in its efforts to collect the amounts due and

owing.

WHEREFORE, Chrysler Financial respectfully requests the Court enter judgment in

favor of Chrysler Financial and against Gerald Gorman granting the following relief:

a.     Damages in the amount of the entire Midlothian Indebtedness, being not

less than $10,251.945, plus prejudgment interest, and the amount of the entire

Marquette Indebtedness, being not less than $227,270.67, plus prejudgment interest;

b.      An award of Chrysler Financial's expenses, reasonable attorneys' fees, and other costs of collection incurred; and

c.      All other relief to which Chrysler Financial is entitled.

## COUNT V – ACTION ON GUARANTY
### (Against Elizabeth Gorman)

89.     Chrysler Financial realleges and incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

90.     The obligations of Elizabeth Gorman, as the unconditional guarantor of the Midlothian Indebtedness pursuant to the Gerald and Elizabeth Gorman Midlothian Guaranty and of the Marquette Indebtedness pursuant to the Gerald and Elizabeth Gorman Marquette Guaranty are primary and independent in nature and may be enforced directly against her.

91.     Elizabeth Gorman is personally liable for the amounts due and owing to Chrysler Financial from Midlothian and Marquette and is personally liable for attorneys' fees and court and collection costs incurred by Chrysler Financial in its efforts to collect the amounts due and owing.

WHEREFORE, Chrysler Financial respectfully requests the Court enter judgment in favor of Chrysler Financial and against Elizabeth Gorman granting the following relief:

a.      Damages in the amount of the entire Midlothian Indebtedness, being not less than $10,251,945, plus prejudgment interest, and the amount of the entire Marquette Indebtedness, being not less than $227,270.67, plus prejudgment interest;

b.     An award of Chrysler Financial's expenses, reasonable attorneys' fees,

and other costs of collection incurred; and

c.     All other relief to which Chrysler Financial is entitled.

Defendant demands trial by jury on all issues so triable.

> Respectfully submitted,
>
> William R. Bay
> Francis X. Buckley, Jr.
> One U.S. Bank Plaza
> St. Louis, Missouri  63101
> 314-552-6000
> FAX 314-552-7010

OF COUNSEL:
THOMPSON COBURN LLP

> GREENE AND LETTS
> Martin P. Greene
> Eileen M. Letts
> 111 West Washington Street, Suite 1650
> Chicago, Illinois  60602
> 312-346-1100
> FAX 312-346-4571
>
> Attorneys for Defendant
> DaimlerChrysler Services North America LLC

2072926

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing was mailed, United States postage prepaid, on March 24th, 2003 to the following counsel of record for Plaintiffs:

Edward R. Vrdolyak
Nicholas Geanopoulos
EDWARD R. VRDOLYAK, LTD.
741 North Dearborn Street
Chicago, IL 60610

Steven W. Berman
Steven C. Mitchell
Christopher A. O'Hara
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

William Hooks
HOOKS LAW OFFICES, PC
29 S. LaSalle, Suite 333
Chicago, IL 60603

Eugene Pinchman
R. EUGENE PINCHAM, PC
9316 S. Michigan Ave.
Chicago, IL 60619

## VERIFICATION BY CERTIFICATION

I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the statements set forth in this pleading are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true, and that the exhibits attached to this instrument are true and accurate copies of such documents maintained in the files of Chrysler Financial in the ordinary course of business.

_____
Robert J. Theriot, Manager-Wholesale Risk Administration
DaimlerChrysler Services North America, LLC


STATE OF MICHIGAN )
                  ) SS.
COUNTY OF Oakland )


On this 20th day of March, 2003, before me appeared Robert J. Theriot, to me personally known, who being by me duly sworn, did state that he/she is authorized to make this affidavit on behalf of DaimlerChrysler Services North America LLC, and that the statements made herein are true to the best of his/her knowledge, information and belief.

IN TESTIMONY WHEREOF, I hereunto set my hand and affix my official seal in the County and State aforesaid, the date and year written above.


_____
Notary Public
SANDRA J. GERBER
Notary Public, Macomb County, Michigan
Acting in Oakland County, Michigan
My Commission Expires August 28, 2004

(SEAL)

My Commission Expires:

# SEE CASE
# FILE FOR
# EXHIBITS