**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RIDGE CHRYSLER JEEP, L.L.C, ET AL. )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>DAIMELR CHRYSLER SERVICES )<br>NORTH AMERICAN, ET. AL. )<br>Defendant. )<br>v. )<br> )<br>RIDGE CHRYSLER PLYMOUTH LLC, )<br>d/b/a SALES, INC. d/b/a DODGE OF )<br>MIDLOTHIAN, GERALD W. GORMAN )<br>and ELIZABETH GORMAN, )<br>Counterclaim Defendants. ) | 03 C 00760<br>Judge Anderson<br><br>**FILED**<br>MAY 0 2 2003<br>MICHAEL W. DOBBINS<br>CLERK, U.S. DISTRICT COURT |

DOCKETED
MAY 0 5 2003

## NOTICE OF FILING

TO:     SEE ATTACHED SERVICE LIST

    **PLEASE TAKE NOTICE** that on May 2, 2003 we filed with the Clerk of the Court for the United States District Court for the Northern District of Illinois, Eastern Division, **Plaintiff/Counterclaim Defendants' Answer to Verified Counterclaim,** a copy of which is attached hereto and served upon you

_____
James J. Roche

## CERTIFICATE OF SERVICE BY U.S. MAIL

        The undersigned, an attorney, certifies that he served a copy of the above Notice of Filing and attached documents, by depositing in the U.S. mailbox at Dearborn and Grand a true and correct copy of same to the individual indicated before 5:00 p.m. on the 2nd day of May, 2003.

_____
James J. Roche

JAMES J. ROCHE & ASSOCIATES
Attorney for Plaintiff/Counterclaim Defendants
642 North Dearborn Street
Chicago, Illinois 60610
(312)335-0044
A.R.D.C.#: 2359162

45

## RIDGE CHRYSLER JEEP, LLC
### v.
## DAIMLERCHRYSLER SERVICES NORTH AMERICA
Case No. 03 C 00760

Hon. R. Eugene Pincham
9316 South Michigan Avenue
Chicago, IL 60619

Mr. Edward R. Vrdolyak
Mr. Nick Geanopoulos
Edward R. Vrdolyak, Ltd.
741 North Dearborn Street
Chicago, IL 60610

Mr. William H. Hooks
Hooks Law Office, P.C.
29 South LaSalle Street
Suite 333
Chicago, IL 60603

Mr. Steve W. Berman
Mr. Christopher O'Hara
1301 Fifth Avenue
Suite 2900
Seattle, WA 98101

Mr. Martin Peter Greene
Ms. Eileen Marie Letts
Greene & Letts
111 West Washington Street
Suite 1650
Chicago, IL 60602

Mr. William Robert Bay
Mr. Thompson Coburn
Mr. Francis X. Buckley, Jr.
One US Bank Plaza
Suite 3500
St. Louis, MO 63101-1693

Mr. D. J. Culkar
Staff Counsel
Daimler Chrysler Services North America,
LLC
27777 Inkster Road
Farmington Hills, MI 48334-5326

Mr. William J. Harte
Mr. Erik D. Gruber
William J. Harte, Ltd.
111 West Washington Street
Suite 1100
Chicago, IL 60602-2705

FILED

MAY 0 2 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
MAY 0 5 2003

RIDGE CHRYSLER JEEP, LLC, d/b/a )
MARQUETTE CHRYSLER JEEP, et al., )
)
    Plaintiffs, )
)
    v. )
)
DAIMLERCHRYSLER SERVICES )
NORTH AMERICA, )
)
    Defendant/Counterclaim Plaintiff, )
)
    v. )
)
RIDGE CHRYSLER PLYMOUTH, LLC, d/b/a )
MARQUETTE CHRYSLER JEEP, )
SALES, INC. d/b/a DODGE OF MIDLOTHIAN, )
GERALD W. GORMAN, )
and )
ELIZABETH GORMAN, )
)
    Counterclaim Defendants. )

Civil Action No. 03 C 00760

Judge Wayne R. Anderson

Magistrate Sidney I. Schenkier

# ANSWER TO VERIFIED COUNTERCLAIM

Now come Plaintiffs/Counterclaim Defendants, RIDGE CHRYSLER JEEP, LLC, d/b/a

MARQUETTE CHRYSLER JEEP, SALES, INC. d/b/a DODGE OF MIDLOTHIAN, GERALD

W. GORMAN and ELIZABETH GORMAN, by their attorneys, and Answer the Verified

Counterclaim as follows:

## PARTIES, JURISDICTION AND VENUE

1.    Chrysler Financial is a limited liability company organized under the laws of the

State of Michigan, authorized to do business in the State of Illinois, and having its principal

place of business in the State of Michigan. Chrysler Financial is the successor by merger to

45

Chrysler Financial Company, LLC, a Michigan limited liability company, which was the successor by merger to Chrysler Financial Corporation, a Michigan corporation, which was the successor by merger to Chrysler Credit Corporation, a Delaware corporation.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 1 of the Verified Counterclaim.


2.     Chrysler Financial's sole member is DaimlerChrysler Corporation, a corporation organized under the laws of the State of Delaware having its principal place of business in the State of Michigan. Chrysler Financial is thus deemed to be a citizen of the States of Delaware and Michigan for purposes of diversity jurisdiction.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 2 of the Verified Counterclaim.


3.     Gerald Gorman is an individual with his domicile located in the State of Illinois and in this judicial district. He is a citizen of the State of Illinois.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 3 of the Verified Counterclaim.


4.     Elizabeth Gorman is an individual with her domicile located in the State of Illinois and in this judicial district. She is a citizen of the State of Illinois.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 4 of the Verified Counterclaim.

