# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | Arlander Keys |
|---|---|---|---|
| **CASE NUMBER** | 03 C 760 | **DATE** | 12/2/2003 |
| **CASE TITLE** | Ridge Chrysler Jeep vs. Daimler Chrysler Services NA | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation submitted to Judge Andersen. It is recommended that Defendant Chrysler Financial's Motion to Disqualify [#81] as to Edward R. Vrdolyak and Edward R. Vrdolyak, Ltd. be **granted;** and that the Motion with respect to the other attorneys of record be **denied.** *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 9 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC 0 3 2003 | |
| | Notified counsel by telephone. | | date docketed | 102 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 12/2/2003 | |
| ✓ | Copy to judge/magistrate judge. | | date mailed notice | |
| | courtroom deputy's initials | | FT | |
| FT/*secy* | | | mailing deputy initials | |

U.S. DISTRICT COURT
CLERK

03 DEC -2 PM 3:20

FILED

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RIDGE CHRYSLER JEEP L.L.C., d/b/a )
MARQUETTE CHRYSLER JEEP and SALES, )
INC., d/b/a DODGE OF MIDLOTHIAN, )
)                    Case No.: 03 C 760
Plaintiffs, )
)                    Judge Wayne R. Andersen
vs. )
)
DAIMLER CHRYSLER SERVICES NORTH )          Magistrate Judge
AMERICA, L.L.C. d/b/a CHRYSLER )            Arlander Keys
FINANCIAL COMPANY, L.L.C., )
)
Defendant. )

TO:  THE HONORABLE WAYNE R. ANDERSEN,
     UNITED STATES DISTRICT JUDGE



## REPORT AND RECOMMENDATION

This case is before the Court on a Motion to Disqualify
Plaintiffs' Counsel, filed by the defendant, Daimler Chrysler
Services North America, L.L.C. d/b/a Chrysler Financial Company,
L.L.C. ("Chrysler Financial").  For the reasons set forth below,
the Court recommends that the motion be granted in part and
denied in part.

### Facts & Procedural History

On February 3, 2003, Ridge Chrysler Jeep L.L.C., formerly
doing business as Marquette Chrysler Jeep at 65th Street and
Western Avenue in Chicago, Illinois, and Sales, Inc., doing
business as Dodge of Midlothian, in Midlothian, Illinois ("the
Dealerships"), sued Chrysler Financial.  In their complaint, the
Dealerships, which are both owned by the same person, Gerald

Gorman, allege that Chrysler Financial adopted an internal corporate policy of refusing to provide financing to non-suburban African-American car buyers, regardless of their creditworthiness, and then punished the Dealerships for refusing to go along with that discriminatory practice. The Dealerships alleged breach of contract, tortious interference with prospective business or economic advantage, violation of the Automobile Dealers' Day in Court Act, and violation of the Illinois Motor Vehicle Franchise Act.

The Dealerships' complaint piggybacked on another case filed that same day by a putative class of minority plaintiffs who allege that Chrysler Financial engaged in predatory lending practices by refusing to give lower financing rates to otherwise qualified minority car buyers. The plaintiffs in both the dealership case (the case assigned to this Court) and the class action case (*Coburn v. Daimler Chrysler*, which is assigned to Judge Castillo) were, when the cases were filed, represented by the same attorneys: Edward Vrdolyak and Nicholas Geanopoulos of Edward R. Vrdolyak, Ltd.; Steve Berman, Steven Mitchell and Christopher O'Hara of Hagens Berman LLP; William Hooks of Hooks Law Offices, PC; and Eugene Pincham of R. Eugene Pincham, PC. Mr. Vrdolyak and his law firm have since been disqualified from the class action case. *See Coburn v. Daimler Chrysler Services North America*, No. 03 C 759, 2003 WL 22425007 (N.D. Ill. Oct. 23,

2

2003). Chrysler Financial now seeks to disqualify Mr. Vrdolyak, his law firm, and all of the other lawyers from the dealership case.

The present disqualification motion, like the motion in the *Coburn* case, is based primarily upon certain contacts that Edward Vrdolyak had with Karen Bradley, a Michigan resident who contacted Mr. Vrdolyak after reading the *Coburn* complaint because she believed that she had been victimized by the same discriminatory practices alleged therein. The kicker, though, is that, at the time, Ms. Bradley just happened to be working in the Office of the General Counsel (OGC) at Chrysler Financial; worse yet, she happened to be working as the administrative assistant to the attorney with primary responsibility for defending the *Coburn* case.

