IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RIDGE CHRYSLER JEEP, LLC, d/b/a<br>MARQUETTE CHRYSLER JEEP, et al.,<br><br>Plaintiffs/Counterclaim Defendants,<br><br>v.<br><br>DAIMLERCHRYSLER SERVICES<br>NORTH AMERICA LLC,<br><br>Defendant/Counterclaim Plaintiff,<br><br>v.<br><br>GERALD GORMAN and ELIZABETH<br>GORMAN,<br><br>Counterdefendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 03 C 760<br><br>Judge Virginia M. Kendall |

MEMORANDUM OPINION AND ORDER

**Facts & History**

Two Dodge dealerships, Ridge Jeep of Midlothian, Illinois (hereafter "Midlothian") and

Marquette Jeep of Chicago, Illinois (hereafter "Marquette" and together with Midlothian, the

"Dealerships"), filed a verified complaint on February 3, 2003 against DaimlerChrysler Services

North America LLC (hereafter "Chrysler" or "Defendant"). *See* Verified Cmplt., Docket No. 1. The

Dealerships alleged that Chrysler persisted in a "shocking corporate policy of blatant racial

discrimination and redlining" by refusing to provide financing for African-American customers

purchasing cars at the Dealerships. *Id.* at ¶¶ 1, 4. The Dealerships alleged violation of the

Automobile Dealers' Day in Court Act, as well as state law violations of the Illinois Motor Vehicle

Franchise Act, tortious interference with prospective business advantage, and breach of contract. On the same day, class action plaintiffs filed a related suit against Chrysler for discrimination in lending, *Coburn v. Daimler Chrysler Services North America*, 03 C 759. The *Coburn* matter was assigned to a different judge in this district. The attorneys representing the Dealerships in the matter before this Court also represented the *Coburn* plaintiffs.

Mr. Gerald Gorman (hereafter "Gorman") is the president and owner of both Dealerships. *See* Verified Cmplt. at Verification. Gorman purchased Marquette in 1999 and Midlothian in 2000. *Id.* at ¶¶ 15-16. The basis for the allegations set forth in the Verified Complaint are numerous conversations between Gorman and various Chrysler representatives, portions of which are set forth in quotes in the Verified Complaint. *See, e.g., id.* at ¶¶ 28-39, 59, 62, 73, 106. Gorman personally verified the facts included in the Verified Complaint. The attorneys representing the Dealerships also represented Gorman (the Dealerships and Gorman together "Plaintiffs").

On March 24, 2003, Chrysler filed a verified Counterclaim against the Dealerships, and added Gorman and his wife, Elizabeth Gorman, as counterclaim defendants. *See* Verified Counterclaim, Docket No. 13. Chrysler alleged that Plaintiffs defaulted on the terms of the original loan and security agreements between Chrysler and Midlothian through misleading statements, incomplete records, and payments from Midlothian to Gorman personally. *Id.* at ¶ 36-45. Chrysler alleged that these defaults jeopardized Chrysler's first-priority security interest in Midlothian's collateral. Chrysler also alleged that Marquette made misleading representations to Chrysler over the course of several retail financing contracts between Marquette and Chrysler, which statements caused Chrysler to enter into agreements with Marquette and Marquette customers that it would not have entered but for the misrepresentations. *Id.* at ¶¶ 52-58. Chrysler sought replevin against

Midlothian, damages as against the Gormans for their personal guarantees of the Midlothian loan documents, and damages for breach of contract against both Dealerships.

### *The Temporary Restraining Order*

On April 4, 2003, the Dealerships filed an emergency request for a Temporary Restraining Order ("TRO") against Chrysler. The Dealerships alleged that starting in the spring and summer of 2002, Chrysler had refused to finance vehicle purchases from the Dealerships. Motion for TRO, Docket No. 23 at 5-6. By September 2002, Chrysler had ceased all vehicle financing for the Dealership and started audits of the Dealerships' financials. *Id.* at 6-7. The TRO request also alleged that by December 2002, after completing the audits, Chrysler threatened to stop all pending vehicle orders unless Gorman infused capital into the Dealerships and signed a release of claims against Chrysler, which Gorman refused to sign. *Id.* at 8-9. The TRO request alleged that by early 2003, Chrysler retaliated by restricting factory orders, terminating lines of credit and sending notice of repossession of the floor plan. *Id.* at 10. The Dealerships requested a TRO to reinstate the lines of credit, lift the factory order restrictions, and cease the floor plan repossession. The Dealerships alleged that without the TRO, they would be "forced out of business within days." *Id.* at 14.

On April 11, 2003, the Court granted a stipulated TRO, but only after Plaintiffs met certain conditions set by the Court. Gorman testified via supporting affidavit, filed with Plaintiffs' April 9, 2003 reply brief in support of the TRO, that he had: (i) tried to obtain alternate financing, but had been unable to due so due to the pending litigation, and (ii) put $925,000 of personal, unencumbered funds back into the dealership as working capital. *See* Affidavit of Gerald Gorman, April 9, 2003 at ¶¶ 2, 12, Docket No. 29. Gorman's affidavit specifically stated that the $925,000 "was an investment of personal money and is wholly unencumbered" and that the investment funds came

from "sale of stock certificates and a direct investment from a long time business associate." *Id.* at ¶ 2. The Court commented during the hearings on the TRO that the equity infusion was "essential" because the Court did not believe that "Chrysler Financial should be put in a position where it is in effect writing blank checks for Midlothian and does not have complete assurance that its position is not going to erode if it continues to be a floor plan lender." Tr. of April 8, 2003 Hearing at 16-18, Ex. C to Pltf.'s Objections to June 14, 2005 Ruling, Docket No. 262.