5. Upon information and belief, Gerald Gorman dn Elizabeth Gorman are husband and wife.

**ANSWER:** Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 5 of the Verified Counterclaim.

6. Ridge Chrysler Plymouth, LLC, d/b/a Marquette Chrysler Jeep ("Marquette"), is a limited liability company organized under the laws of the State of Illinois having its principal place of business in Chicago, Illinois, which is located in this judicial district. (Ridge Chrysler Plymouth, LLC, is misidentified as "Ridge Chrysler Jeep, LLC" in Plaintiffs' complaint.) Gerald Gorman and Elizabeth Gorman are the only members of Marquette. Marquette is thus deemed to be a citizen of the State of Illinois.

**ANSWER:** Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 6 of the Verified Counterclaim.

7. Marquette is a former dealer of vehicles manufactured by DaimlerChrysler Corporation. It had a dealer franchise agreement with DaimlerChrysler Motors Company LLC.

**ANSWER:** Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 7 of the Verified Counterclaim.

8. Sales, Inc., d/b/a Dodge of Midlothian ("Midlothian"), is a corporation organized under the laws of the State of Illinois having its principal place of business in Midlothian, Illinois, which is located in this judicial district. Midlothian is thus deemed to be a citizen of the State of Illinois.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 8 of the Verified Counterclaim.

9.     Midlothian is currently a dealer of vehicles manufactured by DaimlerChrysler Corporation. It has a dealer franchise agreement with DaimlerChrysler Motors Company LLC.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 9 of the Verified Counterclaim.

10.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because (i) there is complete diversity of citizenship, and (ii) the amount in controversy, exclusive of interest and costs, exceeds $75,000 as against each of the Counterclaim Defendants. Additionally, the Court has supplemental subject matter jurisdiction under 28 U.S.C. § 1367 because the counterclaims asserted herein are so related to claims in the action that are within the Court's original subject matter jurisdiction that the counterclaims form part of the same case of controversy under Article III of the United States Constitution.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 10 of the Verified Counterclaim.

11.     Venue in this action is roper pursuant to 28 U.S.C. §1391 because (i) all of the Counterclaim Defendants reside in Illinois and one or more of the Counterclaim Defendants reside in this judicial district, (ii) one or more of the Counterclaim Defendants is subject to personal jurisdiction in this judicial district, and (iii) a substantial part of the events giving rise of Chrysler Financial's claims occurred in this judicial district.

**ANSWER:** Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 11 of the Verified Counterclaim.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### A. Loan and Security Agreements Between Chrysler Financial and Midlothian

12.　On or about June 26, 2002, Midlothian and Chrysler Financial entered into a Master Loan and Security Agreement (the "Security Agreement"). Under the Security Agreement, Chrysler Financial has financed Midlothian's acquisition and inventory of new and used motor vehicles. This is known as "floor plan" financing. A true and accurate copy of the Security Agreement is attached hereto as Exhibit 1 and incorporated by reference herein.

**ANSWER:** Plaintiff/Counterclaim Defendant admits that he signed the agreements on June 26, 2002, but states such signature was done under duress.

13.　On or about June 26, 2002, Midlothian and Chrysler Financial entered into a Master Loan and Security Agreement Variable Interest Rate Schedule (Prime Rate) (the "Security Agreement Interest Schedule"). Pursuant to the Security Agreement Interest Schedule, Midlothian and Chrysler Financial agreed to supplement the Security Agreement concerning certain terms relating to the rate of interest charged on loans to Midlothian by Chrysler Financial. A true and accurate copy of the Security Agreement Interest Schedule is attached hereto as Exhibit 2 and incorporated by reference herein.

**ANSWER:** Plaintiff/Counterclaim Defendant admits that he signed the agreements on June 26, 2002, but states such signature was done under duress.

14.     On or about June 26, 2002, Midlothian and Chrysler Financial entered into a Dealer Cash Management Addendum to Master Loan and Security Agreement (the "Cash Management Agreement"). Pursuant to the Cash Management Agreement, Midlothian and Chrysler Financial agreed to supplement the Security Agreement concerning certain terms relating to the repayment by Midlothian on loans to Midlothian by Chrysler Financial. A true and accurate copy of the Cash Management Agreement is attached hereto as Exhibit 3 and incorporated by reference herein.

**ANSWER:**     Plaintiff/Counterclaim Defendant admits that he signed the agreements on June 26, 2002, but states such signature was done under duress.


15.     On or about June 26, 2002, Midlothian and Chrysler Financial entered into a DRAC Addendum to Master Loan and Security Agreement (the "DRAC Agreement"). Pursuant to the DRAC Agreement, Midlothian and Chrysler Financial agreed to supplement the Security Agreement concerning the ability of Midlothian to request loans from Chrysler Financial for vehicles that Midlothian leases or rents on a daily rental basis to third parties. A true and accurate copy of the DRAC Agreement is attached hereto as Exhibit 4 and incorporated by reference herein.

**ANSWER:**     Plaintiff/Counterclaim Defendant admits that he signed the agreements on June 26, 2002, but states such signature was done under duress.


16.     On or about June 26, 2002, Midlothian and Chrysler Financial entered into a Retail Installment Contract and Lease Program Agreement (the "Retail Program Agreement"). Pursuant to the Retail Program Agreement, Midlothian and Chrysler Financial agreed to certain terms concerning the purchase by Chrysler Financial from Midlothian of retail installment

-6-

contracts or leases with Midlothian's customers for motor vehicles. A true and accurate copy of the Retail Program Agreement is attached hereto as Exhibit 5 and incorporated by reference herein.

**ANSWER:**     Plaintiff/Counterclaim Defendant admits that he signed the agreements on June 26, 2002, but states such signature was done under duress.

17.     On or about June 26, 2002, Midlothian and Chrysler Financial entered into a Dealer Rate Buy-Down Addendum to Retail Installment Contract and Lease Program Agreement (the "Retail Program Agreement Addendum"). Pursuant to the Retail Program Agreement Addendum, Midlothian and Chrysler Financial agreed to modify and/or supplement certain terms of the Retail Program Agreement concerning variable interest rates and other charges under retail contracts. A true and accurate copy of the Retail Program Agreement Addendum is attached hereto as Exhibit 6 and incorporated by reference herein.