It is really not necessary to delve too far into the specifics of Ms. Bradley's potential discrimination claim, but a few details will help to provide context. Karen Bradley and her husband, Larry Bradley, bought two cars from Rochester Jeep, a Chrysler dealership in Rochester Hills, Michigan. Both times they financed the cars, and both times they had to do so at higher interest rates than they had expected. The Bradleys believed that, when they purchased their cars, Chrysler was offering super low financing rates (2.9% or lower), and they believed that they would qualify for those low rates. Both

times, the dealership told them that they did not qualify for those rates. On the second purchase, the Bradleys first signed a contract to finance the car for 72 months at 10.54%, with a $2,500 rebate. Ms. Bradley was later able to get a new contract - ironically, with the help of some Chrysler Financial colleagues - for 60 months at 2.9%, but she had to forego the rebate. Despite the new contract, Ms. Bradley apparently continued to seethe, and, after reading the discrimination allegations in the complaint that Mr. Vrdolyak filed, she pounced.

On June 11, 2003, Larry Bradley called Mr. Vrdolyak to discuss the Bradleys' situation. During the course of that conversation, he told Mr. Vrdolyak that his wife worked for Chrysler Financial. They arranged for Mr. Vrdolyak to speak with Karen Bradley on June 12, 2003, and during that telephone conversation, Mr. Vrdolyak learned that, not only did Karen Bradley work for Chrysler Financial, but she worked in the Office of the General Counsel as an administrative assistant to Patricia Musso, the attorney charged with handling the cases that Mr. Vrdolyak had filed against the company. Mr. Vrdolyak claims that, upon hearing this juicy tidbit, he immediately told Ms. Bradley that he did not want to hear anything about her job or what goes on in her office; he told her that they should only discuss her car purchases. (Deposition of Edward Vrdolyak, p. 32; Deposition of Karen Bradley, pp. 247-48.)

Beginning the next morning, Mr. Vrdolyak told the other attorneys working with him on the *Coburn* and *Ridge* cases about his conversation with Karen Bradley. Neither Mr. Vrdolyak, nor any of his co-counsel, said anything to the defendants about the connection. But, on June 13, 2003, Ms. Bradley told Michael Dodge, one of her supervisors in the OGC, that she had talked to one of the plaintiffs' attorneys in the class action case. Later that day, Ms. Bradley told Mr. Dodge that, if the company would pay off her two cars and give her $350,000, she would walk away and stop pursuing any claim she might have because of the Rochester Jeep deals. Chrysler Financial transferred Ms. Bradley to another department, and later placed her on administrative leave; her superiors did not bite at her pay-off offer.

From June 12, 2003 through June 23, 2003, Mr. Vrdolyak spoke to the Bradleys between six and ten times by telephone. Mr. Vrdolyak also had one face-to-face meeting with the Bradleys; on June 18, 2003, he met them at the Detroit airport, where they talked for about 30 minutes. At that meeting, the Bradleys signed an agreement, retaining Mr. Vrdolyak to represent them "in the prosecution of any and all claims against Daimler Chrysler Services North America, L.L.C., d/b/a, Chrysler Financial Company, L.L.C.," in exchange for a fee of 25% of any recovery obtained. Additionally, Karen Bradley gave Mr. Vrdolyak, who was accompanied by Sean Howard, a public relations consultant Mr.

Vrdolyak had retained, a stack of documents relating to the Rochester Jeep deals, some of which she had printed from Chrysler Financial's computer system while she was at work. Mr. Vrdolyak shared a set of the documents with Christopher O'Hara, one of his co-counsel, but Mr. O'Hara did not read the documents.

At a June 23, 2003 status hearing in the *Coburn* case, counsel brought the Court's attention to the Karen Bradley problem. By that time, Mr. Vrdolyak and his co-counsel had consulted an ethicist, who, according to representations Mr. Harte made at the hearing, had advised them that the Bradleys should be represented by independent counsel. Counsel for Chrysler asked the Court to disqualify all of the plaintiffs' attorneys, and the Court ordered plaintiffs' counsel to have no further contact with Ms. Bradley pending resolution of the disqualification issue. Except for one conversation, where Mr. Vrdolyak called Ms. Bradley to tell her about the Court's order, Mr. Vrdolyak and his co-counsel complied with that order. Sean Howard, Mr. Vrdolyak's paid consultant, did not; he and Ms. Bradley called each other repeatedly during the period between June 23 and July 17, the day Ms. Bradley was deposed (represented by another attorney, who was secured by Mr. Vrdolyak's co-counsel) in connection with the disqualification issue.