The Court granted a Stipulated Order on April 11, 2003 which, among other provisions, committed Chrysler to restore Midlothian's floor-plan financing for 180 days. The stipulated order stated, "Midlothian represents and warrants that a $925,000 equity capital infusion has been made, which is unencumbered and not to [sic] subject to repayment by Midlothian to the investment source." April 11, 2003 Stipulated Order at ¶ 9, Docket No. 80. Kevin Spivey, Senior Dealer Credit Manager of Chrysler, testified that Chrysler suffered losses of at least $585,464 as a result of the requirements placed on Chrylser by the April 11, 2003 Stipulated TRO. Spivey Aff., Sanctions Ex. S1 at ¶ 10.[1]

### Discovery

After granting the stipulated TRO, the Court referred all discovery matters to the Magistrate Judge. Discovery proceeded, with regular motions to compel, from April 2003 through December 2004. During the discovery period, the Magistrate Judge granted a motion by Chrysler for monetary

---

[1]As discussed below, Chrysler filed two motions for sanctions prompting this opinion. Chrysler filed one set of supporting exhibits for both motions. The two-volume filing, titled "Original Exhibits to Defendant's Motions for Sanctions Against Plaintiffs and Counterclaim Defendant Gerald Gorman for False Statements to the Court and for Failure to Produce and Preserve Evidence" is referenced hereafter as "Sanctions Ex. __." Exhibits to the False Statements motion are lettered; Exhibits to the Failure to Produce & Preserve Evidence motion are numbered.

sanctions against the Dealerships because Plaintiffs caused the delay by failing to comply with damages discovery requests. *See* Docket No. 139.

### *The Disqualification*

In December 2003, on motion from Chrysler, the Magistrate Judge recommended that the Court disqualify the lead attorney for Plaintiffs, Edward Vrdolyak. *See* Report and Recommendation of December 2, 2003, Docket No. 102. Vrdolyak had already been disqualified by the judge handling the *Coburn* matter due to communications between Vrdolyak and a potential *Coburn* plaintiff whom Vrdolyak knew was an employee in the general counsel's office of Chrysler. *Id.* at 5-7. The Magistrate Judge agreed that disqualification would be appropriate in this matter as well, because the potential *Coburn* plaintiff by virtue of her position at Chrysler had access to confidential materials concerning this litigation, and Vrdolyak could have received confidential information about this matter through contact with her. *Id.* at 13-14.[2]

As an additional and supplemental reason for disqualification, the Magistrate Judge noted that Vrdolyak revealed during his deposition that he had signed a $2.5 million note securing financing for Gorman's business operations, and that Vrdolyak received $10,000 per month from Gorman without explanation. *Id.* at 18-19.

On March 2, 2004, Chrysler moved to compel discovery from Vrdolyak concerning an alleged loan of $750,000 made from Vrdolyak to Gorman, which loan formed the majority of the $925,000 capital infusion into Midlothian used to fulfill the Court's requirement for the April 2003 TRO. *See* Docket No. 115. The Magistrate Judge granted Chrysler's motion to compel discovery

---

[2]The Court adopted the recommendation of the Magistrate Judge to disqualify Vrdolyak on September 30, 2004. *See* Docket No. 135.

about the loan.  *See* Docket No. 122.  Discovery on the loan revealed that Vrdolyak was the "business associate" referenced in Gorman's April 9, 2003 affidavit.

### *The Motions for Sanctions*

In October 2004, the Dealerships filed a partial motion for summary judgment, which  the Court took under advisement.  *See* Docket Nos. 136, 151.  On January 12, 2005, the Magistrate terminated his appointment because discovery matters had closed.  *See* Docket No. 171.

On January 26, 2005, Defendant moved for sanctions against Plaintiff via two motions: one for false statements by Gorman in connection with the April 2003 TRO, and a second for deliberate efforts by Plaintiffs to conceal discoverable material.  *See* Docket Nos. 180-182.[3]  The Court entered an order on February 9, 2005 reopening the referral to the Magistrate, who set a briefing schedule on the sanctions motions.  *See* Docket No. 192-93.

Chrysler raised five separate issues of allegedly inappropriate conduct that it believed merited sanctions:

(i) false testimony by Gorman in his affidavit of April 9, 2003, regarding the source of a $750,000 equity infusion;

(ii) false testimony by Gorman in the affidavit of April 9, 2003 regarding Gorman's attempts to obtain alternate financing to that provided by Chrysler;

(iii) false testimony by Gorman in the affidavit of April 9, 2003 and in deposition testimony concerning the Subordination Agreement between Midlothian, Gorman, and Chrysler;

(iv) willful (or at least grossly negligent) failure to turn over to Chrysler a computer containing materially relevant data from Midlothian that could not be obtained elsewhere, as well as other missing financial data from the Dealerships; and

---

[3]  Defendant also moved by separate motion for summary judgment on all counts of the complaint. *See* Docket Nos. 183-185.  The Court has not ruled on this motion.

(v)"missing notes" - handwritten notes by Gorman - that formed the basis of the Verified Complaint.

Chrysler requested that the Court dismiss the Dealerships' complaint or, in the alternative, fine the Dealerships and Gorman, and give adverse instructions to the jury during the trial concerning the impact of the inappropriate conduct.