**ANSWER:**     Plaintiff/Counterclaim Defendant admits that he signed the agreements on June 26, 2002, but states such signature was done under duress.

18.     On or about June 26, 2002, Midlothian and Chrysler Financial entered into a Special Retail Finance Plan Agreement (the "Special Retail Agreement"). Pursuant to the Special Retail Agreement, Midlothian and Chrysler Financial agreed to certain additional and supplemental terms concerning the purchase by Chrysler Financial from Midlothian of contracts or leases with Midlothian's customers for motor vehicles. A true and accurate copy of the Special Retail Agreement is attached hereto as Exhibit 7 and incorporated by reference herein.

**ANSWER:**     Plaintiff/Counterclaim Defendant admits that he signed the agreements on June

26, 2002, but states such signature was done under duress.


19.     On or about June 26, 2002, Midlothian executed in favor of Chrysler Financial
a Notice of Assignment (Factor Credits and Other Payments) (the "Factor Credit Assignment").
Pursuant to the terms of the Factory Credit Assignment, Midlothian acknowledged Chrysler
Financial's right to collect factor credits or other payments otherwise due to Midlothian. A true
and accurate copy of the Factory Credit Assignment is attached hereto as Exhibit 8 and
incorporated by reference herein.

**ANSWER:**     Plaintiff/Counterclaim Defendant admits that he signed the agreements on June

26, 2002, but states such signature was done under duress.


20.     On or about June 26, 2002, Midlothian executed in favor of Chrysler Financial
a notice of Assignment (Deposit Accounts), as acknowledged by First Suburban National Bank
(the "Deposit Accounts Assignment"). Pursuant to the terms of the Deposit Accounts
Assignment, Midlothian and First Suburban National Bank acknowledged Chrysler Financial's
security interest in the deposit accounts of Midlothian located in the First Suburban National
Bank. A true and accurate copy of the deposit Accounts is attached hereto as Exhibit 9 and
incorporated by reference herein.

**ANSWER:**     Plaintiff/Counterclaim Defendant admits that he signed the agreements on June

26, 2002, but states such signature was done under duress.

21. On or about June 26, 2002, Midlothian executed in favor of Chrysler Financial a Special Power of Attorney (Wholesale and DRAC) (the "Power of Attorney"). Pursuant to the Power of Attorney, Midlothian irrevocably appointed Chrysler Financial as its attorney-in-fact for purposes of accomplishing certain actions described therein. A true and accurate copy of the Power of Attorney is attached hereto as Exhibit 10 and incorporated by reference herein.

**ANSWER:** Plaintiff/Counterclaim Defendant admits that he signed the agreements on June 26, 2002, but states such signature was done under duress.

22. On or about June 26, 2002, Midlothian executed in favor of Chrysler Financial a Certificate o Authority (the "Certificate of Authority"). Pursuant to the Certificate of Authority, Midlothian certified to Chrysler Financial that certain individuals had authority to undertake certain actions on behalf of Midlothian as described therein. A true and accurate copy of the Certificate of Authority is attached hereto as Exhibit 11 and incorporated by reference herein.

**ANSWER:** Plaintiff/Counterclaim Defendant admits that he signed the agreements on June 26, 2002, but states such signature was done under duress.

23. On or about December 15, 2000, Midlothian and Gerald Gorman executed in favor of Chrysler Financial a Subordination Agreement (the "Subordination Agreement"). Under the terms of the Subordination Agreement, Midlothian agreed to refrain from paying, and Mr. Gorman agreed to refrain from collecting, any payments on the $4.5 million in subordinated debt owed by Midlothian to Mr. Gorman because the debt owed by Midlothian to Mr. Gorman is subordinate in priority to Midlothian's debt to Chrysler Financial. A true and accurate copy of the Subordination Agreement is attached hereto as Exhibit 12 and incorporated by reference herein.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph

23 of the Verified Counterclaim.


24.     The Security Agreement, the Security Agreement Interest Schedule, the Cash

Management Agreement, the DRAC Agreement, the Retail Program Agreement, the Retail

Program Agreement Addendum, the Special Retail Agreement, the Factor Credit Assignment,

the Deposit Accounts Assignment, the Power of Attorney, the Certificate of Authority, and the

Subordination Agreement are sometimes hereinafter referred to together as the "Midlothian

Loan and Security Documents."

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph

24 of the Verified Counterclaim.


25.     Pursuant to the terms of the Security Agreement and other Midlothian Loan dn

Security Documents, Midlothian granted Chrysler Financial a first-priority security interest int

eh following present and future property and rights of Midlothian:  (i) all Inventory (including

both Inventory financed by Chrysler Financial and other Inventory not financed by Chrysler

Financial), including without limitation all new and used motor vehicle and parts Inventory, and

further including without limitation all Inventory on order but not yet delivered to Midlothian, and

all consigned goods; (ii) all Equipment, including without limitation all furniture, fixtures,

machinery, tools, and all attachments and accessions; (iii) all investment property; all accounts,

contract rights, tangible chattel paper, electronic chattel paper, instruments, documents,

promissory notes and supporting obligations; (iv) all general intangibles, payment intangibles,

franchise rights, books, records, files, computer disks, software, involving or emanating from

Midlothian's business or assets; (v) all rights to receive payment, credits and other

compensation (including without limitation all holdbacks, incentive payments, stock rebates, allowances, and additional factor credits) from any manufacturer, distributor or supplier of Inventory or Equipment, or from any of their subsidiaries or affiliates; (vi) all payments and credits that Chrysler Financial may owe to Midlothian, and all funds of Midlothian that Chrysler Financial may have or retain in its possession, whether in the form of cash collateral, reserve, contingency or escrow accounts, or otherwise; (vii) and all proceeds of the foregoing, including without limitation proceeds of proceeds, goods received in trade, claims and tort recoveries, insurance proceeds, refunds of insurance premiums, proceeds derived from Midlothian's sale of chattel paper, and all cash and other funds held in all deposit accounts in which proceeds may be deposited (collectively, the "Collateral").