On October 22, 2003, the Court decided the disqualification issue in the *Coburn* case. Judge Castillo disqualified Mr.

6

Vrdolyak and his law firm based upon the contacts with Karen Bradley, but declined to disqualify the other attorneys from the case. Judge Castillo found that Mr. Vrdolyak's co-counsel had "'clearly and effectively' rebutted the presumption that they received confidential information," but that Mr. Vrdolyak had not done so. *Coburn*, — F.Supp.2d —, 2003 WL 22425007, at *6-7 (N.D. Ill. Oct. 23, 2003). Specifically, Judge Castillo found that, although all of the attorneys represented that they had received no confidential information, inconsistencies in Mr. Vrdolyak's testimony made his representations unreliable, whereas the other attorneys' representations were not similarly undermined. *Id.* The issues presented here are almost identical to those presented in the *Coburn* case; indeed, in support of their motion in this case, Chrysler Financial simply adopted wholesale the briefs and evidence it had previously submitted in the *Coburn* case. And, although this Court has read Judge Castillo's opinion on the disqualification issue, it is not bound by it; instead, the Court considers the issues anew.

## DISCUSSION

In the *Coburn* case, Chrysler Financial asked the Court to disqualify the plaintiffs' attorneys based upon Mr. Vrdolyak's contacts with Karen Bradley, and based upon a conflict of interest that exists because the attorneys represent both the Dealerships and individuals who might have a valid claim against

7

those Dealerships. The Court first turns to the conflict of interest argument.

Chrysler Financial contends that, when the Bradleys first decided to pursue legal action, they were interested in suing the Rochester Hills dealership only, and had no intention of pursuing a claim against Chrysler Financial. And there is some evidence in the record to support this notion; Karen Bradley said as much at her deposition. *See* Deposition of Karen Bradley, p. 164 ("I felt as though Chrysler Financial hadn't done anything to me. My anger and animosity and hatred was toward . . . Rochester Jeep."); id., p. 244 ("I was not interested – Edward Vrdolyak was interest in suing Chrysler Financial, everybody. That is not who I wanted to bring litigation against. I just wanted Rochester Jeep only."). And the record contains two emails sent by Ms. Bradley on March 1 and 2, 2003, stating that she and her husband were "only going after the Dealership." See Defendant's Motion to Disqualify, Exhibit 10. Nevertheless, the Court is skeptical that, when the Bradleys contacted Mr. Vrdolyak, they had no intention to pursue a claim against Chrysler Financial. Ms. Bradley's testimony is, at best, equivocal on the issue; although she said she was hesitant to call Mr. Vrdolyak because she only wanted to sue the dealership, she also said she "felt as though the company had a part in Rochester Jeep's wrongdoing," Deposition of Karen Bradley, p. 378. And her behavior certainly

suggests that she intended to pursue a claim against Chrysler Financial: on June 13, 2003, with no input from Mr. Vrdolyak, she, at least implicitly, threatened to bring down the company if it did not pay her $350,000; the evidence is clear that she made the payoff offer to Chrysler Financial, not to Rochester Jeep. Whatever Ms. Bradley's intent, however, Chrysler Financial's conflict of interest argument would seem to be moot in this case. Even if the Court were to accept, as Chrysler argues, that Ms. Bradley decided to sue Chrysler Financial only because Mr. Vrdolyak convinced her to do so, the Bradleys unquestionably have no claim against the dealerships involved in this case. Additionally, as it now stands, Mr. Vrdolyak has been disqualified from the *Coburn* case, and the remaining attorneys have been ordered to have no contact with the Bradleys. Thus, the Court cannot see how the conflict of interest argument raised in the *Coburn* case is relevant to this case. To the extent Chrysler Financial thought the argument had some special significance in this case, as opposed to its application in *Coburn*, it should have explained as much, rather than simply adopting the *Coburn* arguments in a wholesale fashion.