1. <u>Gorman's Affidavit Testimony regarding the $925,000 Capital Infusion</u>

During the hearings on the TRO in April 2003, the Court expressed concern that if the Court granted the TRO request, Chrysler would be forced to continue to finance a business that it alleged would lose money. Therefore, at the hearing on April 8, 2003, the Court clarified that Gorman would have to guarantee that additional equity had been placed into the Dealerships that would protect Chrysler from further losses. *See* April 8, 2003 Tr., Sanctions Ex. C at 16-17. Gorman swore in an affidavit dated April 9, 2003 that he had obtained $925,000 in late 2002 as additional, unencumbered equity for the Dealerships. According to the affidavit, the sources of the investment were "monies obtained from the sale of stock certificates and a direct investment from a long time business associate." *See* April 9, 2003 Aff. at ¶ 2.

As came to be revealed in late 2004, after Chrysler motioned to compel discovery and testimony from Vrdolyak, the "personal loan from a business associate" was a check for $750,000 to Midlothian (not Gorman) from Vrdolyak, who at the time of the loan was lead counsel for Plaintiffs. Vrdolyak Dep., Sanctions Ex. V, at 96. Additionally, the evidence suggested that the "personal loan" was secured by the assets of Midlothian. Mr. Vrdolyak and Gorman signed a written contract in December 2002 for the $750,000, granting to Vrdolyak "as collateral used cars subject to all UCC filings" and "ownership documents concerning [Midlothian] and companies. . ." *Id.* at

100-104. Although both men testified under oath that their "personal understanding" of this agreement changed a few days later, Vrdolyak also testified at his deposition that he considered the money to be a loan to Midlothian that would be repaid (by either Midlothian or by Gorman personally.) *Id.* at 107-112, 124-26. The $750,000 check was made payable to "Midlothian Dodge" and stated in the memo line that it was a "loan." Gorman Dep., Sanctions Ex. G, at 2166. The bank records showed that the check was deposited into the Midlothian account. *Id.* Although Vrdolyak testified that he considered the loan to be "interest-free," a review of Vrdolyak's finances showed that he had accepted routine payments from Midlothian accounts - not from Gorman personally. Vrdolyak Dep, Sanctions Ex. V, at 127-36; Gorman Dep., Sanctions Ex. G, at 2206-12.

In addition to the $750,000, the "sale of stock certificates" forming the remaining $175,000 of the equity infusion could not be traced clearly to Gorman's personal assets as opposed to Midlothian's assets. At the time of the purchase of the stock, Gorman withdrew money for the purchase from a Midlothian account, and recorded the cash withdrawal as a transfer between Midlothian accounts rather than a stock purchase. Gorman Dep., Sanction Ex. G, at 2094-2101. The stock was issued to Gorman and his wife, not to Midlothian. Hogan Dep., Sanctions Ex. H, at 142-144; Gorman Dep., Sanctions Ex. G, at 2078-2079. Gorman claimed that he transferred the stock to Midlothian at some point prior to the sale, but Gorman remained the owner of record even after the stock had been sold, and still listed the stock as a personal asset when applying for loans in February 2003. Gorman Dep., Sanctions Ex. G, at 2553-2556.

Chrysler alleges that both the $750,000 and the $175,000 were assets of Midlothian rather than Gorman's personal assets, and that the $750,000 portion of the equity financing was encumbered by the assets of Midlothian. According to Chrysler, all of these facts indicate that the

8

April 9, 2003 Affidavit contains false statements, and that the false statements influenced the Court to grant the TRO to the Dealerships to Chrysler's detriment.

### 2. Gorman's Affidavit Testimony about Alternate Funding

Gorman testified in his April 9, 2003 affidavit that he made two attempts to find alternate floor plan financing prior to seeking the TRO, but that banks would not agree to financing due to the pending litigation with Chrysler. *See* April 9, 2003 Affidavit at ¶ 12. But, in his deposition months later, Gorman stated that he had sought financing *after* the TRO had been granted, not before. Gorman Dep., Sanctions Ex. G, at 2174; 2584-86. Additionally, a bank employee who spoke with Gorman about floor plan financing further testified that his banks did not reject Gorman due to the pending litigation at all, but rather due to the size of the financing he had requested. Hogan Dep. at 114-117. Chrysler alleges that these statements directly contradicted the testimony of Gorman in the April 9, 2003 affidavit.

### 3. The Subordinated Note

In 2000, prior to the lawsuit at issue here, Gorman and Midlothian executed a Subordination Agreement with Chrysler, whereby $4.5 million in debt owed by Midlothian to Gorman would be subordinated to the claims of Chrysler. Answer to Verified Counterclaim at ¶ 23. In the Verified Counterclaim, Chrysler alleged that Midlothian made payments toward the $4.5 million owed to Gorman in violation of the terms of the Subordination Agreement. Verified Counterclaim at ¶ 43. In the April 9, 2003 Affidavit, Gorman testified that the $4.5 million debt had been reduced by nearly $1 million. April 9, 2003 Aff. at ¶ 11, Docket No. 29. In their reply brief in support of the TRO, to which the Affidavit provided support, Gorman and Midlothian argued that the Subordination Agreement was a "sliding" note that allowed Gorman to remove money from

Midlothian. Reply Brief at 5-6, Docket No. 28. But, during his deposition in 2004, Gorman argued that the Subordination Agreement was an invalid document. Gorman Dep., Sanctions Ex. G, at 1969-78. Chrysler alleges that the deposition testimony, the Affidavit, and the Answer to the Verified Counterclaim are all inconsistent and indicate false statements by Gorman with respect to the treatment of the subordinated debt.