**ANSWER:**    Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 25 of the Verified Counterclaim.


26.    Specifically, a part of the Collateral, Midlothian granted Chrysler Financial a security interest in those motor vehicles listed on the attached Exhibit 13.

**ANSWER:**    Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 26 of the Verified Counterclaim.


27.    The security interest of Chrysler Financial in the Collateral is duly perfected, Chrysler Financial having filed a UCC-1 financing statement showing Chrysler Financial as security party and Midlothian as debtor with the Illinois Security of State.

**ANSWER:**    Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 27 of the Verified Counterclaim.


-11-

28.     True and accurate copies of the documents constituting the financing statements are attached hereto as Group Exhibit 14 and incorporated by reference herein.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 28 of the Verified Counterclaim.


29.     The Security Agreement requires Midlothian to "[p]rovide Lender [Chrysler Financial] with such financial information and statements (including monthly balance sheet and profit and loss statements), audit reports, management letters, lists of assets and liabilities, agings of receivables and payables, budgets, forecasts, projected cash flow statements, and such other reports with respect to Borrower's [Midlothian's] financial condition and business operations at such intervals and in such detail as Lander [Chrysler Financial] may request."

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 29 of the Verified Counterclaim.


30.     The Security Agreement provided that "[s]o long as this Agreement remains in effect, Borrower [Midlothian] . . . shall . . . [m]aintain minimum capitalization, minimum net worth, and other financial ratios to such amounts and within such percentages as may be acceptable to Lender [Chrysler Financial]". These working capital and net worth obligations are required to provide Chrysler Financial with further assurances that Midlothian will be able to repay its loans with Chrysler Financial.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 30 of the Verified Counterclaim.

31.    A dealer's working capital is measured by its current assets (the sum of cash, accounts receivable, new and used inventory values, plus prepaid expenses) less its current liabilities (the sum of accounts payable to trade creditors and other payables and accrued expenses). Certain current assets – including amounts due to Midlothian from its officers (such as its owner, Gerald Gorman), employees and affiliates (such as Marquette) – are excluded in calculating a dealer's working capital. Dealers such as Midlothian know how the amount of their working capital is calculated for purposes of their financing relationships with Chrysler Financial.

**ANSWER:**    Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 31 of the Verified Counterclaim.


32.    The amount of working capital required is based on a formula that applies to all dealers. The formula is the dealer's annualized sales of new vehicles based on its sales of new vehicles multiplied by a certain dollar amount based on the dealer's annualized sales. For dealers such as Midlothian with annualized sales of 1,200 or more new vehicles, the multiplier is $1,400 per vehicle.

**ANSWER:**    Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 32 of the Verified Counterclaim.


33.    The Security Agreement provides for numerous Events of Default, including but not limited to:

      a.    "Should Borrower [Midlothian] fail to comply with or perform under any term or condition of this Agreement or any Related Document"'

      b.    "Should any representation, warranty or statement made to Lender [Chrysler Financial] under this Agreement, or under any Related

Document, or in connection with any Loan or Obligation, provide to be false or misleading in any material respect"; and

c.  "Should there be a material adverse change in Borrower's [Midlothian's] or any Guarantor's financial condition, or should Lender [Chrysler Financial] reasonably believe the prospect of Borrower's [Midlothian's] payment or performance to be impaired."

**ANSWER:**  Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 33 of the Verified Counterclaim.

34.  The Security Agreement provides that upon occurrence of an Event of Default:

Lender may take possession of the Collateral wherever located, even if the Collateral is then in the possession of a third party. Immediately following Lender's demand, Borrower shall deliver, or cause to be delivered, to Lender or its designed all Collateral then in Borrower's possession, or in the possession of any third-party of which Borrower may exercise control. Borrower shall further deliver or cause to be delivered to Lender all books, records, files, computer disks and software in any way relating to the collateral. If and when requested by Lender, Borrower shall assemble the Collateral and make it available to Lender at a place or at such places as Lender may designate. Lender may enter upon Borrower's property, or the property of a third party where any of the collateral may then be located, and take possession of and remove the Collateral.

**ANSWER:**  Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 34 of the Verified Counterclaim.

35.  Pursuant to the terms of the Midlothian Loan and Security Documents, Midlothian is responsible for payment of all attorneys' fees, costs, and expenses incurred by Chrysler Financial to collect the sums due and owing by Midlothian to Chrysler Financial or to secure possession of the collateral.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph
35 of the Verified Counterclaim.

### B.   Midlothian's Defaults

36.   Midlothian is in default under the Midlothian Loan and Security Documents
because:

    a.   Midlothian provided false, misleading, and inaccurate financial
         statements to Chrysler Financial;

    b.   Midlothian has failed to satisfy working capital requirements;

    c.   Midlothian paid out over $1 million to Gerald Gorman in violation of the
         Subordination Agreement;

    d.   Midlothian has failed to provide any monthly financial statements to
         Chrysler Financial for any month since December 2002; and

    e.   Midlothian has committed other defaults.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph
36 of the Verified Counterclaim.

37.   On or about December 2, 2002 through December 5, 2002, Chrysler Financial
performed a "Limited Financial Review ("LFR") of Midlothian to compare Midlothian's October
2002 financial statement submitted to Chrysler Financial and Midlothian's general ledger.
Chrysler Financial conducted a detailed review of cash and vehicle equity accounts, a limited
review of the asset liability and equity accounts and a reconciliation of Midlothian's financial
statement with Midlothian's general ledger in accordance with Chrysler Financial's LFR
program. All of the documents reviewed were prepared and provided by Midlothian. The
purpose of the LFR was able to determine the true overall financial condition of Midlothian. A

true and accurate copy of the audit report for the LFR is attached hereto as Exhibit 15 and incorporated by reference herein.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 37 of the Verified Counterclaim.