The Court next considers whether Mr. Vrdolyak's contacts with the Bradleys warrant disqualification. "[D]isqualification is a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'" *Schiessle v. Stephens*, 717

F.2d 417, 420 (7th Cir. 1983)(quoting *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982)). The Seventh Circuit has created a three-step test for determining whether disqualification is appropriate. "First, we must determine whether a substantial relationship exists between the subject matter of the prior and present representations." *Schiessle*, 717 F.2d at 420. If it does, that relationship "gives rise to a presumption of shared confidences." *Id.* at 420 n.2 (citing *Novo Terapeutisk Laboratorium, etc. v. Baxter Travenol Laboratories*, 607 F.2d 186 (7th Cir. 1979)). The Court

> must next ascertain whether the presumption of shared
> confidences with respect to the prior representation
> has been rebutted. If we conclude this presumption has
> not been rebutted, we must then determine whether the
> presumption of shared confidences has been rebutted
> with respect to the present representation. Failure to
> rebut this presumption would also make disqualification
> proper.

*Id.* (citing *LaSalle National Bank v. County of Lake*, 703 F.2d 252, 255-56 (7th Cir. 1983)). Although the test was designed to apply where an attorney or law firm switches sides in litigation, it has also been applied when a non-lawyer employee of one of the attorneys or law firms switches sides. *See Kapco Manufacturing Company, Inc. v. C&O Enterprises, Inc.*, 637 F.Supp. 1231, 1236 & n.11 (N.D. Ill. 1985). And the Court finds that such an analysis is similarly appropriate here. Although in *Kapco,* the infected person actually left one law firm to go to work for its adversary, the situation here is analogous: Ms. Bradley worked

for Chrysler Financial, but joined forces with its enemy.

Turning first to the substantial relationship question, though the *Schiessle* language about "prior and present representations," is somewhat ill-fitting on the facts of this case, the disqualification motion will not fail on the basis of this element. Ms. Bradley assisted Ms. Musso in the representation of Chrysler in the *Coburn* matter, and then she retained one of the attorneys who represented Chrysler's adversaries in that same matter, potentially with the thought of joining the plaintiffs' class in that same matter. Moreover, the allegations in this case revolve around the same set of facts: both cases accuse Chrysler Financial of denying favorable credit terms to customers of color. The Court has little trouble finding that the matters involved are substantially related, and even plaintiffs' counsel does not argue otherwise.

Turning to the second step in the analysis, "the existence of a substantial relationship gives rise to a presumption of shared confidences with respect to the prior representation." *Kapco*, 637 F.Supp. at 1237 (citing *Novo Terapeutisk Laboratorium, etc. v. Baxter Travenol Lab.*, 607 F.2d 186 (7th Cir. 1979)). Additionally, the evidence shows that Ms. Bradley unquestionably had access to Chrysler Financial's confidential materials and information. Ms. Bradley worked as an administrative assistant in Chrysler Financial's OGC. More troubling still, she worked

for Patricia Musso, who supervised the *Coburn* case, and, in that capacity, Ms. Bradley had full access to case files, she prepared and sent letters from Ms. Musso to outside counsel, she talked to outside counsel on the telephone, and she may have overheard Ms. Musso's conversations with outside counsel. Again, the Court has little trouble finding that Ms. Bradley "shared confidences" with respect to the *Coburn* matter.

Under step three of the Seventh Circuit's analysis in *Schiessle*, the Court asks whether Mr. Vrdolyak and his co-counsel have rebutted the presumption that Ms. Bradley, in fact, shared confidential materials and information with them during the course of their relationship in this case. The presumption of shared confidences can be rebutted "by demonstrating that 'specific institutional mechanisms' [have] been implemented to effectively insulate against any flow of confidential information . . . ." *Schiessle*, 717 F.2d at 421 (quoting *LaSalle national Bank*, 703 F.2d at 259). "The types of institutional mechanisms that have been determined to protect . . . confidentiality . . . include: (1) instructions, given to all members of the new firm, of the attorney's recusal and of the ban on exchange of information; (2) prohibited access to the files and other information on the case; (3) locked case files with keys distributed to a select few; (4) secret codes necessary to access pertinent information on electronic hardware; and (5) prohibited

sharing in the fees derived from such litigation." *Cromley v. Board of Education of Lockport Township High School*, 17 F.3d 1059, 1065 (7th Cir. 1994). Although these specific measures apply more easily where the "infected person" is an attorney who has switched sides, analogous measures could have been taken here, where the infected person is an administrative assistant for one side in the suit and a potential client in the other side of the suit. For example, upon learning that Ms. Bradley worked for Ms. Musso, Mr. Vrdolyak could have told her to disclose the connection to Chrysler Financial, to discontinue her access to the *Coburn* and *Ridge* case files, to cease any and all contact with Chrysler's outside counsel on the matter, etc. But he did none of those things.