4. <u>The Missing Financial Data</u>

The Dealerships maintained their financial records and general balance sheet electronically, on a computer and accounting system rented from Reynolds & Reynolds, a data system vendor specializing in auto dealerships. Gorman Dep., Sanctions Ex. G, at 485-92. The data for Midlothian was maintained on a computer located at Midlothian. Temple Dep., Sanctions Ex. T-2, at 68-69. The Dealerships also maintained backup tapes of the information located on their computers in the event that something caused the computer data to be erased. Gilmartin Dep., Sanctions Ex. J-2, at 30-32. The Dealerships also allegedly printed reports of some portions of the balance sheet. Gorman Dep., Sanctions Ex. G, at 485.

Starting in May 2003, Chrysler issued discovery requests to the Dealerships to produce the balance sheet information in both paper and electronic form. The Dealerships responded that they would produce the relevant and non-privileged information they had in their possession. Sanctions Exs. 1 at ¶¶ 23-24; Ex. 2 at ¶ 35. The Dealerships produced some paper records, but not a complete set of the financial records for the relevant periods. They produced most of Midlothian's monthly data from September 2000 through August 2003, Marquette's monthly information in paper form for 1999 and 2002, and backup tapes for Marquette for 1999. The Dealerships did not produce

Marquette's monthly information in any form for 2000 and 2001, or most of the backup tapes, or the electronic balance sheet. Keller Expert Report, Sanctions Ex. K, at 3-6.

Starting in early 2004, Chrysler began to ask about the missing paper and electronic financial information. Chrysler's attorneys specifically requested the electronic version, stating that the "client's financial information – including their general ledgers – was stored on your clients' computers." Sanctions Ex. 3. Counsel for Plaintiffs responded that "all Reynolds & Reynolds material in the possession of the dealerships or owner have been produced." Sanctions Ex. 4. A few days later, counsel for Plaintiffs restated "as for financial records on hard drive or discs, my clients again have none." Sanctions Ex. 5. Counsel for Plaintiffs reiterated in correspondence in May 2004 that "the dealerships have not had access to the Reynolds & Reynolds system since [the dealerships] went out of business." Sanctions Ex. 7. Chrysler never received the data that had been missing since the initial productions in late 2003.

When Chrysler deposed Gorman in June 2004, Gorman testified that there was no computer at Midlothian as of the date of his deposition, and that he did not know the location of any hard drive. Gorman Dep., Sanctions Ex. G, at 505. He testified that he had "checked every square foot" in the Midlothian building, but did not find anything else. *Id.* When Chrysler at last deposed Mr. Temple, the Dealerships' chief financial officer, he testified that Reynolds & Reynolds repossessed the physical computer from Midlothian's offices in October 2004. Temple Dep., Sanctions Ex. T-2, at 68-74. He also testified that he told counsel about the repossession shortly after it occurred. *Id.* at 74. Plaintiffs' counsel did not communicate to counsel for Chrysler that the computer had been repossessed in October 2004.

Chrysler alleges that the financial data from both Midlothian and Marquette contained in the computer would show that Plaintiffs engaged in inappropriate accounting practices that gradually dwindled the value of each of the Dealerships. This, Chrysler alleges, would show that any financial harm to the Dealerships came not from Chrysler's alleged discriminatory lending practices, but rather from the poor management of the Dealerships. Chrysler alleges that Gorman and the Dealerships wilfully withheld the Reynolds & Reynolds computer, containing the electronic financial data for Midlothian, and at least negligently withheld backup tapes and paper records, to the extent such records existed, for both Midlothian and Marquette.

### 5. The Missing Notes

In the Verified Complaint, the Dealerships allege that Chrysler employees made blatantly racist comments to Gorman during company meetings. Verified Cmplt. at ¶¶ 28-39. These allegations are framed as block quotes, rather than general allegations of fact. *Id.* Gorman verified the complaint, and alleged that these block quotes came from notes of several conversations between himself and certain employees of Chrysler. Gorman Dep., Sanctions Ex. G, at 1109-1110. Chrysler issued a discovery request for "all documents" that referred to meetings between Gorman and employees of the Dealerships and employees of Chrysler, and received some handwritten notes, but when asked to point to the racial slurs in those notes, Gorman could not find the quoted passages and suggested that there might have been additional notes that had been lost or given to his attorneys. *Id.* at 684-86, 690-94. Gorman then recanted this statement in a supplemental affidavit in March

2005.[4]  Chrysler alleges that the missing notes improperly formed the basis of a Verified Complaint, when such notes may well have never existed.

### *The Magistrate Judge's June 14, 2005 Opinion*

In his detailed, 48-page Report and Recommendation of June 14, 2005, the Magistrate Judge decided that the combination of evidence presented by Chrysler constituted "clear and convincing evidence" that Gorman had made false statements and that Gorman and/or the Dealerships had concealed relevant discoverable material.  The Magistrate Judge found that "a lesser sanction is inappropriate" and recommended dismissal with prejudice.