38.     A further investigative tool used by Chrysler Financial, a bank cut off ("BCO"), was performed by Chrysler Financial's auditors with respect to Midlothian's financial condition on December 5, 2002. A BCO is an examination of the amount of cash on hand and new and used vehicle equity. The BCO confirmed the findings of the LFR, which had considered the financial condition of Midlothian as of October 31, 2002 (the date of the most recent Midlothian financial statements available to Chrysler Financial at the time).

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 38 of the Verified Counterclaim.


39.     The LFR revealed a number of financial irregularities and deceptive reporting practices and that Midlothian's financial records were inaccurate in any respects and significantly misstated its true financial condition.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 39 of the Verified Counterclaim.


40.     The LFR revealed that Midlothian had overstated its net worth by $850,015.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 40 of the Verified Counterclaim.

-16-

41. The LFR revealed that Midlothian had falsely stated its assets and liabilities, thereby overstating its reported working capital position in the amount of $2,0897,646. Among the misstatements of Midlothian's assets and liabilities were the following:

a. Midlothian misstated $419,454 due from Gerald Gorman as cash in Midlothian's bank account when, in fact, this amount consisted of unrecorded wire transfers and checks paid to Gerald Gorman. Midlothian's misstatement falsely inflated its reported working capital by $419,454. Because this amount was in fact an amount due from Mr. Gorman, it could not be included in Midlothian's current assets for purposes of calculating Midlothian's working capital.

b. Midlothian misstated $125,000 due from Gerald Gorman as "Cash on Deposit," when, in fact, this amount had been paid out to purchase stock in First Suburban Bancorp Corp. owned by Gerald and Elizabeth Gorman. Midlothian's misstatement falsely inflated its reported working capital by $125,000. Because this amount was in fact an amount due from Mr. Gorman, it could not be included in Midlothian's current assets for purposes of calculating Midlothian's working capital.

c. Midlothian improperly offset against its accounts payable old accounts receivable in the amount of $480,860 due from Marquette, its affiliates sister company, and thereby understated its current liabilities and overstated its working capital by $480,860. this amount should have been recorded as affiliated accounts receivable, which could not be included in Midlothian's current assets for purposes of calculating Midlothian's working capital.

d. Midlothian misstated as "Prepared Expenses" $112,135 in accumulated personal expenses of Gerald Gorman and Shawn Temple (Midlothian's chief financial officer) – including credit card, mortgage, telephone and other bills – that Midlothian paid. Midlothian's misstatement falsely inflated its reported working capital by $112,135.

e. Midlothian misstated $697,847 of accounts receivables that it should have classified as doubtful based on its aging report, which showed the receivables to be over 90 days old. In turn, those accounts receivable should have been excluded from Midlothian's current assets for purposes of calculating its working capital.

**ANSWER:** Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 41 of the Verified Counterclaim.

-17-

42.     As a result of the LFR and BCO audits, Chrysler Financial discovered that Midlothian's working capital was only approximately $288,00 as of October 31, 2002. Based on the standard formula discussed above and Midlothian's annualized sales, as of that date, Midlothian was required to have approximately $2,377,000 in working capital.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 42 of the Verified Counterclaim.


43.     Midlothian, without the prior approval or advance knowledge of Chrysler Financial, made one or more payments totaling in excess of $1 million on debt wowed to Gerald Gorman in violation of the terms of Sections 2(a) and 5 of the Subordination Agreement. Under the terms of the Subordination Agreement, Midlothian had agreed to refrain from paying, and Gerald Gorman agreed to refrain from collecting, any payments on the subordinated debt owed by Midlothian to Gerald Gorman because the debt owed by Midlothian to Gerald Gorman is subordinate in priority to Midlothian's debt to Chrysler Financial.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 43 of the Verified Counterclaim.


44.     Midlothian has failed to provide any monthly financial statements to Chrysler Financial for any month since December 2002 although required to do so under the Security Agreement.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 44 of the Verified Counterclaim.

45.     Midlothian has committed other defaults under the Security Agreement and the Midlothian Loan and Security Documents.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 45 of the Verified Counterclaim.


46.     As a result of the LFR and BCO audits, on or about December 20, 2002, Chrysler Financial provided notice to Midlothian and its principals, Gerald and Elizabeth Gorman, that Midlothian was in default of its obligation to Chrysler Financial. A true and accurate copy of this letter (the "Notice of Default Letter") is attached hereto as Exhibit 16 and incorporated by reference herein.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 46 of the Verified Counterclaim.


47.     In the Notice of Default Letter, Chrysler Financial:

a.     Notified Midlothian that a permanent capital injection in the amount of $2.1 million was needed in order to maintain sufficient capital levels to operate the dealership;

b.     Notified Midlothian that it had failed to maintain accurate financial statements as required under the Security Agreement between the parties; and

c.     Demanded that Midlothian undertake action within 90 days of the date o the letter to obtain an infusion of capital in the form of a rue and otherwise unencumbered capital investment or subordinated loan in the principal amount of $2.1 million and deliver to Chrysler Financial accurate financial statements going forward.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 47 of the Verified Counterclaim.

-19-

48. To date, Midlothian has failed to cure its defaults under the Security Agreement and the Midlothian Loan and Security Documents.

**ANSWER:** Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 48 of the Verified Counterclaim.


49. On March 21, 2003, Chrysler Financial, acting pursuant to its rights under the Security Agreement and the Midlothian Loan and Security Documents, sent a letter to Midlothian in which Chrysler Financial:

     a. Advised Midlothian that Midlothian had failed to cure its defaults;

     b. Accelerated all amounts due and owing by Midlothian to Chrysler Financial under the Midlothian Loan and Security Documents;

     c. Demanded immediate payment of these amounts; and

     d. Demanded that Midlothian surrender the Collateral to Chrysler Financial.