Mr. Vrdolyak claims that he told Ms. Bradley, immediately upon learning that she worked for Patricia Musso and Chrysler Financial, that she should tell him nothing about her job or her office; he claims he told her that he wanted to limit their discussions to the allegedly discriminatory car transactions. Curiously, Ms. Bradley's testimony is less than entirely consistent on the subject. And even Mr. Vrdolyak acknowledges that he made no attempt to assess whether any of the documents the Bradleys provided were confidential as to Chrysler Financial. All of which leads to the same conclusion: what little effort Mr. Vrdolyak made was not enough to ensure the protection of

confidential information. It is true that Ms. Bradley was transferred out of the OGC, and that her access to case files was limited. But these measures were initiated by Chrysler Financial, not by Mr. Vrdolyak. Had Ms. Bradley not disclosed her contact with Mr. Vrdolyak to Mr. Dodge on June 13, the Court has no reason to think that Mr. Vrdolyak would have taken it upon himself to ensure that Ms. Bradley's access to confidential information was controlled or curtailed.

Moreover, the Court has no confidence that measures taken to protect confidentiality would actually have been complied with. As already noted, the evidence suggests that Mr. Vrdolyak effectively thwarted Judge Castillo's order that he have no contact with Ms. Bradley; despite the order, Mr. Vrdolyak continued to have what Judge Castillo referred to as "proxy contacts" with Ms. Bradley through Sean Howard.

Despite the lack of any institutional mechanisms or safeguards, the record contains evidence that the plaintiffs' other attorneys, in fact, received no confidential information or materials from Ms. Bradley. The record contains either an affidavit or a deposition transcript wherein each of the attorneys representing the plaintiffs discussed the extent of his involvement with the Bradleys. With the exception of Edward Vrdolyak, whose contacts with the Bradleys are detailed above, and William Harte, who attended parts of the Bradleys'

14

depositions, none of the attorneys of record for the *Coburn* and *Ridge* plaintiffs had any contact with Karen Bradley or her husband. And, with the exception of Mr. Vrdolyak, who received a stack of documents from the Bradleys at the Detroit airport, and Chris O'Hara, who received a set of copies of those documents but never read them, none of the attorneys have received any documents from the Bradleys, let alone documents or information that could be classified as confidential vis-a-vis Chrysler Financial. Attorneys Hooks, Pincham and Harte all submitted affidavits swearing that they have not received any information or documents from any current employees of Chrysler Financial. *See* Supplemental Affidavit of William H. Hooks, ¶16; Supplemental Affidavit of R. Eugene Pincham, ¶13; Supplemental Affidavit of William J. Harte, ¶17. Attorney Steve Berman stated that he received one document that could arguably be characterized as confidential, but the document came from an anonymous Chrysler employee long before the Bradleys contacted Mr. Vrdolyak. *See* Supplemental Affidavit of Steve W. Berman in Support of Plaintiffs' Motion to Limit Discovery from Plaintiffs' Counsel, ¶2. Based upon this evidence, the Court is satisfied that Ms. Bradley shared no confidences with the attorneys other than Mr. Vrdolyak.

Mr. Vrdolyak similarly stated that he had received no confidential information from Ms. Bradley. In deciding to

disqualify Mr. Vrdolyak from the *Coburn* case, Judge Castillo outlined some of the inconsistencies in Mr. Vrdolyak's testimony that tended to undermine the Court's confidence in his representations. And this Court agrees that Mr. Vrdolyak's statements are, at times, slippery. But this Court finds it unnecessary to pick at the nits in Mr. Vrdolyak's deposition. One glance at the big picture in this case leads to the inescapable conclusion that Mr. Vrdolyak should no longer be a part of it.

"The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration ... that a court may disqualify an attorney for failing to avoid even the appearance of impropriety." *Commonwealth Insurance Co. v. Stone Container Corp.*, 178 F.Supp.2d 938, 943 (N.D. Ill. 2001) (quoting *International Business Machines Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978)). Mr. Vrdolyak's conduct, both with respect to Ms. Bradley and with respect to other matters, gives off the distinct stench of impropriety.

First, when Mr. Vrdolyak learned that Karen Bradley worked for Chrysler Financial's OGC, he should have stopped dead in his tracks and not made another move without first consulting the Court. His consultation with an ethicist was laudable enough, but he clearly failed to take the ethicist's advice to heart.