The Magistrate Judge found that three issues raised by Chrysler constituted "clear and convincing evidence" of either false statements or willful concealment of evidence: the statements in the April 9, 2003 affidavit concerning the $750,000 loan, and those concerning the attempts to obtain alternate financing, and the failure to turn over the Reynolds & Reynolds computer during discovery.  The remaining factual issues - the $175,000 stock sale, the missing paper data from Midlothian and Marquette, the statements concerning the $4.5 million subordinated debt, and the missing notes - formed additional support for the Magistrate's decision that the case had been tainted with discovery violations and at least misleading statements throughout its course.   Taken in total, and combined with the previous requests for sanctions by Chrysler, the Magistrate Judge found that dismissal with prejudice would be the only appropriate course of action in this case.

---

[4] The Supplemental Affidavit is attached to Plaintiff's Response to Chrysler's Motion for Sanctions for Failure to Produce and Preserve Evidence, Exhibit F. Docket No. 206.

The Plaintiffs timely filed their objections to the Magistrate Judge's report in the summer and fall of 2005.[5]   At the request of the Dealerships and Gorman, the Court held oral argument on the objections on February 24, 2006.

Based on a review of the entire record and the Magistrate Judge's analysis, this Court adopts the Report and Recommendation of the Magistrate Judge and dismisses the case with prejudice.

## Legal Standard

When considering the extreme sanction of dismissing a case with prejudice, the Court is mindful of the admonition that such a step "must be infrequently resorted to by district courts." *See Schilling v. Walworth County Park and Planning Commission*, 805 F.2d 272, 275 (7th Cir. 1986); *United States v. Golden Elevator, Inc.*, 27 F.3d 301, 303 (7th Cir. 1994).   Recognizing that such a harsh sanction should only be used in "extreme situations," this Court reviewed the entire record of this matter to determine whether such "contumacious conduct" existed and "whether less drastic sanctions have proven unavailing." *See Webber v. Eye Corp.*, 721 F.2d 1067, 1069 (7th Cir. 1983). Also aware that the Court's discretion is narrowed when imposing such a harsh penalty, the Court has reviewed Plaintiff's conduct in relation to all aspects of the judicial process.   *See Halaco Engineering Company v. Costle*, 843 F.2d 376, 379 (9th Cir. 1988).

Even recognizing the need for such restraint and review, "there are species of misconduct that place too high a burden. . . for a court to allow a case to continue." *Barnhill v. United States*, 11 F.3d 1360, 1368 (7th Cir. 1993).   Both Rules 37 and 41 permit the Court to sanction a party for failure to comply with discovery orders if the district court finds willfulness, bad faith, or fault,

---

[5]The case was reassigned to this Court as part of the Court's initial docket on January 23, 2006.  Docket No. 274.

especially in circumstances where a pattern of noncompliance with the district court's orders has been established. *See e.g. Ladien v. Astrachan*, 128 F.3d 1051, 1056 n.5 (7th Cir. 1997) (plaintiff's failure to timely produce discovery, his ex parte communication with the court, and his impermissible contact with witnesses warranted dismissal with prejudice); *Newman v. Metro. Pier & Exhibition Auth.*, 962 F.2d 589, 590-91 (7th Cir. 1992) (plaintiff's failure to respond to interrogatories and refusal to be deposed warranted dismissal with prejudice).

When discovery non-compliance, however, is coupled with lies to both an adversary and the Court in order to gain an advantage in the litigation, the Court must step in and impose the ultimate sanction in order to preserve the integrity of the federal judicial system. The Magistrate Judge's Report and Recommendation documents such a pattern of deception on behalf of Mr. Gorman that has so tainted the litigation that the very allegations set forth in the Complaint can not be trusted as being valid.

The case began with serious allegations of discrimination which were supported by the alleged notes that were maintained by Gorman and which formed the basis of his charges against Chrysler. The Court, at the time of the Motion for Temporary Restraining Order, took those allegations to be true, as it was required to do. Relying on the verified complaint, and the seriousness of the allegations, the Court crafted an agreed restraining order to maintain the status of the parties while the litigation ensued. But the Court recognized that Defendant could not be held financial hostage to Plaintiff if Defendant's counterclaims proved to be true – that the termination of the lines of credit was due to the quickly sinking financial condition of the dealerships and their theft of over $1 million to pay debts owed to Mr. Gorman. Relying on the statements of Mr. Gorman that he would infuse unencumbered capital into the operation in order to preserve

Defendant's financial position, Judge Andersen granted the TRO. Meanwhile, Chrysler sought to prove its counterclaims by obtaining the financial records believed to support their claims that were stored on the computers maintained by Plaintiffs.

In the end, the Magistrate Judge's findings, which are thoroughly supported by the record, revealed that notes Gorman used to support the most inflammatory allegations in the Complaint either did not exist, were not preserved, or worse yet, were fabricated in the first place; the computers that could have supported Defendant's defense and counterclaims were concealed and then destroyed in spite of preservation notices and repeated requests by Defendant, and the TRO was entered due, in significant part, to the false statements of Mr. Gorman who lied about both the source and status of the funds that were infused into the dealerships. This intentional conduct on the part of Plaintiffs can not be tolerated in a court of law where judges rely on the sworn statements of witnesses to reach objective decisions on the merits.