A true and accurate copy of this letter (the "Default Letter") is attached hereto as Exhibit 17 and incorporated by reference herein.

**ANSWER:** Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 49 of the Verified Counterclaim.


50. To date, Midlothian has failed and refused to surrender the Collateral to Chrysler Financial.

**ANSWER:** Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 50 of the Verified Counterclaim.

51.     As of March 12, 2003, Midlothian owes Chrysler Financial $10,251,945 under the Security Agreement and the Midlothian Loan and Security Documents (the "Midlothian Indebtedness").  To date, Midlothian has not paid the amount due and owing to Chrysler Financial.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 51 of the Verified Counterclaim.


### C.    Marquette's Indebtedness to Chrysler Financial

52.     On or about February 4, 1999, Marquette executed in favor of Chrysler Financial a Vehicle Financing Agreement (the "Vehicle Financing Agreement"), which gave Chrysler Financial the option to accept or decline to take an assignment of retail installment contracts that Marquette proposed to enter into with its customers and thereafter sell to Chrysler Financial. A true and accurate copy of the Vehicle Financing Agreement is attached hereto as Exhibit 18 and incorporated by reference here.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 52 of the Verified Counterclaim.


53.     The Vehicle Financing Agreement provides:

> If any warranty contained in any such [Retail Installment] Contract shall be breached, in addition to any other liability arising from such breach, we [Marquette] unconditionally guarantee payment of the full amount remaining unpaid under the affected Contract and agree to purchase  said Contract on demand for the full amount then unpaid whether or not the Contract shall then be, or not be, in default (such liability being herein called a "Full Recourse Liability") and you [Chrysler Financial] are hereby authorized by make the appropriate corrections on our [Marquette's] endorsement and assignment of such Contract.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 53 of the Verified Counterclaim.

54.     Marquette entered into a number of retail installment contracts with its customers for the purchases of vehicles from Marquette and then sold and assigned those contracts to Chrysler Financial.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 54 of the Verified Counterclaim.

55.     In assigning each of these retail installment contracts, Marquette made several representations and warranties to Chrysler Financial concerning each contract, including (1) that "the Contract contains an accurate representation of statements made by the Buyer, there is no inaccuracy or misrepresentation in any statement made by or on behalf of the Buyer, including those in the credit application, furnished to Assignee [Chrysler Financial] by Seller [Marquette]"; and (2) that "no material fact relating to the vehicle was misrepresented." Each of the Retail Installment Contracts provides that if any of the "representations and warranties prove to be false or incorrect in any respect, and without regard to Seller's [Marquette's] knowledge or lack of knowledge, or Assignee's [Chrysler Financial's] reliance, Seller [Marquette] unconditionally, and with waiver of all defenses, agrees to pay to Assignee [Chrysler Financial] immediately on demand the full unpaid balance of this Contract, in principal, interest, costs, expenses and attorney's fees."

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations in Paragraph 55 but affirmatively state that it was the responsibility of Chrysler Financial to verify such information from the customer.

56.     Marquette's representations and warranties to Chrysler Financial were false and incorrect with respect to at least 54 retail installment contracts executed between October 14, 2000 and December 31, 2000 and assigned by Marquette to Chrysler Financial and with respect to other retail installment contracts assigned by Marquette to Chrysler Financial. These retail installment contracts are collectively referred to herein as the"Fraudulent Retail Installment Contracts."

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 56 of the Verified Counterclaim.

57.     Marquette supplied false information and/or misrepresented various portions of the retail credit applications leading to the Fraudulent Retail Installment Contracts, including, but not limited to:

      a.      Marquette overstated the invoice/wholesale value of the vehicle;

      b.      The consumers had no vehicle insurance or the insurance was canceled or could not be verified;

      c.      The down payments reported by Marquette were overstated or nonexistent;

      d.      The consumers worked for one of three fictitious employers – Grace Transportation, M&M Towing or B&S Constructions -- which apparently did not exist; and

      e.      Other misrepresentations or problems.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 57 of the Verified Counterclaim.

58.     Marquette's actions caused Chrysler Financial to agree to purchase and take assignments of the Fraudulent Retail Installment Contracts when Chrysler Financial would not otherwise have done so.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 58 of the Verified Counterclaim.

59.     Because Marquette breached its representations and warranties in each of the Fraudulent Retail Installment Contracts, the Contracts are full recourse liabilities of Marquette and Marquette is fully liable for the unpaid balances due on the contracts in the event the borrowers defaulted.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 59 of the Verified Counterclaim.

60.     On or about February 12, 2001, Marquette signed a document (the "Full Recourse Acknowledgment") whereby it acknowledged that 54 of the Fraudulent Retail Installment Contracts had become full recourse liabilities and that it was fully liable for the unpaid balances due on those contracts in the event the borrowers defaulted. A true and accurate copy of the Full Recourse Acknowledgment is attached hereto as Exhibit 19 and incorporated by reference herein.

**ANSWER:**     Plaintiffs/Counterclaim Defendant admits that he signed Exhibit 19, but states such signature was made under duress due to the fact that the Manager of Chrysler Financial told him that he must sign such document or his floor plan at Midlothian would be terminated; and only under threat of financial extinction and duress did Plaintiff sign Exhibit 19.

61.     As of March 21, 2003, Marquette owes Chrysler Financial $227,270.67 for the Fraudulent Retail Installment Contracts (the "Marquette Indebtedness"). On March 21, 2003, Chrysler Financial sent a letter to Marquette in which Chrysler Financial demanded payment of this amount. A true and accurate copy of this letter is attached hereto as Exhibit 23 and incorporated by reference herein. to date, Marquette has not paid this amount due and owing to Chrysler Financial.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 61 of the Verified Counterclaim.