16

According to William Harte, the ethicist advised that any representation between Mr. Vrdolyak and the Bradleys "can and should be rescinded . . . ." Transcript of Hearing of June 23, 2003, p. 6. Yet at his deposition, taken a month after the ethicist rendered his opinion, Mr. Vrdolyak said that he had not terminated his representation of Ms. Bradley. Deposition of Edward Vrdolyak, p. 132. Mr. Vrdolyak's deposition testimony makes clear that, despite the ethicist's opinion, he intended to continue to represent Ms. Bradley if the Court permitted him to do so.

Second, the record strongly suggests that Mr. Vrdolyak skirted Judge Castillo's order that he have no contact with the Bradleys pending resolution of the disqualification issue. Despite that order, it appears that Mr. Vrdolyak continued to communicate with the Bradleys through Sean Howard. The telephone records that Chrysler submitted in support of its motion – which, admittedly, tell only part of the story – are damaging to Mr. Vrdolyak; they suggest that Mr. Howard, on several occasions (June 27, June 30, July 2, July 3, July 15, and July 17), called the Bradleys within minutes after talking with Mr. Vrdolyak, or called Mr. Vrdolyak within minutes after talking with the Bradleys, suggesting that Mr. Vrdolyak was using Mr. Howard as a go-between to do what Judge Castillo had ordered him to refrain from doing. Karen Bradley all but confirmed that this was the

arrangement when she said, at her deposition, that Sean Howard called her, in Mr. Vrdolyak's place, because Mr. Vrdolyak could not himself make the calls. Deposition of Karen Bradley, p. 26.

Third, there is some question as to whether Mr. Vrdolyak twisted the Bradleys' allegations into a claim against Chrysler Financial when they, in fact, wanted to sue only the dealership. Karen Bradley stated at her deposition that, when she contacted Mr. Vrdolyak, she had no interest in pursuing a claim against Chrysler Financial. As explained above, the Court is somewhat skeptical that this was the case; Ms. Bradley admitted that she approached Michael Dodge with an offer to walk away if Chrysler Financial would pay her $350,000, and this is utterly at odds with her testimony that her complaint at the time was with the dealership only. Nevertheless, the testimony on the issue is sufficiently inconsistent to give the Court pause. At a minimum, it would seem that Mr. Vrdolyak should have advised his co-counsel that the Bradleys were interested in suing the dealership, and the record contains no evidence that he did so.

Finally, Mr. Vrdolyak testified at his deposition that he and Gerald Gorman, the owner of the Dealerships that are named as plaintiffs in this lawsuit, signed an agreement whereby Mr. Vrdolyak signed a $2.5 million note to secure financing for Mr. Gorman's operations. Even more disconcerting, Mr. Vrdolyak testified that, although he never had to pay anything out on the

18

note, which has apparently since been refinanced, thereby eliminating any risk to Mr. Vrdolyak, he nonetheless receives $10,000 per month from Mr. Gorman. Mr. Vrdolyak testified that he has received payments from Mr. Gorman since 2000, and that he expects to continue to receive the payments throughout the term of the agreement, which is seven years. This arrangement seems questionable on so many levels - for starters, the Court has to wonder whether Mr. Vrdolyak, as Mr. Gorman's attorney, drafted the agreement, which at the end of the day will require Mr. Gorman to pay out $840,000 in exchange for, essentially, nothing. And while Mr. Vrdolyak's side deal with Mr. Gorman might not be enough, in and of itself, to persuade the Court to disqualify him from the case, taken in combination with his behavior with respect to the Bradleys, it affirms that disqualification is the appropriate course.

## CONCLUSION

For the reasons set forth above, the Court finds that a blanket disqualification of all of the attorneys of record for the dealership plaintiffs is unwarranted. The Court finds, however, that Mr. Vrdolyak's conduct, as outlined above, creates the appearance of impropriety, and, based upon that appearance, the Court finds that disqualification is appropriate. Accordingly, the Court recommends that the district court grant Chrysler Financial's motion to disqualify as to Edward R.

19

Vrdolyak and Edward R. Vrdolyak, Ltd., but deny the motion as to the other attorneys of record.

Dated: December 2, 2003

RESPECTFULLY SUBMITTED:

_____
ARLANDER KEYS
United States Magistrate Judge

Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable Wayne R. Andersen. *See* Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1). Failure to object constitutes a waiver of the right to appeal. *Egert v. Connecticut General Life Ins. Co.,* 900 F.2d 1032, 1039 (7th Cir. 1990).