**False Statements**

The Magistrate Judge correctly held that Mr. Gorman made two distinct misrepresentations. The first lie occurred in his April 9, 2003 affidavit when he stated that he personally made a $925,000 capital investment into the dealership which was unencumbered. As stated above, the unencumbered nature of the investment was critical to Judge Andersen's decision in granting the TRO. The evidence does not support Plaintiffs' version that the money from Mr. Vrdolyak was unencumbered because a written agreement between Vrdolyak and Gorman provided that the $750,000 loan to Midlothian would give Vrdolyak "as collateral used cars subject to all UCC filings as directed and controlled by First Suburban National Bank and its president" and ownership documents concerning the business and a "pro rata percentage of profits and losses." Vrdolyak

confirmed in his deposition that the money was not a gift and that he expected it to be repaid. Gorman admitted that Midlothian's cash disbursements journal showed payments that were most likely payments made on the loan. The money was originally obtained by Vrdolyak who took out a loan from First Suburban National Bank and then turned over the money to the dealership. Both men intended that Vrdolyak would be repaid and the dealership was responsible for repaying the loan. This evidence clearly shows that the $750,000 was not a "direct investment from a long time business associate" but rather a loan secured by collateral – exactly the situation that the district court judge sought to avoid by requiring an unencumbered asset before entering the TRO.

The Magistrate Judge also correctly held that Mr. Gorman lied to the Court regarding whether he sought to obtain financing from banks prior to Chrysler placing Midlothian on financial hold. Mr. Gorman stated in his affidavit to Judge Andersen that he went to two different banks to try to take out loans to refinance the floor plan at Midlothian. This statement, of course, was critical to that court's review of the Plaintiff's motion for temporary restraining order. If Plaintiffs were unable to obtain any other financing except that from Defendant, in spite of their efforts to do so, the court would give Defendant's withdrawal of financing more weight due to its extreme impact on Plaintiffs than if other financing was available. This lie was made directly to the Court to gain a strategic and economic benefit for Plaintiffs during the litigation and resulted in the Court entering the judicial relief they sought. In truth, the Court relied on a misrepresentation in granting the relief requested; one which would have significantly altered the outcome of that relief, and one might reasonably conclude, such relief would not have been granted but for the misrepresentation.

These two misrepresentations, as set forth and supported by the record, resulted in Plaintiffs obtaining equitable relief to which they were not entitled and placed Defendant in an unfair financial

position by placing it at risk of financial erosion. Therefore, the Magistrate Judge correctly held that lying in a formal proceeding warranted such a sanction, and this Court agrees. *See also ABF Freight System, Inc. v. NLRB*, 510 U.S. 317, 323 (1976)(False testimony in a formal proceeding is intolerable.).[6]

**Failure to Produce and Preserve Evidence**

Because the nature of Defendant's defense and its counterclaims required an analysis of the financial records of the dealerships, Defendant sought to have the dealerships' computers preserved and reviewed, as well as, other financial records including monthly accounting journals, schedules, and notes.

Once again, Mr. Gorman lied in his deposition. This time, he claimed that he had not seen the computers "lying around the store" and did not know where they were in June of 2004. Yet, the dealership's Chief Financial Officer, Shawn Temple, testified that the computers were repossessed by Reynolds and Reynolds about two months before he gave his deposition in December of 2004 – which would mean that the computers were not repossessed until months after Gorman's testimony. The Magistrate Judge correctly held that Plaintiffs concealed the true nature of the location of the computers by stating in April 2004 that they did not have access to the computers. In truth, the

---

[6]The Magistrate Judge correctly refrained from finding that Gorman misrepresented the nature of the $175,000 from Mr. Fitzgibbon and that Gorman lied regarding the $4.5 million subordinated note from Midlothian. The record is not as clearly established on these issues and therefore the Magistrate Judge correctly withheld using the statements as support for his Report and Recommendation that the conduct of Plaintiffs required the dismissal of this case. This exercise of restraint further weakens Plaintiffs' position at oral argument that the Magistrate Judge was biased against Vrdolyak and Plaintiffs. It demonstrates, instead, that the Magistrate Judge objectively weighed the evidence and only relied on those statements that clearly showed that Gorman had lied based on all of the evidence before him.

computers were still on site.  Arguably, and even giving Plaintiffs the benefit of their interpretation, their incomplete answer regarding lack of access was given to mislead Defendant into believing that the computers were not in existence.  In truth, they should have informed Defendant that the computers were on site, that they were being repossessed by Reynolds within the near future, and that if Defendant wanted access to them it would need to seek access through Reynolds.  This type of gamesmanship was employed to prevent Defendant from defending against Plaintiffs' allegations and from supporting its counterclaims and can not be condoned.

Aside from the original computers, computer back-up tapes and journals were also requested during discovery, neither of which were produced.  As for the missing journals from the most relevant years of the dealership, 2000-2001, Mr. Gorman stated originally that they were turned over and then later that he had no idea where they were in spite of his efforts to find them. In spite of Defendant's clear efforts to both seek preservation of these items and then review of them, neither have been produced.  The Magistrate judge correctly concluded that the absence of these items reflects poorly upon the credibility of Plaintiffs and correctly did not rely solely on their absence in reaching his conclusion that a pattern of discovery abuse had occurred in the matter.