### D.   The Guaranties

62.     On or about June 26, 2002, Gerald Gorman executed and delivered to Chrysler Financial a Continuing Guaranty, whereby Gerald Gorman unconditionally guaranteed the payment of all obligations of Midlothian to Chrysler Financial (the "Gerald Gorman Midlothian Guaranty"). A true and accurate copy of the Gerald Gorman Midlothian Guaranty is attached hereto as Exhibit 20 and incorporated by reference herein.

**ANSWER:**     Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 62 of the Verified Counterclaim.

-25-

63.    On or about September 5, 2000, Gerald Gorman and Elizabeth Gorman jointly executed and delivered to Chrysler Financial a Continuing Guaranty, whereby Gerald Gorman and Elizabeth Gorman jointly and unconditionally guaranteed the payment of all obligations of Midlothian to Chrysler Financial (the "Gerald and Elizabeth Gorman Midlothian Guaranty"). A true and accurate copy of the Gerald and Elizabeth Gorman Midlothian Guaranty is attached hereto as Exhibit 21 and incorporated by reference herein.

**ANSWER:**    Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 63 of the Verified Counterclaim.


64.    On or about February 9, 1999, Gerald Gorman and Elizabeth Gorman jointly executed and delivered to Chrysler Financial a Continuing Guaranty, whereby Gerald Gorman and Elizabeth Gorman jointly and unconditionally guaranteed the payment of all obligations of Marquette to Chrysler Financial (the "Gerald and Elizabeth Gorman Marquette Guaranty"). A true and accurate copy of the Gerald and Elizabeth Gorman Marquette Guaranty is attached hereto as Exhibit 22 and incorporated by reference herein.

**ANSWER:**    Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 64 of the Verified Counterclaim.


### COUNT I - REPLEVIN
### (Against Midlothian)

65.    Chrysler Financial re-alleges and incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

**ANSWER:** Plaintiffs/Counterclaim Defendants answer this paragraph as set forth in answers to Paragraphs 1-64 above.

66. Because of Midlothian's defaults, Chrysler Financial is lawfully entitled to immediate possession of the Collateral pursuant to the terms of the Midlothian Loan and Security Documents.

**ANSWER:** Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 66 of the Verified Counterclaim.

67. The Collateral has not been taken for any tax, assessment, or fine levied by virtue of the laws of the State of Illinois against Chrysler Financial or the property of Chrysler Financial, nor seized under any lawful process against the goods or chattels of Chrysler Financial subject to such lawful process, nor held by virtue of any order of replevin against Chrysler Financial.

**ANSWER:** Plaintiffs/Counterclaim Defendants admit the allegations contained in Paragraph 67 of the Verified Counterclaim.

68. The value of the Collateral does not exceed $10,500,000.

**ANSWER:** Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 68 of the Verified Counterclaim.

69. Midlothian is in the wrongful possession of the Collateral.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 69 of the Verified Counterclaim.

70.     Chrysler Financial is in danger of losing its interest in the Collateral unless Chrysler Financial obtains immediate possession of same.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 70 of the Verified Counterclaim.

71.     The allegations of these counterclaims are verified by Robert T. Theriot, Manager-Wholesale Risk Administration for Chrysler Financial, in compliance with 735 ILCS § 5/19-104, incorporated by reference pursuant to the Federal Rules of Civil Procedure.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 71 of the Verified Counterclaim.

72.     Based on the foregoing, an order and judgment of replevin should be entered in favor of Chrysler Financial with respect to the Collateral.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 72 of the Verified Counterclaim.

WHEREFORE, Chrysler Financial should be denied an order of judgment of replevin and the Plaintiff should be awarded costs and attorneys' fees in this action.

## COUNT II - BREACH OF CONTRACT
### (Against Midlothian)

73.     Chrysler Financial re-alleges and incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

**ANSWER:**     Plaintiffs/Counterclaim Defendants answer this paragraph as set forth in answers to Paragraphs 1-64 above.

74.     The Midlothian Loan and Security Documents constitute valid and binding contracts, enforceable against Midlothian in accordance with their terms.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 74 of the Verified Counterclaim.

75.     Midlothian is in breach of its obligations under the terms of the Midlothian Loan and Security Documents for, among other things, the aforementioned defaults.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 75 of the Verified Counterclaim.

76.     Despite demand by Chrysler Financial made upon Midlothian, Midlothian has failed to cure its defaults under the Midlothian Loan and Security Documents.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 76 of the Verified Counterclaim.

77.     All conditions precedent to Midlothian's performance in making payment and/or surrendering the Collateral have been satisfied by Chrysler Financial or have been excused.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph

77 of the Verified Counterclaim.

78.     Midlothian continues in its breach of the Midlothian Loan and Security

Documents by failing to pay the entire balance due thereunder.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph

78 of the Verified Counterclaim.

79.     Chrysler Financial has been damaged by Midlothian's breach of the Midlothian

Loan and Security Documents in an amount not less than the Midlothian Indebtedness.

**ANSWER:**     Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph

79 of the Verified Counterclaim.

WHEREFORE, Plaintiffs/Counterclaim Defendants pray this court to order judgment on

their behalf against Chrysler Financial and Plaintiffs/Counterclaim Defendants should be

awarded their attorneys' fees and costs for this action.

### COUNT III - BREACH OF CONTRACT
### (Against Marquette)

80.     Chrysler Financial re-alleges and incorporates by reference paragraphs 1 through

64 as if fully set forth herein.

**ANSWER:**     Plaintiffs/Counterclaim Defendants answer this paragraph as set forth in

answers to Paragraphs 1-64 above.

81.     The Vehicle Financing Agreement constitutes a valid and binding contract,

enforceable against Marquette in accordance with its terms, and includes the assignment warranties made by Marquette to Chrysler Financial in each Fraudulent Retail Installment Contract.