The Magistrate Judge did, however, conclude that Mr. Gorman's "missing notes" played a significant role in his findings.  These notes which were the documentation that allegedly supported Plaintiffs' position that a Chrylser representative used explicit racial slurs and expressed extreme racially discriminatory views at meetings with Gorman and Temple, formed the basis for the quoted allegations within the Complaint.  In his deposition, Mr. Gorman stated that he took notes of his meetings with this Chrysler representative during which these inflammatory statements were made and that his notes reflected those meetings and those slurs.  Yet, at deposition, he was unable to point

to any place in his notes where such comments were documented let alone to indicate that any such meetings took place. This led to a six-month period of discovery during which time Defendant sought to locate the notes which Gorman first alleged he gave to his attorney, next that they were lost, and finally, that they may not have existed at all but rather were confused with a five-page written summary of the case. The Magistrate Judge correctly viewed Gorman's testimony in light of his other lies to the court, the missing computers and logs, and his delays in completing timely discovery and held that the answers regarding the notes were meant to mislead the Defendant.

**Pattern of Behavior**

Finally, the Magistrate Judge correctly reviewed the entire record before him and took into account his earlier Report and Recommendation (which was eventually adopted by the court) requiring the disqualification of Vrdolyak due to his complete lack of respect for Court orders and the judicial proceedings. At oral argument, Plaintiffs reiterated their concern that the Magistrate Judge was biased against Vrdolyak and that bias led to this ultimate recommendation for dismissal. A careful review of the entire record reveals no such bias. Rather, the Magistrate Judge frequently refrained from findings where the evidence could be interpreted in favor of Plaintiffs and never relied on that evidence in reaching his conclusions. His careful and meticulous examination of the record is supported by this Court's review of the same.

**Lesser Sanctions are Not Sufficient**

The decision to dismiss a case with prejudice for discovery abuses and false statements is not a decision the Court makes lightly. "[T]he careful exercise of judicial discretion requires that a district court consider less severe sanctions and explain, where not obvious, their inadequacy for promoting the interests of justice." *Schilling v. Walworth County Park & Planning Com'n*, 805 F.2d 272, 275 (7th Cir. 1986). Dismissal with prejudice is appropriate in limited circumstances, "when there is a clear record of delay or contumacious conduct, or when other less drastic sanctions have proven unavailing." *Webber*, 721 F.2d 1067, 1069 (7th Cir. 1983). In the case of dismissal under Rule 37, a slightly different standard applies, and the sanction of dismissal is reserved for cases in which the offending party has demonstrated wilfulness, bad faith, or fault. *See Maynard v. Nygren (I)*, 332 F.3d 462, 468 (7th Cir. 2003) (addressing both dismissal for delay and dismissal for willfulness or bad faith); *see also Long v. Steepro*, 213 F.3d 983, 986 (7th Cir. 2000). Under both these standards for sanctioning, the violating conduct must be clear and convincing. *Maynard I*, 332 F.3d at 468 (remanding sanction of dismissal to district court for explanation of evidence supporting sanction of dismissal). The choice between dismissal and lesser sanctions is a product of weighing three main considerations: (i) prejudice to Defendant as a result of Plaintiffs' conduct, (ii) prejudice to the judicial system, and (iii) deterrence and punishment. *Schilling*, 805 F.2d at 275, *citing Shea v. Donohoe Constr. Co.*, 795 F.2d 1071 (D.C. Cir. 1986); *see also Larson*, 2005 WL 4652509 at *8.

The detailed findings of the Magistrate Judge establish clear and convincing violations by Plaintiffs with respect to the false statements in the April 2003 affidavit underlying the TRO and in the failure to turn over the essential records on the Reynolds & Reynolds computer. Chrysler has provided to the Court a multitude of exhibits supporting its contentions, including affidavits,

deposition transcripts, and letters between counsel, with thorough examinations in its written submissions in support of sanctions. *Compare Maynard v. Nygren (II)*, 372 F.3d 890 (7th Cir. 2004) (affirming after remand a sanction of dismissal after district court credited circumstantial evidence as clear and convincing evidence of untruthfulness).

This clear and convincing evidence reveals that the Plaintiff, Gorman, lied in an affidavit submitted to the court in order to gain a monetary and strategic advantage over Defendant; misled Defendant as to the existence and location of evidence (the computers) which resulted in that evidence not being available for Defendant's use in these proceedings; and either lost key pieces of evidence (notes of his conversations with Defendant's agent) or fabricated their existence in the first instance, in an effort to bolster his position before the court and to inflame the passions of the court and the public. Each of these abuses can not be remedied by a monetary fine because each has resulted in damage that can not be remedied.

In the case of the false affidavit, it was due to this lie, in significant part, that the Court entered an order requiring Defendant to continue to provide floor plan financing to Plaintiffs during the pendency of this action. That false representation was bolstered by another – that plaintiff had sought financing from two other sources but could not obtain it due to the pendency of the litigation. These false statements were made to weight the scale on Plaintiffs' behalf in order to convince the district court judge that it was imperative that Defendant continue its business relationship in spite of their vehement objection to do so over concerns that they would be pumping money into a sinking concern. As a result of that extension of financing, Defendant has lost approximately $500,000 – a monetary loss that it expressly professed to the Court as a real possibility when they opposed the extension of financing to Plaintiffs. That money would not have been lost had the appropriate

unencumbered asset been provided as part of the Court's order. Aside from the monetary loss, Defendant was placed in a position that required them to continue to do business with an entity and with individuals that it strongly believed had breached contractual obligations and had engaged in improper accounting practices and possible unethical conduct.