**ANSWER:**    Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 81 of the Verified Counterclaim.

82.    The Full Recourse Acknowledgment constitutes a valid and binding contract, enforceable against Marquette in accordance with its terms.

**ANSWER:**    Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 82 of the Verified Counterclaim.

83.    Marquette is in breach of its obligations under the terms of the assignment warranties, the Vehicle Financing Agreement, and the Full Recourse Acknowledgment because of its failure to pay the amounts due and owing to Chrysler Financial for the Fraudulent Retail Installment Contract (" the Marquette Indebtedness") despite demand for payment made by Chrysler Financial upon Marquette.

**ANSWER:**    Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 83 of the Verified Counterclaim.

84.    All conditions precedent to Marquette's performance in making payment have been satisfied by Chrysler Financial or have been excused.

**ANSWER:**    Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 84 of the Verified Counterclaim.

85.    Chrysler Financial has been damaged by Marquette's breach of the assignment warranties, Vehicle Financing Agreement, and Full Recourse Acknowledgment in an amount not less than the Marquette Indebtedness.

**ANSWER:**    Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 85 of the Verified Counterclaim.

WHEREFORE, Plaintiffs/Counterclaim Defendants pray this court to order judgment on their behalf against Chrysler Financial and Plaintiffs/Counterclaim Defendants should be awarded their attorneys' fees and costs for this action.

## COUNT IV – ACTION ON GUARANTY
### (Against Gerald Gorman)

86.    Chrysler Financial re-alleges and incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

**ANSWER:**    Plaintiffs/Counterclaim Defendants answer this paragraph as set forth in answers to Paragraphs 1-64 above.

87.    The obligations of Gerald Gorman, as the unconditional guarantor of the Midlothian Indebtedness pursuant to the Gerald Gorman Midlothian Guaranty and the Gerald and Elizabeth Gorman Midlothian Guaranty and of the Marquette Indebtedness pursuant to the Gerald and Elizabeth Gorman Marquette Guaranty are primary and independent in nature and may be enforced directly against him.

**ANSWER:**    Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 87 of the Verified Counterclaim.

88.    Gerald Gorman is personally liable for the amounts due and owing to Chrysler Financial from Midlothian and Marquette and is personally liable for attorneys' fees and court and collection costs incurred by Chrysler Financial in its efforts to collect the amounts due and owing.

**ANSWER:**    Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 88 of the Verified Counterclaim.


WHEREFORE, Plaintiffs/Counterclaim Defendants pray this court to order judgment on their behalf against Chrysler Financial and Plaintiffs/Counterclaim Defendants should be awarded their attorneys' fees and costs for this action.

## COUNT V – ACTION ON GUARANTY
### (Against Elizabeth Gorman)

89.    Chrysler Financial re-alleged and incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

**ANSWER:**    Plaintiffs/Counterclaim Defendants answer this paragraph as set forth in answers to Paragraphs 1-64 above.


90.    The obligations of Elizabeth Gorman, as the unconditional guarantor of the Midlothian Indebtedness pursuant to the Gerald and Elizabeth Gorman Midlothian Guaranty and of the Marquette Indebtedness pursuant to the Gerald and Elizabeth Gorman Marquette Guaranty are primary and independent in nature and may be enforced directly against her.

**ANSWER:**    Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 90 of the Verified Counterclaim.

91.    Elizabeth Gorman is personally liable for the amounts due and owing to Chrysler Financial from Midlothian and Marquette and is personally liable for attorneys' fees and court and collection costs incurred by Chrysler Financial in its efforts to collect the amounts due and owing.

**ANSWER:**    Plaintiffs/Counterclaim Defendants deny the allegations contained in Paragraph 91 of the Verified Counterclaim.


WHEREFORE, Plaintiffs/Counterclaim Defendants pray this court to order judgment on their behalf against Chrysler Financial and Plaintiffs/Counterclaim Defendants should be awarded their attorneys' fees and costs for this action.


## AFFIRMATIVE DEFENSES

NOW COME the Plaintiffs/Counterclaim Defendants and state as Affirmative Defenses as follows:

1.    That the claims of the Counterclaim Plaintiffs are barred by Estoppel.

2.    That the claims of the Counterclaim Plaintiffs are barred by Waiver.

3.    That the claims of the Counterclaim Plaintiffs are barred by Unclean Hands.

4.    That the claims of the Counterclaim Plaintiffs are barred for the reasons set forth in the original Complaint in Case No. 03 C 00760.

5.    That the claims of the Counterclaim Plaintiffs are barred by the Doctrine of Laches.

6.    That the Counterclaim Plaintiffs have failed to state any claim upon which relief may be granted.

7.     That the Plaintiffs/Counterclaim Defendants deny that Chrysler Financial has suffered any damages.  To the extent that any damages exist, Chrysler Financial failed to mitigate its damages and any recovery obtained must be reduced as a result.

8.     That Plaintiffs/Counterclaim Defendants deny that Chrysler Financial has suffered any damages.  To the extent that any damages exist, Chrysler Financial's damages were due to its own conduct, or the conduct of third parties, over which the Plaintiffs/Counterclaim Defendants had no control.

9.     Plaintiffs/Counterclaim Defendants reserve the right to assert additional defenses that may be discovered during the course of this proceeding.

Respectfully submitted,

_Edward V. Vrdolyak_

Edward R. Vrdolyak
Nicholas Geanopoulos
EDWARD R. VRDOLYAK, LTD.
Attorneys for Plaintiffs/Counterclaim Defendants
741 North Dearborn Street
Chicago, IL  60610
312-482-8200

_James J. Roche_

James J. Roche
JAMES J. ROCHE & ASSOCIATES
Attorney for Plaintiffs/Counterclaim Defendants
642 North Dearborn Street
Chicago, IL  60610
312-335-0044

C:\Server\DATA\JJR\CLIENTS\GORMAN\DAIMLERFED\ANSWER.CC.wpd