Second, the allegations of discriminatory intent that were proclaimed throughout the Complaint – allegations that were publicly disseminated – were used strategically before the district court to emphasize the seriousness of the charges. Those serious accusations had greater import due to the affirmation that they were direct statements from agents of Defendant and were documented at the time they were made. The quoted sections within the Complaint are extreme examples of discriminatory intent. Defendant rightfully sought the full disclosure of the notes in order to determine the veracity and seriousness of the accusations. When those notes were not produced and the testimony regarding their existence became so muddled that even their original existence is in question, Defendant was placed at an extreme disadvantage in attempting to defend against such serious and inflammatory allegations.

Third, the computers that were withheld from the defense could have supported Defendant's theory that the withdrawal of floor plan financing was due to the financial incompetence of Plaintiffs and not from discriminatory motivations. Defendant took all appropriate steps to preserve that evidence to support its defense and counterclaims, yet Plaintiffs either intentionally concealed their existence until they were destroyed or acted with such incompetence that they were eventually destroyed. Either way, this critical evidence is lost forever and now Defendant is left to reconstruct its theories from spotty records and incomplete books. A monetary sanction can not bring that evidence back to life.

There is no doubt that Chrysler has been prejudiced by the conduct of Plaintiffs throughout this case. The Court relied upon Gorman's affidavit to compel Chrysler to enter into a TRO that cost Chrysler in excess of half a million dollars. Chrysler has defended itself in this lawsuit for more than three years, and the discovery materials withheld by Plaintiffs are the key elements to Chrysler's defense to the claims alleged by Plaintiffs. *Compare Marrocco v. General Motors Corp.*, 966 F.2d 220 (finding that plaintiffs' "willful and unexcused violations" of a protective order resulting in the destruction of evidence "certainly qualify as contumacious conduct.")

As to the prejudice to the legal system from Plaintiffs' conduct, this case merits the harsh sanction of dismissal. The pattern of behavior exhibited by Plaintiffs included at least one prior incident of being fined for their abuse which demonstrates that the monetary sanction had little or no impact on deterring them from acting in the inappropriate manner in which they did. The Magistrate Judge correctly identified the difficulties during discovery which led to his eventual order requiring Plaintiffs to reveal the source of the money presented as part of the April TRO. Plaintiffs did not willingly reveal Vrdolyak's role in the TRO money, requiring the Magistrate Judge to hold hearings to determine the source of that money. These are not the actions of truth-seeking individuals intent on having their day in court, but rather, sleight of hand tactics of manipulators seeking to use the federal court system to their own advantage. Plaintiffs' actions with respect to the discovery violations constitute *contumacious* violations, having continued for nearly two years despite repeated requests from counsel for the Defendant, initially polite, and then increasingly firm, as the records and information essential to Defendant's defense were not forthcoming. Even lacking prejudice to the non-offending party, a Court is entitled to say "enough is enough" in the face of flagrant violations by one party. *See Larson*, 2005 WL 4652509 at *9.

The Court notes also that the completed settlement of the class action plaintiffs in the *Coburn* case gives the Court comfort that the individual consumers who purchased vehicles from Midlothian and Marquette have been compensated. The allegations in the matter before this Court involve only the dealerships and Gorman; therefore, the decision to dismiss this case with prejudice will not result in harm to those customers of the dealerships even if the conduct alleged in this suit occurred. That matter has been resolved and is not pending before this court.

Finally, the Court finds that punishment and deterrence of conduct like Plaintiffs' requires dismissal with prejudice rather than a lesser sanction. Plaintiffs request in their motion to reconsider the Magistrate Judge's ruling that the Court consider lesser sanctions, such as fines against Plaintiffs or adverse jury instructions at trial. But the harm to Chrysler in this case cannot be cured by monetary sanctions. This is not a matter of missed status calls or late filings, causing inconvenience and delay to Chrysler and the Court. This is a matter of *lost or concealed evidence* - essential evidence - that directly flows from Plaintiffs' conduct, and a TRO forcing Chrysler to continue to do business with Plaintiffs based on Plaintiffs' untruthful statements. These violations cannot be cured through fines, and adverse jury instructions cannot replace lost evidence essential to a case.

While it is true that Plaintiffs will be prejudiced by the decision to dismiss this case with prejudice, the harm to Plaintiffs is more than outweighed by the harm to Chrysler and to the legal system as a whole that would flow from any decision to allow Plaintiffs to continue to prosecute their case under these circumstances.

## Conclusion

The Magistrate Judge correctly concluded that Mr. Gorman made false statements in the affidavit he filed on April 9, 2003 and that those statements led, in part, to the Court order that

required Chrylser to extend additional floor plan financing to Plaintiffs, which in turn caused Chrysler to suffer additional losses. The Magistrate Judge correctly concluded that Mr. Gorman misled Chrysler during discovery which resulted in the computers that contained valuable evidence not being preserved for this dispute. The Magistrate Judge correctly concluded that Mr. Gorman either lied or misled Defendant regarding the notes which formed the basis for the allegations of discriminatory intent in the Complaint to the extent Defendant is able to pursue them.

Because Defendant can not properly defend against allegations that have been supported by such lies, and cannot build its counterclaims against Plaintiffs without evidence that has been destroyed or concealed, monetary sanctions can not suffice to repair the harm inflicted on this case and on the judicial system as a whole. The harsh sanction of dismissal of this case is warranted and that will be the order of this Court. The Court denies the Motion for Default Judgment on the Counterclaims and those counterclaims will remain in the case.

The Court adopts the Report and Recommendation and its reasoning in its entirety. The Complaint is dismissed with prejudice.

So ordered.

Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: September 6, 2006